# Exhibit "A"

*Gary M. Vilke, M.D., FACEP, FAAEM*
*11582 Normanton Way*
*San Diego, California 92131*
*(619) 666-8643*

May 30, 2019

Christina Vilaseca
Senior Deputy County Counsel
County of San Diego
1600 Pacific Highway, Room 335
San Diego, CA 92101

*RE: A.B., et al v. County of San Diego, et al.*
*Case: CV15-08441 JAK (AJWx)*

## Introduction

I am a board-certified emergency department physician with substantial experience in sudden cardiac arrest and sudden cardiac death, including my service as the Medical Director of the American Heart Association Training Center at the University of California, San Diego Center for Resuscitation Science for over seven years. I am also an independent researcher on the effects of position and weight force on human physiology, spit masks, the physiologic effects of TASER electronic control devices (ECD's), and in-custody cardiac arrest and deaths. My specific qualifications will be outlined in more detail at the end of this report.

I have been retained as an expert to review relevant materials and provide expert opinion on this matter on whether the actions of the Riverside Sheriff's Office employees, including the use of restraint, a spit mask, or a TASER ECD caused or contributed to the death of Mr. Kristopher Birtcher on October 14, 2017. After careful review, it is my opinion to a reasonable degree of

medical certainty that Mr. Birtcher's cardiac arrest and death on October 14, 2017 was not caused by or related to the restraining process, the spit mask, or the TASER ECD. More likely than not, Mr. Birtcher's sudden cardiac arrest and death was caused by a combination of methamphetamine cardiac irritability, agitation and continued resistance and struggling due to his methamphetamine intoxication. These opinions and related opinions are set forth in the expert report.

## Materials Reviewed

I have reviewed extensive materials pertaining to the above referenced case. This includes, but is not limited to:

1. Plaintiff's Complaint for Damages
2. San Diego Sheriff's Department Follow-up Investigative Report
3. Taser Downloads
4. Autopsy Report
5. Hobby Lobby video
6. WinCo video
7. Body Worn Camera Video of Deputy Crawford
8. Body Worn Camera Video of Deputy Noble
9. Body Worn Camera Video of Deputy Kodadek
10. Body Worn Camera Video of Deputy Stalzer
11. EMS Run Report

## Medical and Scientific Literature

Chan TC, Vilke GM, Neuman T, Clausen JL: Restraint position and positional asphyxia. Ann Emerg Med 1997;30(5):578-586.

Chan TC, Vilke GM, Neuman T: Reexamination of custody restraint position and positional asphyxia. Am J Forensic Med Pathol 1998;19(3):201-205.

Vilke GM, Chan TC, Neuman T, Clausen JL:  Spirometry in normal subjects in sitting, prone, and supine positions.  Respir Care 2000;45(4):407-410.

Chan TC, Vilke GM, Clausen J, Clark R, Schmidt P, Snowden T, Neuman T:  The impact of oleoresin capsicum spray on respiratory function in human subjects in the sitting and prone maximal restraint positions, final report.  NCJ 182433.  Washington, DC: United States Department of Justice, National Institute of Justice, 2000, 68 pages.

Chan TC, Vilke GM, Clausen J, Clark RF, Schmidt P, Snowden T, Neuman T:  The effect of oleoresin capsicum "pepper" spray inhalation on respiratory function.  J Forensic Sci 2002; 47(2):299-304.

Chan TC, Neuman T, Clausen J, Eisele J, Vilke GM:  Weight force during prone restraint and respiratory function.  Am J Forensic Med Pathol 2004;25(3):185-189.

Michalewicz BA, Chan TC, Vilke GM, Levy SS, Neuman TS, Kolkhorst FW.  Ventilatory and metabolic demands during aggressive physical restraint in healthy adults.  J Forensic Sci 2007;52(1):171-175.

Reay DT, Howard JD, Fligner CL, Ward RJ.  Effects of positional restraint on oxygen saturation and heart rate following exercise. Am J Forensic Med Pathol. 1988 Mar;9(1):16-8.

Schmidt P, Snowden T. The effects of positional restraint on heart rate and oxygen saturation. J Emerg Med 1999;17:777-782.

