# Exhibit "C"

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

_____

A.B., etc., et al.,                    ) CASE NO.:

                                       ) 3:18-cv-01541-MMA-LL

            Plaintiffs,                )

                                       )

vs.                                    )

                                       )

COUNTY OF SAN DIEGO,                   )

et al,                                 )

                                       )

            Defendants.                )

_____   )


DEPOSITION OF GARY M. VILKE, M.D.

PAGES 1 - 130

SAN DIEGO, CALIFORNIA

JULY 19, 2019


REPORTED BY:  AMORITA A. LEDESMA, CSR NO. 12852

<pre>
 1                 UNITED STATES DISTRICT COURT

 2                 SOUTHERN DISTRICT OF CALIFORNIA

 3    _____

 4    A.B., etc., et al.,                 )CASE NO.:

                                          )3:18-cv-01541-MMA-LL

 5             Plaintiffs,                )

                                          )

 6    vs.                                 )

                                          )

 7    COUNTY OF SAN DIEGO,                )

      et al,                              )

 8                                        )

               Defendants.               )

 9    _____)

10

11

12             DEPOSITION OF GARY M. VILKE, M.D., taken by

13    the Plaintiffs, commencing at 9:04 a.m., on Friday,

14    July 19, 2019, at 1350 Columbia Street, Suite 703,

15    San Diego, California, before Amorita A. Ledesma, CSR,

16    Certified Shorthand Reporter in and for the State of

17    California.

18

19

20

21

22

23    REPORTED BY:  AMORITA A. LEDESMA, CSR NO. 12852

24

25
</pre>

1    APPEARANCES:

2    For the Plaintiffs:

3        LAW OFFICE OF JOHN FATTAHI

         BY:  JOHN FATTAHI, ESQ.

4        21250 Hawthorne Boulevard, Suite 700

         Torrance, California 90503

5        (424)999-5579

6    For the Defendants:

7        OFFICE OF COUNTY COUNSEL

         BY:  CHRISTINA VILASECA, ESQ.

8        1600 Pacific Highway, Room 355

         San Diego, California 92101

9        (619)531-5805

10

11

12

13

14

15

16

17

18

19

20

21

22

23   ///

24   ///

25   ///

<pre>
 1                    I N D E X

 2   WITNESS:  GARY M. VILKE, M.D.

 3

 4   EXAMINATION BY                              PAGE

 5   MR. FATTAHI                                  5

 6

 7                  INDEX OF EXHIBITS

 8   NO.               DESCRIPTION               PAGE

 9   Exhibit 15        20-page report dated       10
                       May 30, 2019

10

     Exhibit 16        11-page document entitled   10
11                     Deposition Testimony

12   Exhibit 17        Nine-page document entitled 10
                       Birtcher v. City of San Diego

13

14

15

16

17

18

19

20

21

22

23   ///

24   ///

25   ///
</pre>

1          GARY M. VILKE, M.D.,

2    having been first duly sworn, testified as follows:

3

4              EXAMINATION BY MR. FATTAHI

5

6    BY MR. FATTAHI:

7    Q.    Good morning again, Doctor.

8          Can you, please, state your full name and

9    spell your last for the record.

10   A.    Gary Michael Vilke.  V, as in Victor, i-l-k-e.

11   Q.    And you've had your deposition taken a number

12   of times before?

13   A.    I have, yes.

14   Q.    How recently?

15   A.    Probably in the last couple of months.

16   Q.    Okay.  So we can dispense with the usual --

17   with the monologue at the beginning?

18   A.    Yes.

19   Q.    If you don't understand any of my questions,

20   will you, please, let me know?

21   A.    Yes.

22   Q.    And if you need to take a break, will you,

23   please, let me know that.

24   A.    Yes.

25   Q.    Did you bring some documents with you today to

Imagine Reporting 619.888.0297

```
 1   talks about head injury having impacts.  I didn't
 2   address that in my report.  I have thoughts on that.
 3   And I think that was -- I think that was most of the
 4   stuff that was out of their reports that I would have an
 5   opinion on.
 6        Q.   And did you list all the facts and data that
 7   you were relying on in forming your -- at least opinions
 8   you had at the time of your report inside your report?
 9        A.   I mean, all the facts I have are encompassed
10   in my notes.  Every single time and date stamp are not
11   in there, in my reports, so they're larger -- sort of
12   more of a microscopic level, but the general important
13   parts are listed in my report, but the details are in my
14   notes.
15        Q.   Okay.  And what's your opinion on the cause of
16   death for Mr. Birtcher in this case?
17        A.   He had a sudden cardiac arrest, and again, he
18   was restrained.  I don't typically put in that in there,
19   but I agree with the medical examiner.  He was
20   restrained at the time, and I think it was attributable
21   to the methamphetamine intoxication agitation and
22   continued resistance.
23        Q.   Is it your opinion that the cause of his death
24   was excited delirium syndrome?
25        A.   I think he had signs and symptoms consistent
```