Savaser DJ, Campbell C, Castillo EM, Vilke GM, Sloane C, Neuman T, Hansen AV, Shah S, Chan TC.  The effect of the prone maximal restrained position with and without weight force on cardiac output and other hemodynamic measures.  J Forens Leg Med. 2013 Nov;20(8):991-5. Epub 2013 Aug 30.

Sloane C, Chan TC, Kolkhorst F, Neuman T, Castillo EM, Vilke GM.  Evaluation of the Ventilatory Effects of the Prone Maximum Restraint Position (PMR) on Obese Human Subjects. Forens Sci Int 2014;237:86-9. Epub 2014;46(6):865-72. Epub 2014 Feb 14.

Ho JD, Dawes DM, Moore JC, Caroon LV, Miner JR: Effect of position and weight force on inferior vena cava diameter--implications for arrest-related death. Forensic Sci Int. 2011 Oct 10;212(1-3):256-9.

Kroll MW, Still GK, Neuman TS, Graham MA, Griffin LV.  Acute forces required for fatal compression asphyxia: A biomechanical model and historical comparisons.  Med Sci and the Law.  2017 Jan 1:25802417695711. [Epub ahead of print]


Vilke GM, Bozeman WP, Chan TC.   Emergency Department Evaluation after Conducted Energy Weapon Use:  Review of the Literature for the Clinician.  J Emerg Med 2011;40(5):598-604. Epub 2011 Jan 4.

Swerdlow CD, Fishbein MC, Chaman L, Lakkireddy DR, Tchou P. Presenting Rhythm in

Sudden Deaths Temporally Proximate to Discharge of TASER Conducted Electrical Weapons. Acad. Emerg. Med. 2009;16:726-739.

Kroll MW, Lakkireddy D, Rahko PS, Panescu D.  Ventricular Fibrillation Risk Estimation for Conducted Electrical Weapons: Critical Convolutions.  Conf Proc IEEE Eng Med Biol Soc 2011:271-7.

Panescu D, Kroll M, Brave M.  Limitations of Animal Electric Cardiac Safety Models.  Conf Proc IEEE Eng Med Biol Soc. 2014:6483-6.

Panescu D, Kroll M, Brave M. Cardiac Fibrillation Risks with TASER Conducted Electrical Weapons. Conf Proc IEEE Eng Med Biol Soc. 2015:323-9.

Lutz M, Sloane CM, Castillo EM, Brennen JJ, Coyne CJ, Swift SL, Vilke GM. Physiological Effects of a Spit Sock.  Am J Emerg Med. 2018 Oct 3. [Epub ahead of print].

Vilke GM, Payne-James J, Karsch SB.  Excited Delirium Syndrome (ExDS):  Redefining an Old Diagnosis.  J Forens Legal Med. 2012;19:7-11.

Vilke, GM, Bozeman WP, Dawes DM, DeMers, G, Wilson MP.  Excited delirium syndrome (ExDS): Treatment options and considerations.  J Forens Legal Med. [Epub 2012 Jan 24]

Vilke GM, DeBard ML, Chan TC, Ho JD, Dawes DM, Hall C, Curtis MD, Costello MW, Mash DC, Coffman SR, McMullen MJ, Metzger JC, Roberts JR, Sztajnkrcer MD, Henderson SO, Adler J, Czarnecki F, Heck J, Bozeman WP. Excited Delirium Syndrome (ExDS): Defining Based on a Review of the Literature.  J Emerg Med. [Epub 2011 Mar 24]

Wilson MP, Vilke GM. The patient with excited delirium in the emergency department. In Zun LS, Chepenik LG, Mallory MNS editors. Behavioral Emergencies: A handbook for emergency physicians. Cambridge: Cambridge University Press; 2013.

Hughes, E.L., Special Report, Special Panel Review of Excited Delirium, Less-Lethal Devices Technology Working Group, NIJ Weapons and Protective Systems Technologies Center, Penn State.

White Paper Report on Excited Delirium Syndrome. ACEP Excited Delirium Task Force, http://ccpicd.com/Documents/Excited%20Delirium%20Task%20Force.pdf; September 10, 2009.

Jauchem J. Pathophysiologic changes due to TASER devices versus excited delirium: Potential relevance to deaths-in-custody? J Forensic Leg Med. May 2011;18(4):145-153.