1  with it.  It's a fine line.  I wasn't going to opine

 2  specifically on that diagnosis, but I think the -- he

 3  certainly met criteria to call it that, but I wasn't

 4  going to call it a cause of death.  I was just going to

 5  stick with the methamphetamine intoxication and

 6  resistance.

 7      Q.   And what would be the mechanism of death for

 8  Mr. Birtcher, then, if you're saying it was due to

 9  intoxication by the meth and the resistance?

10      A.   It's basically a cardiac arrest.  The

11  methamphetamine is a cardiac irritant, the resistance

12  pattern, fighting and struggling creates lactic acid.

13  That's a cardiac irritant.  The agitation sort of all

14  rolls into that as well.  And so increases heart rate.

15  It increases agitation.  Lactic acid is an irritant.

16  And then all that strains and stresses the heart and can

17  cause a sudden cardiac event.

18      Q.   And what specifically would that studden

19  cardiac event be?  Just a cardiac arrest?

20      A.   Correct.  The heart stopping.

21      Q.   So what would be the progression of cardiac

22  rhythms in that case from when he started the contact

23  with the police officers until when he was in cardiac

24  arrest?

25      A.   In this case, he had been in a PEA rhythm,

1 can be consistent with somebody on meth intoxication or

2 sort of tweaking on methamphetamine or a combination of

3 psychosis, and then he escalated up, and so certainly,

4 he met clinical criteria.  Call it excited delirium

5 syndrome.  But just looking at the presentation, he

6 wasn't as violent as one would typically see in these

7 cases.  Again, you can define it as such based on

8 criteria, but it just presented more of a

9 methamphetamine intoxication out in public, agitated,

10 and then accelerated into a struggle.

11   Q. Was it your understanding from your view of

12 the materials that he was agitated before he was

13 contacted by law enforcement?

14   A. He was not necessarily agitated in the sense

15 of destructive or violent, but just, as I understood,

16 talking to himself, acting in a bizarre, non-typical

17 behavior.

18   Q. Would you say that he was in a state of

19 delirium, but maybe not agitated delirium at that point?

20    MS. VILASECA:  I'm going to object to the

21 extent that it calls for speculation.

22    THE WITNESS:  There could be a delirious

23 component.  I didn't hear a specific component to

24 say that he was hallucinating, but talking to

25 yourself can be consistent with somebody who has

1      delusions.

2    BY MR. FATTAHI:

3      Q.   And you said that these signs and symptoms

4    were consistent with excited delirium, at least at some

5    point.

6          What signs and symptoms were clinical markers

7    for excited delirium did you observe in Mr. Birtcher?

8      A.   Again, sort of that cusp of delirium, talking

9    to yourself behavior, had significant strength, had

10   consistent struggle, despite overwhelming force,

11   persistence, resistance.  He didn't seem to tire.  He

12   kept fighting and struggling against that.

13         He was doing a lot of screaming and keening

14   behavior, sort of just moaning out, yelling out, but not

15   really comprehensible most of the time.  And I think

16   that's probably the major ones.  He had meth in his

17   system as an etiology.

18     Q.   Is there a list of about ten -- or maybe

19   exactly ten different clinical criteria that have been

20   used for trying to determine if it's an excited delirium

21   patient or not?

22     A.   There have.  There are a list of those, yes.

23     Q.   And do you know who originally formulated that

24   list of ten?

25     A.   I think when you try -- the exact number ten

1     A.    If one is able to have a change in response,

2     you can certainly see an increase in heart rate and

3     blood pressure and agitation.

4     Q.    Could it increase catecholamine potentially?

5     A.    In somebody who is able to increase their

6     catecholamine responses, yeah.  Sure.

7     Q.    And did you have information in your review of

8     this case that Mr. Birtcher was placed to maximum

9     restraints?