Bell, L. On a form of disease resembling some advanced stages of mania and fever, but so contradistinguished from any ordinary observed or described combination of symptoms as to render it probable that it may be overlooked and hitherto unrecorded malady. American Journal of Insanity. 1849; 6:97-127.

**Overview of Opinions**
**(all opinions within this report are to a reasonable**
**degree of medical or scientific probability)**

An overview of my opinions is as follows with more description of each below:

1. *The restraining process did not cause the sudden cardiac arrest and death in Mr. Birtcher.*

2. *The use of the TASER ECD on Mr. Birtcher did not cause or contribute to his cardiac arrest or death.*

3. *The placement of a spit mask on Mr. Birtcher did not cause or contribute to his cardiac arrest and death.*

4. *There was no evidence that the Sheriff's deputies failed to timely provide medical assistance to Mr. Birtcher.*

5. *I agree with the medical examiner that Mr. Birtcher died from a sudden cardiac arrest due to his acute methamphetamine intoxication that occurred while he was restrained.*

6. *Mr. Birtcher was demonstrating clinical findings consistent with excited delirium syndrome (ExDS) that contributed to the need for the deputies to use force to restrain him.*


**Analysis**


After reviewing the above listed materials, it appears that at about 1600 on October 14, 2017, Mr. Kristopher Birtcher, who was 34 years old, weighed 165 lbs and was 5'8.5" tall at the time was taken into custody by San Diego County Sheriff's Deputies when he was noted to be acting in a bizarre behavior outside of a hobby store. The psychiatric emergency response team (PERT) members were evaluating him and they noted him to be acting in a manner that would be

consistent with drug intoxication. At some point, Mr. Birtcher suddenly became aggressive. Deputies attempted to use a TASER ECD several times. The first use seemed to have some effect, but Mr. Birtcher pulled out the probes. The other uses of the TASER ECD were reported to be ineffective and Mr. Birtcher began to run away. The deputies caught up with him and took him to the ground and attempted to get him restrained in handcuffs. Several bystanders attempted to help the deputies as Mr. Birtcher was exhibiting very aggressive and strong behavior.

During the attempts to restrain him, deputies used some distraction strikes to assist. Eventually other deputies arrived and helped with the restraining process including placing both hands into separate handcuffs and then clipping them together. Additionally, a hobble restraint was placed on his legs because he kept kicking and struggling. Blood was noticed coming from his face and a spit mask was placed for protection of the deputies from blood exposure.

Mr. Birtcher was initially under a car bumper and was pulled out and rolled onto his side. During this time, he was yelling and screaming; however, he then became less responsive and deputies assessed his well-being. They determined that he had a weak pulse and shallow respirations. They had him on his side for better monitoring and then decided to give him naloxone to reverse a potential opioid overdose causing this decreased level of consciousness. They adjusted his handcuffs prior to giving the medication in case he became aggressive once again when the medication took effect. The deputy that administered the naloxone felt that Mr. Birtcher had a mild response with regards to some facial movement and improved respirations after administration.

Paramedics arrived shortly after and assessed Mr. Birtcher.   EMS was on scene for almost four minutes before moving him by gurney towards the ambulance.  Right after loading Mr. Birtcher onto the gurney, paramedics determined that he had stopped breathing and he was moved to the back of the ambulance where CPR as well as advanced cardiac life support measures were initiated.  Mr. Birtcher was transported to Palomar Medical Center but could not be resuscitated and

was pronounced dead in the emergency department at approximately 1632 on October 14, 2017.

An autopsy was performed, and the cause of death was ascribed by the medical examiner as due to "Sudden cardiac arrest while restrained" with "acute methamphetamine intoxication" listed as a contributing factor.

Given this history, there are a number of issues that need to be addressed in more detail below. All opinions given are to a reasonable, or higher, degree of medical probability based on the information currently available.

### Detailed discussion and basis of opinions

1. ***The restraining process did not cause the sudden cardiac arrest and death in Mr. Birtcher.***

During the period that Mr. Birtcher was being handcuffed, he was restrained in a prone position with possibly a certain amount of weight placed on him initially to gain control over him. After Mr. Birtcher was cuffed he was seen in the video and reported to continue kicking and resisting. He was yelling and screaming, breathing and struggling and without any evidence of respiratory or ventilatory difficulty during this time.