10     A.    Defined as legs with a leg restraint and then

11     the hobble clipped.  I believe he was placed in maximum

12     strength hobble position.

13     Q.    Which would be, in other words, connected

14     between some sort of restraint around the waist and then

15     in a separate restraint around the ankles connected

16     together?

17     A.    They define them as either to the handcuffs or

18     to a waist restraint, yes.

19     Q.    I guess the -- was it your understanding that

20     his ankles were, essentially, pulled up back in the

21     direction of his butt by the restraint devices?

22     A.    Correct.

23     Q.    And was it your understanding that some

24     deputies -- one or more deputies were using body weight

25     to try to push his ankles toward his buttocks?

1    A.    At some point, there was body weight used to

2    help put the legs down there in that position so the

3    clips could be placed, yes.

4    Q.    What's your understanding of how long there

5    was body weight used to push the ankles towards the

6    buttocks?

7          Did you try to time that out?

8    A.    For that, I didn't try to time out, because it

9    doesn't impact my opinions.

10   Q.    And did you have information that EMS was on

11   the scene for about four minutes before Mr. Birtcher was

12   placed on the gurney and moved toward the ambulance?

13   A.    That was about the right time, yes.

14   Q.    What's your understanding of why they did not

15   immediately start putting Mr. Birtcher on the gurney

16   when they arrived?

17   A.    That there was still some adjustments going on

18   with restraints and that there was no -- I think there

19   was no medical need to move him over.  They were

20   assessing him and so letting law enforcement complete

21   their task.

22   Q.    Is it your understanding that EMS didn't

23   assess Mr. Birtcher until that, approximately,

24   four-minute time period was concluded?

25   A.    I think they were assessing him when they

arrived.  That's what they do.  They look at patients to
see what they're doing while they're getting a report
and history.

Q.   And what position was Mr. Birtcher in when the
paramedics did arrive on scene?

A.   I believe he was back into -- he got moved
back into a prone position.

Q.   And what was your understanding of his medical
condition at that point?

A.   At that point, he was breathing.  They had a
pulse, and he was not actively doing any movement or,
you know, responsiveness from that perspective.

Q.   Do you believe he was conscious at that point?

A.   He appeared to be more unconscious at that
point.

Q.   And were deputies monitoring his pulse and
breathing when the paramedics arrived?

A.   They were, yes -- or at least up to the point
where the paramedics arrived.

Q.   Did you have some understanding if
Mr. Birtcher was observed to have shallow breathing?

A.   I believe somebody noted that, which is why I
believe they utilized the Narcan.

Q.   And did you have an understanding that
Mr. Birtcher had a low pulse at some point or that he

```
 1   was noted to have a low pulse?

 2        A.   I can't remember if it was a low pulse or a

 3   weak pulse.

 4        Q.   Or a weak pulse?

 5        A.   I think there was a note to have a weak pulse.

 6        Q.   And did you have some information that it was

 7   observed that he had pinpoint pupils at some point?

 8        A.   I recall somebody using that term.  They're

 9   going to give him the Naloxone, but I can't remember

10   specifically when.

11        Q.   Do you have any medical explanation for why he

12   would have had pinpoint pupils at that point or at any

13   point during this incident?

14        A.   That would be less typical of an amphetamine,

15   you know, overdose, or even a cardiac arrest.  People

16   get dilated, so everything that would happen in his time

17   course, at some point, you would expect to see a larger

18   set of pupils, but I can't explain why somebody noted

19   that.

20        Q.   Do you -- strike that.

21             Could you see his pupils at any point during

22   any of the videos to tell if they were dilated or

23   constricted, or did you try to do that?

24        A.   I didn't try to do that.  I'm trying to think

25   of parts of the videos where he's -- possible -- maybe
```

```
 1   on his stomach a in shot there, but I certainly didn't

 2   look for it specifically.

 3        Q.   And is it your understanding that after the

 4   post-mortem toxicology was conducted, there were no

 5   opiates in his system?

 6        A.   That's what I recall as well, yes.

 7        Q.   And do you think that it's possible that he

 8   had some sort of positive reaction to the Naloxone that

 9   was provided to him?

10        A.   You know, Naloxone is a specific opioid

11   antagonist.  Although, with certain other types of

12   things, we do see some changes sometimes.  People with

13   alcohol particularly sometimes get a little response,

14   but in general, you wouldn't expect to see a significant

15   response in somebody not on opioids or alcohol.

16        Q.   Would you expect to see any response in

17   somebody who's not on the opioids or alcohol?

18        A.   That's a good question that I never looked

19   into.  I would get a feeling probably not.  I wouldn't

20   expect it.

21        Q.   Did you try to make a determination of how

22   long Mr. Birtcher was in a prone position from when he

23   was first, essentially, held onto the ground by the

24   third and the fourth deputies until he was rolled into

25   the recovery position for the first time?
```