The weight force used on Mr. Birtcher was variable as there was changing of positions and movement. When Mr. Birtcher was being handcuffed under the car and the spit mask was placed, he was clearly moving and breathing without any difficulty ventilating. Then he was moved from under the car and had no weight on him at all. Some weight was subsequently being placed to maintain him in position and keep him from getting up. The body camera video of Deputy Kodadek shows one deputy with partial weight of his left knee on Mr. Birtcher's right mid back

with two other hands with some pressure being placed on the upper back and left shoulder region. (see image below) There were also deputies holding some partial body pressure to maintain control of the legs. The time that this weight was being placed was approximately two minutes.



The majority of the weight force was not even on Mr. Birtcher in such a position that would have created the potential to limit ventilation. The weight on the legs would have no impact on ventilation. The weight placed on the shoulders and upper back while placing the hobble would not significantly limit ventilations enough to cause asphyxiation. Research using up to 220 lbs. of weight on a subject's back has not shown to cause physiologic changes that would imply asphyxiation is even possible with that amount of weight.

Finally, the end-tidal CO2 noted by paramedics when they arrived was low at 8 mm Hg. If Mr. Birtcher had been asphyxiated by the restricting of chest wall movement due to weight and compression, he would not have been able to ventilate and breathe out carbon dioxide (CO2). Over

the time of asphyxiation, he would have built up high levels of CO2, the earliest clinical indicator of asphyxiation. This would have led to a buildup of CO2 in the lungs and when the paramedics started ventilating him with the breathing tube, the end tidal CO2 that they measured would have been extremely high. In the case of Mr. Birtcher, the end tidal CO2 levels were abnormally low, meaning this could not be asphyxiation. The low CO2 levels at the time of initiating ventilations are consistent with a cardiac arrest not related to ventilatory failure, but rather cardiac arrest, the heart stopping.

Given that Mr. Birtcher was alive and resisting before, during, and after the hand-cuffing, and that the cardiac arrest occurred suddenly later in time, the effort to restrain and handcuff him did not cause or contribute to Mr. Birtcher's death. Nor is there any evidence that he was asphyxiated particularly, but not solely, based on the end tidal CO2 levels. There is no evidence that position, restraint or body weight caused or contributed to Mr. Birtcher' death.

2. **The use of the TASER ECD on Mr. Birtcher did not cause or contribute to his cardiac arrest or death.**

There are no peer-reviewed published scientific or medical literature that conclusively demonstrates that TASER Electronic Control Devices (ECD), also known as Conducted Electrical Weapons (CEWs) and other such monikers, cause cardiac dysrhythmias or cardiac arrest in humans utilized in the probe mode over the chest transcardiac (over the heart) axis. There is theoretical modeling that describes how a TASER ECD could possibly cause cardiac arrest over the transcardiac axis with an embedded ECD dart with a very close dart-to-heart distance (DTH), but these circumstances are not present with Mr. Birtcher. In the case of an anterior chest deployment of a TASER probe, the modeled risks of going into ventricular fibrillation (VF) are estimated to be 1 in 2.5 million to 1 in 2.87 million for anterior chest probe deployments. More than 2.26 million

volunteer subjects have undergone TASER ECD activations, and none have ever been reported to develop sudden cardiac arrest or die. Just because a TASER ECD was used at some point before a person's death, does not imply contribution or causation to his death.

According to the autopsy report Mr. Birtcher was not thin, but rather of normal body habitus. Mr. Birtcher was 68.5" in length and weighed 165 pounds; which gives Mr. Birtcher a body mass index (BMI) of 24.7 kilograms per meter squared ($kg/m^2$) (BMI of 26.1 is considered normal). Mr. Birtcher had one TASER ECD probe located in the left abdomen with no probes in his chest, close to his heart, or with a very close DTH.

The investigative reports reflect that Deputy Robledo first used his TASER ECD in probe mode, when the prongs made contact and Mr. Birtcher fell to the ground. Mr. Birtcher was then reported to pull the prongs out. Deputy Robledo then used a second TASER ECD cartridge into the back of Mr. Birtcher while he was running, but it had no effect, and Mr. Birtcher kept on running. Deputy Garza used his TASER ECD but the first cartridge was not effective and therefore he tried a second cartridge which also was not effective in causing neuromuscular incapacitation.