1    A.    From that period, I didn't -- it was -- didn't

2    try to get an exact amount of time there, because he was

3    breathing and -- the whole time that he was in the

4    position there, so it wasn't impacting his ventilations.

5         The time period was a number of minutes, but

6    it wasn't a long period of time, so I looked at it, but

7    I didn't try to put an exact number on it.

8    Q.    Other than yelling, did you observe anything

9    else that led you to believe that he was actually

10    breathing during that time period, such as the rise and

11    fall of his chest?

12    A.    In the video, it's difficult to see.    He

13    certainly was doing some moving and some resisting and

14    adjustments as far as that goes, but the yelling was

15    probably the most telling portion at that point.

16    Q.    Did you try to make any determination of how

17    long of a time period Mr. Birtcher had his chest

18    subjected to some degree of compression by body weight?

19    A.    The answer is, to some degree, yes.    I was

20    looking up where weight was being placed and for what

21    time periods, and then whether -- as far as whether

22    there were gaps between those, meaning rolling him off

23    and giving him a chance, if there was any need, to

24    recover and breathe, so --

25    Q.    What was the longest period of significant

Imagine Reporting 619.888.0297

1    A.   That's what I recall.  I think about four

2    minutes, and then we randomized them in different

3    positions, and then we measured blood oxygen levels and

4    other measurements.

5    Q.   And in the report, did you write that it's

6    unlikely that a period of exercise would stimulate all

7    the physiologic alterations that occur with struggle and

8    agitation?

9    A.   Sounds like something that would be a

10   reasonable comment in the limitation section.

11   Q.   Right.

12        Is that something that's fairly common in

13   published peer-reviewed works, that you have to disclose

14   the limitations of the study in order to publish it?

15   A.   That's the honesty of going with what you

16   should and shouldn't interpret out of a paper.  Yes,

17   that's common.

18   Q.   Did you rely at all on the weight force during

19   prone restraint article that was based on the 50 and 100

20   pound -- I'm sorry -- the 25- and 50-pound weights and

21   people placed in the prone restraint position?

22   A.   I sort of rely on everything.  It's important

23   to know the literature that's out there.  It's all part

24   of the database that says that small amounts of weight

25   don't affect the position.  Doesn't affect it.  Large

1     positions don't affect it.

 2            So at varying points during the interaction

 3     here, they're small amounts or maybe more weights.  They

 4     all apply.

 5         Q.   And that study -- just so we're talking about

 6     the same thing, it's on Page 3.  I believe it's the

 7     fourth one down.  "Weight Force During Prone Restraint

 8     and Respiratory Function."

 9            Do you remember that study?

10         A.   Yes.

11         Q.   Okay.  When was that study performed to actual

12     test portions of it?

13         A.   It was in 2004.  In general, in the 12 to 24

14     months prior to publication.  That's just based on

15     estimations on how long it takes to get things published

16     and in print and stuff like that.

17         Q.   Is it possible that was -- the actual study

18     was performed in 1999 or 2000 for that publication?

19         A.   You know, it's possible because I know we did

20     an abstract early on, and we get busy with things.

21     Sometimes we don't get to writing of the paper for

22     awhile.  So it's possible, sure.

23         Q.   And that study, that was published in 2004 and

24     involved ten subjects; is that right?

25         A.   That sounds reasonable.  I don't remember

1    specifics of all the studies, but that sounds about

2    right.

3        Q.   And was there any requirement that the test

4    subjects perform any exercise before or during that

5    test?

6        A.   I don't believe this had any exercise

7    component.  I believe we just put them in the positions

8    and measured their levels.

9        Q.   And in contrast to the 1997 study, in the

10   study published in 2004, there was weight placed on

11   people's backs, correct?

12       A.   Correct.

13       Q.   In what portion of their back -- or on what

14   portion of their back was the weight placed?

15       A.   They were placed in the center portion of the

16   upper torso.