The TASER ECD download of Deputy Robledo's device demonstrates one trigger pull for a total activation time of 8 seconds with an overlapping 3 second arc discharge from the first cartridge. The second cartridge registered a 2 second activation. The TASER ECD download of Deputy Garza's device demonstrates one trigger pull for a total activation time of 5 seconds from the first cartridge. The second cartridge registered a 5 second activation.

For an ECD to deliver a charge to the person, the electrical circuit must be completed and maintained. Thus, as a point of clarification, just because the TASER ECD downloads recorded 20 seconds of total activation/discharge time from the TASER ECD, does not mean that the TASER ECD were indeed in sufficiently close contact with the subject and delivering the electrical stimulus for that amount of time. Nor, does it indicate in what mode of ECD use, or what degree of

neuromuscular incapacitation (NMI), if any, was induced. Even after the TASER ECD activation, Mr. Birtcher was still struggling and fighting for more than five minutes. If the TASER ECD had "electrocuted" Mr. Birtcher, his heart would have gone into a VF at the time the electricity was being delivered and he would have immediately lost consciousness at the time that the TASER ECD was discharging or within 1-2 seconds after stopping. Subjects in VF cannot fight or struggle, let alone remain conscious as the blood flow to the brain ceases immediately.

For one to possibly conclude that a TASER ECD could even be considered to cause cardiac arrest, basically all the following facts would need to be present:

1) The device probes would need to be penetrating deep into the chest directly over the heart with a very close DTH. Even for cardiac capture, which is not synonymous with VF, in a human an ECD dart would have to be within 16.7 millimeters (mm); in a swine model the closest DTH documented to achieve capture was 25.2 mm, and up to 8 mm for VF. For an ECD to induce sufficiently rapid capture or VF in a human would require a DTH of about 4-6 mm;

2) The subject would need to have a thin chest wall. In the case of Mr. Birtcher, even an ECD dart directly over his heart would not have been sufficiently close enough to induce capture, let alone VF, because he was not a thin walled individual;

3) The subject to be standing at the time of the TASER ECD activation and leaning forward so that the heart is closer to the anterior chest wall and the ECD dart closest to the heart;

4) The subject would need to lose consciousness immediately during the TASER ECD activation or with 1-2 seconds after; and

5) The first cardiac rhythm would need to be VF.

All of these would be needed to even consider the TASER ECD as the cause of death, but in this case with Mr. Birtcher, none of these facts are present. So again, the published scientific data

as well as the objective evidence available in this case conclusively confirms that the use of the TASER ECD was non-contributory or causal to the cardiac arrest and death of Mr. Birtcher.

   3. **The placement of a spit mask on Mr. Birtcher did not cause or contribute to his cardiac arrest and death.**

   Mr. Birtcher had a spit mask placed on him for the personal protection of the deputies while he was being maintained in restraints. This is reasonable and prudent given his agitation and lack of compliance coupled with close proximity of the deputies near the face of Mr. Birtcher.  Mr. Birtchner was told not to spit, but on the video he could be seen spitting bloody material, so the mask was placed.

   The mask is made of a thin mesh and paper material that covers the entire head.  This material allows for air to pass through and does not impede one's ability to breathe.  Even if pulled tightly over the nose and mouth, air passes through and allows for respirations.  The material of the spit mask is similar in permeability compared with masks covering the noses and mouths of physicians and nurses in the operating room or construction workers for hours at a time without problems.  There was no clinical evidence that Mr. Birtcher was unable to breathe through the spit mask, as demonstrated by no reported labored breathing, no cyanosis, no coughing or gagging.  Mr. Birtcher was active and moving as well as talking and yelling while in the spit mask. And to date, there are no reports in the medical literature that identify spit masks as a cause of asphyxiation. There is research to demonstrate that the spit mask will not impede the ability to breathe or ventilate.  The use of the spit mask did not cause or contribute to Mr. Birtcher's sudden cardiac arrest or death.