17       Q.   And what type of weights were used?

18       A.   They were -- I believe these are sandbags in

19   this case, because I think we were making a mess with

20   those, but -- yeah.

21            We had -- I think we used sandbags placed sort

22   of midline and then out on the upper torso between the

23   shoulder blades.

24       Q.   And were the test subjects screened for

25   pulmonary function in sitting positions and projected if

baseline force vital capacity or forced respiratory volume or acceptable limits?

A. Probably. I don't remember specifically. We usually had some screened because you can't reproduce data.

Q. And were those also healthy volunteers for that study?

A. I think, in general, they were relatively healthy volunteers.

Q. And the maximum in that study was 50 pounds, correct?

A. Correct.

Q. So then in 2007, your publication of the study -- you reference on Page 8 that your report came out, right?

A. Yes. The Michalewicz study.

Q. Can you spell that for the court reporter.

A. I was going to say. We were going to get there at some point. M-i-c-h-a-l-e-w-i-c-z.

Q. And when was that study performed?

A. Again, sort of -- estimating backwards, usually within, you know, 12 to 24 months of the publication. Sometimes longer. Sometimes a little less.

Q. And were those healthy volunteers in that

Imagine Reporting 619.888.0297

1      study?

2              A.    Yes.

3              Q.    Did they have to pass a drug test before they

4      could engage in that study?

5              A.    Yes.

6              Q.    And were they restrained in any way?

7              A.    In the weight portion of -- there's two

8      portions of that study.  So a part where the weight was

9      placed, because there is so much weight being put on the

10     back, we were unable to restrain them with handcuffs.

11             Q.    So they were basically lying in a prone

12     position with their arms straight out to their sides?

13             A.    Correct.

14             Q.    And to be clear, by "straight," I don't mean

15     perpendicular, but parallel to the body.

16             A.    Parallel to the body, but not in a position to

17     use it to push up or jerk up.

18             Q.    Were any of these studies videotaped?

19                   In other words, somebody videotaping the test

20     subjects to make sure if somebody wants to watch later,

21     they can see exactly what was done?

22             A.    They were not.

23             Q.    And was that the study that used the lead

24     filled bags that were positioned between the shoulders

25     and midback?

1       A.   Yes.   Yeah.

     2       Q.   And you used weight that was proportionate to

     3  the weight of the subjects?

     4       A.   There was a two -- yeah.   The two break-out

     5  periods.   If you're above a certain weight or below a

     6  certain weight, you got a little bit more or a little

     7  less depending on which category.

     8       Q.   If you were under 165 pounds, I believe, if

     9  that sounds familiar, you used to up to 200 pounds, and

    10  above that, it was 220 pounds?

    11       A.   And I think it was actually 225, if I'm

    12  remembering correctly.   But yes, that sounds about right

    13  for the breakdown.

    14       Q.   Were two subjects' data excluded from the

    15  study because they were psychologically not able to

    16  tolerate the restraint?

    17       A.   Correct.

    18       Q.   And the total number of subjects for the

    19  study, was it 27?

    20       A.   I thought we were shooting for 30, but I don't

    21  remember exactly if it was 30 and then we lost two or it

    22  was 32 and came back to 30.   I'd have to read that

    23  specifically to see how they were.

    24       Q.   And there were two parts to the study.   One of

    25  them involved the heavy weights up to 220, correct?

1     A.   Correct.

2     Q.   What was the other part?

3     A.   The other part was to try to determine how

4  much oxygen one could consume in the maximum restraint

5  position, and so you exercise them on a treadmill to

6  find out what their oxygen consumption was and

7  utilization and then do the same measurements with them

8  in full restraint to see could they possibly use a lot

9  of oxygen when they're being restrained relative to how

10 much their body had the capability of using, and that

11 was the -- what was being measured in those two parts.

12    Q.   And for the portion involving the weights, was

13 there some exercise before the weights were placed?

14    A.   I don't believe we exercised them before the

15 weights.

16    Q.   Was there some element of that study that was

17 referred to as sort of a struggle?

18    A.   That was a part in the restraints, so exercise

19 them on the treadmill, see how much oxygen one can

20 consume, put them in the restraints, and move and

21 resist, and the person who could use the most oxygen, so

22 to speak, would get a reward to try to encourage them to

23 flex and extend those muscles to try to burn as much

24 oxygen as soon as possible.