   4. **There was no evidence that the Sheriff's deputies failed to timely provide medical assistance to Mr. Birtcher.**

The compliant claims that the defendants "failed to timely provide medical assistance to DECEDANT." The sheriff's deputies summoned for EMS assistance while they were getting Mr. Birtcher restrained and controlled. During the time interval while waiting for the EMS to arrive, the deputies repeatedly checked on Mr. Birtcher's well-being, including assessing his breathing and pulse. When he had a reduction in his breathing pattern and his pulse became weaker, the deputies treated Mr. Birtcher with naloxone, a medication that treats potential opioid overdoses and reverses respiratory depression and weakened pulse. They not only gave him one dose, but they repeated the medication and gave him a second dose. They continued to monitor his breathing status as well as check his pulse which were both present up until the time the paramedics arrived. Therefore, it is my opinion that the deputies were appropriate in their delivering of medical care which they were capable to Mr. Birtcher while awaiting EMS arrival, and they called EMS in a timely manner while managing Mr. Birtcher. There is no evidence that the deputies failed to timely provide medical assistance to Mr. Birtcher.

5. ***I agree with the medical examiner that Mr. Birtcher died from a sudden cardiac arrest due to his acute methamphetamine intoxication that occurred while he was restrained.***

Mr. Birtcher had methamphetamine and amphetamine reported in his urine toxicology screen on autopsy. Methamphetamine is a sympathomimetic illicit drug that acts as a stimulant. Methamphetamine has a number of physiologic effects, including increasing heart rate and blood pressure. It can cause delusions, paranoia and increased agitation, as well as sweatiness, elevated temperatures and jitteriness. The drug itself is irritating to the heart tissue and can cause changes in cardiac rhythm and is not an uncommon cause of cardiac arrest. Clinically, Mr. Birtcher was stressing his heart to the extreme that day.

This severe exertional activity creates lactic acid by the muscles working so hard and

increases the work of the heart. Lactic acid is the chemical that builds up when a person exercise's and feels the muscles "burn." That burn is from the lactic acid and when in the blood stream, will also lower the pH and make the blood more acidic. The acidic blood is also a cardiac irritant, increasing the risk for sudden cardiac arrest.

Finally, all of this exertion and activity from the running and struggling as well as the methamphetamine use increases the heart's need for blood flow. This cardiac increased demand, if not met, will also be a cardiac irritant and increase risk for sudden cardiac arrest. Thus, in summary, Mr. Birtcher was exerting himself to exhaustion and using methamphetamine leading to increased cardiac demand, increased blood acidosis and the direct toxic effects of methamphetamine, all of which are stressing his heart, until the heart finally failed and went into cardiac arrest. The methamphetamine use and extreme exertion in combination is the probable cause of his sudden cardiac arrest. Thus, I agree with the medical examiner that Mr. Birtcher died from a sudden cardiac arrest due to his acute methamphetamine intoxication that occurred while he happened to be restrained and continued to be aggressive and struggling. But as noted earlier, I do not think that the restraint position had any physiologic impact in directly or indirectly causing the cardiac arrest. And it should be noted that the hobble restraint actually reduces and limits the ability of the restrained individual to exert himself and produce lactic acid and consume oxygen, and thus would actually be protective compared to ongoing running and struggling using flexion and extension of the body's large muscle groups.

6. ***Mr. Birtcher was demonstrating clinical findings consistent with excited delirium syndrome (ExDS) that contributed to the need for the deputies to use force to restrain him.***

Excited Delirium Syndrome (ExDS) is a syndrome most commonly caused by use of

stimulant drugs like cocaine, methamphetamine or PCP and presents typically with aggressive and often paranoid behavior, but can also be caused by uncontrolled and untreated psychiatric illnesses, particularly schizophrenia. In fact, the original description of ExDS symptoms was in psychiatric patients. And in the days before there were medications to treat these patients, the mortality rate was reported at 75%. Currently, the majority of cases occurs in subjects using illicit drugs and is a significant cause of sudden cardiac arrest. ExDS from the use of stimulant drugs is not from an overdose of the drug, but rather a reaction that occurs at regular recreational levels. This is why levels measured at autopsy are not found to be significantly elevated or toxic. ExDS is not an overdose.