25    Q.   And it was for up to 60 seconds of struggle?

1        A.    I believe that was the time period, yes.

2        Q.    And at that point, when they were struggling,

3   there was no weight placed on their backs, correct?

4        A.    That's correct.

5        Q.    Did the test subjects in that study have a

6   higher aerobic fitness level?

7        A.    I believe they did, yes.

8        Q.    And what does MVV mean?

9        A.    MVV is Maximum Minute Ventilation.  It's how

10  much air you can blow out in a one-minute period.

11       Q.    Is it Maximum Ventilation Volume?

12       A.    MVV oh MMV?

13       Q.    MVV.

14       A.    Yeah.  MVV is Maximum Ventilation Volume.

15  Yes.  It's how much air you can move out within a period

16  of time.

17       Q.    And did MVV decrease as more weight was placed

18  on the subject's back?

19       A.    There were some changes that would reduce

20  that, yes.

21       Q.    Are you familiar with a 1999 case study by

22  Dr. Hick and some other colleagues about metabolic

23  acidosis and restraints in cardiac arrest?

24       A.    I reviewed that at some point, yes.

25       Q.    Did you write a letter to the editor with the

1     A.   I don't recall checking IVC.  I thought we

2   just did a chest cutout.  I don't remember an IVC issue

3   being measured.

4     Q.   Have you done any studies that involve placing

5   weight on the lower back of somebody who is in a prone

6   position?

7     A.   Nothing -- nothing formally published, no.

8     Q.   Have you had any published studies involving

9   applying weight to the lower back -- or applying weight

10  to the hips of somebody who's in a prone position?

11    A.   Same thing.  Nothing formally published.

12    Q.   Have you ever studied somebody who's in a

13  delirious state or tried to replicate a delirious state

14  in someone who's being tested for the effects of prone

15  restraint or maximum restrained position?

16    A.   We've done no studies with regard to restraint

17  position measuring of physiology and delirium or drug

18  involvement.

19    Q.   Have any of the test subjects in your

20  restraint-related studies been subjected to Taser

21  applications?

22    A.   Restraint studies?

23    Q.   The ones that we just talked about.

24    A.   These, no.  Sorry.

25    Q.   Yeah.

```
 1        A.    In one of our studies, we saw that, yes.

 2        Q.    And do you know what the make and model used

 3   to Mr. Birtcher was?

 4        A.    Make and model.  It was the full mesh one.  I

 5   think -- I'd have to look it up, but it's nothing how --

 6   with the paper mask across the front.  So it was pure

 7   mesh all the way around.

 8        Q.    And are you aware of any cases in which

 9   somebody died and it was reported to have been caused at

10   least in part by having inadequate breathing because of

11   a spit sock?

12        A.    I'm not aware of it, no.

13        Q.    Have you been aware of occasions where that

14   claim has been made before?

15        A.    I'm aware of claims that have been made but

16   not scientifically shown.

17        Q.    Has it been suggested that the spit sock can

18   become saturated to the point where a person can't

19   adequately ventilate through it?

20        A.    It's been suggested, yes.

21        Q.    Do you know if that's been studied?

22        A.    I've not seen the study where they've looked

23   at it formally.  I've done some informal research with

24   soaking spit socks and -- but nothing published yet.

25        Q.    Okay.  Has there been any peer-viewed formally
```

1    published studies about the safety of spit socks in

2    medical literature?

3         A.   Yes.

4         Q.   What was that?

5         A.   I think it was actually in reference here.

6    Lutz and myself published it.

7         Q.   Is that on Page 4?  Top third?

8         A.   Yes.

9         Q.   Okay.  And that has been published in print?

10        A.   Yes.

11        Q.   Okay.  And was that a pilot study?

12        A.   There's no more coming out of that one, but it

13   was a study looking at, I think, people.

14        Q.   Did that start as a pilot study to determine

15   if it could lead to more -- a larger study?

16        A.   It was not intended to go to a larger study,

17   but actually to go to subsequent studies looking at

18   different spit masks and then different levels of liquid

19   on it and stuff like that.

20        Q.   And that study, it was done on healthy

21   volunteers, true?