Classically, people suffering from ExDS are delusional often hallucinating or paranoid, are hyperactive, may be violent despite threats or overwhelming force, fight inappropriately, be inappropriately dressed for the conditions or take off their clothes or do actions to cool themselves down, may be sweaty, have elevated body temperatures, and are often breathing fast. They are also often destructive and described as having superhuman strength. Some have reported an attraction to glass or mirrors.

The actual pathophysiology of ExDS is complex and not well understood. Anatomic and molecular evaluation of ExDS patients who die has focused primarily on postmortem brain examinations. Results demonstrate a characteristic loss of the dopamine transporter in the striatum of chronic drug abusers who die with clinical presentations consistent with and a diagnosis of ExDS. This suggests that one potential pathway for the development of ExDS is excessive dopamine stimulation in the striatum.

Even more supportive of central dopamine stimulation as a pathway is the fact that hypothalamic dopamine receptors are responsible for thermoregulation. These disturbances of dopamine neurotransmission may help explain the profound elevated temperatures reported in many

ExDS patients as well as elevated levels of heat shock proteins, which are found in nearly every cell and act to protect cell proteins from a variety of stressors. The central dopamine hypothesis also provides a link to psychiatric etiologies and the delirious presentation in patients with ExDS.

==ExDS places the individual at increased risk for sudden death syndrome,== felt by most experts to be caused by an irregular or stoppage of the heartbeat, caused by the increased stress and work on the heart by the excited, over-stimulated, agitated physical state. There are data that this state is caused by a central brain effect and changes in neurotransmitter receptors. Once the heart goes into an irregular beat or stops, blood flow through the body ceases and shortly thereafter, the subject will lose consciousness due to lack of blood flow to the brain and stops breathing. Often, law enforcement officers or medical personnel will notice that the subject has quieted down, thinking that he has finally calmed down and given up the fight. Then a short time later is when someone will identify that the subject is suddenly in cardiac arrest.

==Mr. Birtcher demonstrated a number of symptoms consistent with ExDS.== He was agitated and was delusional. He was not following commands consistently and was impulsive. He did not show evidence of tiring despite heavy struggle and near continuous activity. He was not responsive to the deputy presence and multiple people trying to control him and continued to resist. He had a high tolerance to pain as evidenced by the fact that he was reported to show essentially no pain impact by the TASER ECD when applied to his body, by pulling out the TASER ECD probes. He was breathing fast and continued yelling and keening. He was described as very strong and the deputies had difficulty getting him handcuffed. Finally, the initial cardiac rhythm of pulseless electrical activity is also common for ExDS. All of these are clinical findings of ExDS.

==ExDS has a significant mortality rate and requires medical therapy to optimize outcomes,== with most experts in agreement that the sooner therapy is initiated, the better. The medical community does not expect law enforcement to make a diagnosis of ExDS, as a number of medical

issues such as hypoglycemia, thyroid storm, seizures or delirium tremens can mimic ExDS by causing altered mental status. Law enforcement's role is to secure a scene and get a violent or agitated or altered person safely restrained so that medical personnel can then perform an assessment and initiate treatment as appropriate. Thus, the behavior exhibited by Mr. Birtcher was consistent with ExDS from his methamphetamine use and required the deputies to use force in order to get him safely restrained in preparation for medical evaluation by EMS.

## Background

My background is that I am a full-time faculty member in the department of emergency medicine at the University of California, San Diego Medical Center. I am residency trained and board certified in Emergency Medicine. I work full time as a practicing clinician in the Emergency Department of a busy urban hospital and serve as the clinical operations chief for our two emergency departments with a combined annual census of approximately 70,000 visits. I currently serve as the Medical Director for Risk Management for the UC San Diego Health System. I also serve as the UCSD Medical Center's Medical Risk Management Committee Chair and Allocation Committee Co-Chair, as well as previously having served as the Chair of the Patient Care and Peer Review Committee, each of which are charged with the task of reviewing medical records and making determinations of standard of care. I am also the former Chief of Staff for the UCSD Medical Center.