22        A.   Correct.

23        Q.   It wasn't trying to replicate the

24   circumstances that spit socks are used in the field by

25   law enforcement or EMS?

```
 1        A.   It was just purely looking at the spit sock,

 2   correct.

 3        Q.    And the subjects were seated and comfortably

 4   resting?

 5        A.   Yes.

 6        Q.   There was no other restraints used besides the

 7   spit sock?

 8        A.   Correct.

 9        Q.   Did they engage in any physical exercise in

10   that study?

11        A.   They did not.

12        Q.   Would you agree that you need a larger sample

13   size to get a statistical significance than 15

14   volunteers?

15        A.    There were no changes at all, so -- do more

16   studies to -- if you think there's a small risk there,

17   you can do more and more, but as far as looking at CO2

18   levels and oxygen saturation levels, it -- if there were

19   changes that you were starting to see, you want more

20   numbers to see if those changes would bare out.  They

21   were zero in this population.

22        Q.   And in that study, there were no liquids or

23   other materials on the spit socks, correct?

24        A.   Correct.

25        Q.   And did you have any disagreements with
```

1  Dr. Stably's decisions regarding the cause and manner of

2  death in this case?

3       A.   Manner of death, I don't get involved in.

4       Q.   Okay.  How about the cause of death?

5       A.   Cause of death, I think he said it was cardiac

6  arrest while restrained, which I think is accurate from

7  an objective perspective, and then contributing factor

8  was methamphetamine intoxication, which we've talked

9  about already.

10           I don't think he had anything else on that

11  one, so didn't have any problems with that.

12      Q.   Were you aware that he determined that the

13  events which resulted in injury were described as being

14  restrained by law enforcement?

15           Do you remember reading that on the coroner's

16  amendment of the death certificate?

17      A.   I read somewhere that he was restrained by law

18  enforcement, yes.

19      Q.   But did you read that he had determined the

20  events which resulted in the injury were being

21  restrained by law enforcement?

22      A.   Oh.  I don't recall that specifically, but as

23  far as -- if you're asking me do I think that the

24  restraints lead to the death, the cardiac arrest, I

25  don't believe so.

1    Q.   So you would disagree if his opinion was that

2  being restrained by law enforcement resulted in

3  Mr. Birtcher's death?

4    A.   It was associated with it, but I don't think

5  it was a result.

6    Q.   And was it your understanding that he

7  determined methamphetamine intoxication was -- had

8  contributed to death, but was not -- did not result in

9  the underlying cause of death of sudden cardiac arrest?

10   A.   Contributed, but did not --

11   Q.   Did not result in the underlying cause of

12  death of the cardiac arrest.

13   A.   I think it was contributing with the acidosis

14  and the agitation, so I don't disagree with that.

15   Q.   So you would say that the methamphetamine

16  intoxication did result in the cardiac rest?

17   A.   Contributed to the other aspects that resulted

18  in a cardiac arrest.

19   Q.   And just to wrap things up, do you -- is it

20  your opinion that the restraint of Mr. Birtcher did not

21  play any role at all in his cardiac arrest?

22   A.   Correct.  Negative role.  Restraint actually

23  reduces amount of oxygen consumption and slows down

24  acidosis, so may have been protective of trying to

25  reduce that, but it wasn't causative in a negative way.

Imagine Reporting 619.888.0297

```
1   STATE OF CALIFORNIA        )

2                              ) SS

3   COUNTY OF SAN DIEGO        )

4

5

6              I, AMORITA LEDESMA, IN AND FOR THE STATE

7   OF CALIFORNIA, CSR, DO HEREBY CERTIFY:

8              THAT I PRIOR TO BEING EXAMINED, THE WITNESS

9   NAMED IN THE FOREGOING DEPOSITION WAS BY ME PLACED UNDER

10  OATH TO TESTIFY TO THE TRUTH, THE WHOLE TRUTH, AND

11  NOTHING BUT THE TRUTH;

12             THAT SAID DEPOSITION WAS RECORDED

13  STENOGRAPHICALLY BY ME AT THE TIME AND PLACE THEREIN

14  NAMED AND THEREAFTER TRANSCRIBED, AND THE SAME IS A

15  TRUE, CORRECT, AND COMPLETE TRANSCRIPT OF SAID

16  PROCEEDINGS.

17             I FURTHER CERTIFY THAT I AM NOT INTERESTED IN
    THE EVENT OF THIS ACTION.

18             WITNESS MY HAND THIS 19TH
    DAY OF AUGUST, 2019.

19

20

21

22

23              Amorita ledesma
24              CSR No. 12852

25
```

Imagine Reporting 619.888.0297