I have worked for over 25 years as a faculty emergency physician at an urban-based emergency department that is contracted to receive patients who are in custody, both as field arrests and for on-going care while incarcerated. I served as the UCSD Director of Custody Services overseeing hospital services for the San Diego County Sheriff's Department Medical Services for

16 years.   I also have worked in a jail setting for over 18 years, staffing weekly sick call clinics on site at the San Diego Sheriff's jails throughout San Diego County.  I have also served as the on-site medical director for the San Diego Sheriff's medical clinics for 16 years where I have trained staff physicians, participated in quality assurance, resource utilization, policy and protocol development and peer review.  I have also overseen the physician staffing for seven jails in San Diego County over that time.  During my career, I have evaluated thousands of patients over the last 25 years who are agitated and require the use of calming medications and restraints.

I am knowledgeable of peer-reviewed medical and scientific research on the physiological effects of positional restraint and positional asphyxia conducted by others. I have also performed extensive clinical research on human subjects who have been restrained in various positions and with various amounts of weight being placed (articles included in my curriculum vitae) which includes having directly been involved with hundreds of subjects being restrained and studied, hundreds of patients restrained during my work in the emergency department and have personally been restrained with weights placed on me as well.   I have been invited to lecture nationally and internationally on this subject.  Given my own interests in this area, I regularly perform a complete review of the literature regarding restraints and in custody death.

I am knowledgeable of peer-reviewed medical and scientific research on spit masks, also known as spit socks.  I have performed research and written several peer reviewed papers on this topic.  I have been personally had a spit mask placed on me and know how it functions.  Given my own interests in this area, I regularly perform a complete review of the medical literature regarding spit masks.

I am knowledgeable of peer-reviewed medical and scientific research on TASER electronic control devices (ECDs) conducted by others.  In fact, I was the lead author on work requested by the American Academy of Emergency Medicine (AAEM) to review the totality of the peer

reviewed published medical literature on humans and come to conclusions regarding the necessary emergency department evaluation of patients being seen after receiving a TASER ECD activation. I have received federal grant funding and performed extensive clinical research on human subjects who have received TASER ECD applications (articles included in my curriculum vitae) which includes having been involved with over 200 TASER ECD activations and have personally received multiple applications of the device. I have written several book chapters on this topic and have lectured internationally about the physiologic effects of TASER ECDs.

I was the lead author on work requested by the American College of Emergency Physicians (ACEP) to review the totality of the body of literature on the topic of Excited Delirium Syndrome (ExDS) and wrote up the findings of the expert consensus panel's white paper. I have published a number of peer reviewed papers on the topic, have been grant funded by the National Institute of Justice to study patients with ExDS and invited to write multiple text book chapters on the topic of ExDS. I have also been invited to lecture nationally and internationally on the topics of Excited Delirium Syndrome.

I am knowledgeable of peer-reviewed medical and scientific research for cardiac arrest and CPR practices. I was the Principle Investigator for San Diego's Resuscitative Outcomes Consortium (ROC) site, a National Institute of Health (NIH) funded study for ten years that involved over 200,000 cardiac arrest patients to evaluate treatment options for out of-hospital cardiac arrest and severe traumatic injury. I have published many peer-reviewed papers on the topic of cardiac arrest and cardiac resuscitation, including publications in the New England Journal of Medicine, JAMA, and Circulation. I also served as the Medical Director of the American Heart Association Training Center at the University of California, San Diego Center for Resuscitation Science almost ten years, teaching Advanced Cardiac Life Support (ACLS) both locally and being asked to give lectures on cardiac arrest internationally. I had been an ACLS instructor for over 20

years.  I also work at a busy urban comprehensive emergency department where I care for patients in cardiac arrest on a regular basis.

As per Rule 26 formatting, Appendix A is a copy of my current Curriculum Vitae, which includes a list of all publications authored by me.  Appendix B is a list of all cases in which I have testified as an expert in trial or deposition within the preceding four years.  Appendix C is my fee schedule.   The knowledge base that I utilize has been developed over time from my years of clinical practice and experience, reading and training as well as research.  Under penalty of perjury, I hereby swear that the opinions stated above are true and correct within a reasonable degree of medical probability.


Respectfully submitted,

Gary M. Vilke, M.D., FACEP, FAAEM
Professor of Clinical Emergency Medicine
Vice-Chair, Clinical Operations Emergency Medicine
Medical Director, Risk Management, UC San Diego Health System
Medical Director, Carlsbad Fire Department and AirLinkUSA