# Exhibit "A"

1              UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4

5   A.B., et al,                    )
                                    )
6              Plaintiff,           )
                                    )
7        vs.                        ) No. 3:18-cv-01541
                                    )     MMA-JMA
8                                   )
    COUNTY OF SAN DIEGO, et al.,    )
9                                   )
               Defendants.          )
10                                  )

11

12

13

14

15

16        VIDEOTAPED DEPOSITION OF DREW BEATTY

17                  VISTA, CALIFORNIA

18            WEDNESDAY, APRIL 24, 2019

19

20

21

22

23   STENOGRAPHICALLY REPORTED BY:

24
    Valerie C. Rodriguez
25   CSR No. 12871 (orig 6980)

```
 1              UNITED STATES DISTRICT COURT

 2         FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4

 5   A.B., et al,                  )
                                   )
 6                  Plaintiff,     )
                                   )
 7        vs.                      ) No. 3:18-cv-01541
                                   )     MMA-JMA
 8                                 )
     COUNTY OF SAN DIEGO, et al., )
 9                  Defendants.    )
10   _____)

11

12

13      VIDEOTAPED DEPOSITION OF DREW BEATTY, TAKEN ON

14    BEHALF OF THE PLAINTIFF, AT 325 MELROSE, VISTA,

15   CALIFORNIA, COMMENCING AT 12:13 p.m. AND ENDING AT

16    2:34 p.m. ON WEDNESDAY, APRIL 24, 2019, BEFORE

17   VALERIE C. RODRIGUEZ, CERTIFIED SHORTHAND REPORTER

18            NO. 12871 (ORIGINALLY 6980).

19

20

21

22

23

24

25
```

Exhibit A-2

```
 1    APPEARANCES:

 2

 3           FOR A.B., ET AL:

 4                LAW OFFICE OF JOHN FATTAHI
                  BY:   JOHN FATTAHI, ESQ.
 5                21250 HAWTHORNE BLVD, SUITE 700
                  TORRANCE, CALIFORNIA  90503
 6                (424)999-5579
                  JFATTAHI@GMAIL.COM
 7

 8

 9           FOR COUNTY OF SAN DIEGO, ET AL.:

                  SAN DIEGO COUNTY COUNSEL
10                BY:   CHRISTINA ISABEL VILASECA, ESQ.
                  1600 PACIFIC HIGHWAY
11                ROOM 355
                  SAN DIEGO, CALIFORNIA 92101
12                (619)531-4896
                  CHRISTINA.VILASECA@SDCOUNTY.CA.GOV
13

14           ALSO PRESENT:

15                JASON PATSALIS, VIDEOGRAPHER

16

17

18

19

20

21

22

23

24

25
```

1              INDEX TO DEPOSITION OF DREW BEATTY

2                       April 24, 2019

3

4    EXAMINATION BY MR. FATTAHI                        6

5

6

                          EXHIBITS
7
                      (NONE OFFERED)
8

9

10         INFORMATION REQUESTED:   (None)

11
           DIRECTIONS NOT TO ANSWER:   (None)
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      SAN DIEGO, CALIFORNIA, WEDNESDAY, APRIL 24, 2019

2                    ~~12:14 P.M.~~

3

4

5

6           THE VIDEOGRAPHER:  Good afternoon.  We

7   are on the record.  This is videotaped deposition of

8   Deputy Beatty in the matter of A.B. versus San Diego

9   County, case number 3:18-cv-01541-MMA-JMA.

10          This depo is being taken at 325 Melrose,

11  Vista, California, 92081.

12          This is residing in the district court of

13  Southern California.  Today's date is April 24th,

14  2019.  The time on the monitor is 12:14 p.m.

15          My name is Jason Patsalis.  I'm here on

16  behalf of Huseby.  Would counsel and all present

17  please identify yourselves for the record.

18          MR. FATTAHI:  John Fattahi for the

19  plaintiff.

20          MS. VILASECA:  Good afternoon.  Christina

21  Vilaseca, senior deputy county counsel for the

22  defendants.

23          THE VIDEOGRAPHER:  Your court reporter is

24  Valerie Rodriguez and she'll now swear in the

25  witness.

**Exhibit A-5**

```
 1                    DREW BEATTY,
 2             having been first duly sworn,
 3         was examined and testified as follows:
 4                      EXAMINATION
 5                         -o0o-
 6   BY MR. FATTAHI:
 7        Q     Can you please state your name and spell
 8   it once more for the record, please.
 9        A     Yeah.  Drew Beatty, D-R-E-W B-E-A-T-T-Y.
10        Q     Have you ever had your deposition taken
11   before?
12        A     No.
13        Q     Have you testified in court before?
14        A     Yes.
15        Q     Do you have any estimate of approximately
16   how many times?
17        A     We're talking about trial court or like
18   preliminary hearings?
19        Q     Any type of in-court testimony.
20              MS. VILASECA:  I'm going to stop you from
21   swaying your seat.
22              THE WITNESS:  Oh, sorry.
23              Say ten times.
24   BY MR. FATTAHI:
25        Q     Have you -- well, strike that.
```

1    onto to try to control him when you approached?

2         A      Yeah.  They were trying to control his

3    right arm and left arm.

4         Q      Did you see any deputies trying to

5    control his legs when you approached?

6         A      I believe at that point Deputy Garza was

7    trying to control his legs.

8         Q      Could you tell -- well, strike that.

9                Do you remember what specifically Deputy

10   Garza was doing to try to control his legs

11   initially?

12        A      It looked like he was mainly trying to

13   gain control of him by, like, holding them together

14   and down so they wouldn't have independent motion.

15        Q      Did it appear that Deputy Garza was using

16   his body weight to try to restrain Mr. Birtcher's

17   legs on the ground when you initially arrived?

18        A      No.

19        Q      What's the first thing that you did to

20   try to assist the deputies that were already trying

21   to retrain Mr. Birtcher?

22        A      I joined Deputy Garza and basically tried

23   to get control of his legs, trying to limit

24   Mr. Birtcher's movement.

25        Q      What position were Mr. Birtcher's legs in

1    Q    From when you started to assist Deputy

2  Garza with Mr. Birtcher's legs, was your main focus

3  from that point on on his lower body?

4    A    Yes.

5    Q    Were you also paying attention to what

6  was going on with his upper body after that, or not

7  really?

8    A    Not particularly.  Like I said, I was

9  mainly focused on his lower body.

10    Q    Did it seem like the handcuffs had been

11  connected together by the time you started to assist

12  Deputy Garza with Mr. Birtcher's legs?

13    A    No.

14    Q    In what manner did you try to assist

15  retraining Mr. Birtcher's legs?

16    A    Again, just by holding them together so

17  they wouldn't have that independent movement or

18  force.  And then by kind of grabbing them around his

19  lower calves and by his ankles, just pushing them

20  down towards the ground.

21    Q    And by -- by your efforts to push his

22  ankles down towards the ground as you described,

23  were you able to somewhat control his legs?

24    A    Not really.  It was difficult.

25    Q    Was Deputy Garza still helping control

1  Mr. Birtcher's legs at this point where you're

2  trying to push them down towards the ground?

3      A    At that point, no.

4      Q    Do you know what Deputy Garza was doing

5  at that point?

6      A    No.

7      Q    As you're trying to hold Mr. Birtcher's

8  legs down towards the grounds, what's the next thing

9  you remember happening?

10      A    Once we -- once I was holding his legs

11  down, I applied one of my -- or my cord cuff

12  restraint around his ankles.

13      Q    Was there any discussion about the

14  application of the cord cuff before you started to

15  apply it?

16      A    I just know that it had been -- I heard

17  one requested when I was -- had still been en route

18  to the scene.

19      Q    Is that something you heard over the

20  radio?

21      A    Yes.

22      Q    So was it your intention in part when you

23  got to the scene to try to restrain his legs so that

24  the maximum restraints could be applied?

25      A    Yes.

1    Q    Did anyone else help you try to apply the

2    maximum restraints around Mr. Birtcher's ankles?

3    A    I think I mostly did it on my own.

4    Deputy Garza might have helped me a little bit.

5    Q    Were Mr. Birtcher's legs still generally

6    straightened out towards the ground when you applied

7    the initial maximum restraints around his ankles, or

8    did you have them in some other position when you

9    did that?

10    A    That was -- similar position.  He kept

11    trying to like flex his legs, but that's -- he

12    didn't change position though.

13    Q    So was he generally in that same prone to

14    slightly on the side position when you were applying

15    those?

16    A    Yes.

17    Q    Were his legs basically extended fully

18    when you were applying the ankle restraint?

19    A    I mean, that was the idea, trying to

20    apply them.  But like I said, he was still -- he was

21    still moving around a lot.

22    Q    You were trying to keep his legs fully

23    extended when you were applying the maximum

24    restraints initially?

25    A    Yeah, to limit his movement.

1      Q      Did you try to use your own body weight

2   to try to keep his legs extended and near the ground

3   while you were applying the restraints?

4      A      Yes.

5      Q      How did you do that?

6      A      Again, just by kind of pressing down on

7   his calves, towards the bottom of his legs.

8      Q      And what part of your body were you using

9   to press down on his calves?

10      A      Initially just my hands.  I used my -- my

11   knee and my lower leg a little bit.

12      Q      Were you able to get the ankle restraints

13   attached in the way that you were intending to at

14   this point?

15      A      Yes.

16      Q      Could you just describe how they were

17   attached to his ankles?

18      A      Yeah.  So with the cord cuff, you

19   basically wrap it around their ankles.  And then --

20   so it just kind of encircles them.  Then you kind of

21   thread the cord back between their legs and kind of

22   circle it in an opposing circle, if that makes

23   sense.  So you're wrapping it almost in a

24   perpendicular direction until you have the desired

25   length that you want.

```
 1              MR. FATTAHI:  I'm just going to move to
 2    strike as nonresponsive.
 3    BY MR. FATTAHI:
 4         Q     Let me ask you a different question.  Did
 5    you ever specifically observe Mr. Birtcher grabbing
 6    anybody's hands, visually observe?
 7         A     No.
 8         Q     But you heard who you believe was Deputy
 9    Robledo say something to the effect of "he's
10    grabbing my fingers" or something?
11         A     Yes.
12         Q     In what position was Mr. Birtcher when
13    you heard that?
14         A     About grabbing his hands?
15         Q     Correct.
16         A     He was in the same position that I
17    earlier described, kind of on the side on his back
18    -- or on his side, on his stomach.
19         Q     Could you tell -- well, strike that.
20              Did you hear Robledo say something about
21    grabbing hands before or after the cord cuff was
22    applied to Mr. Birtcher's ankles by you?
23         A     I believe it was after.
24         Q     Do you know whether any maximum
25    restraints had been connected around Mr. Birtcher's
```

1    Mr. Birtcher's body or in the back of his body?

2        A    It's hard to explain.  It kind of

3    generally connect in between the legs.

4        Q    The part of the waist restraint that

5    connects to the ankles, is that typically drawn from

6    the front of the person's waist or from the back of

7    the person's waist?

8        A    Can you ask that again.  Sorry, I'm

9    trying...

10        Q    Sure.  So the cord from the waist

11    restraint is connected around the person's ankle

12    restraint; correct?

13        A    Yes.

14        Q    And where does the -- there's a loop in

15    the waist restraint cord, correct, that the material

16    is passed through --

17        A    Yes.

18        Q    -- before it goes to the ankles?

19        A    Yes.

20        Q    Where does that loop usually sit?  Is it

21    in the front of person's waist or the back of the

22    person's waist where then the material is then

23    connected to the ankles?

24        A    That -- that part you're talking about

25    generally gets passed kind of to the front in

1  between the legs down to their ankles.

2      Q      And were you expecting the maximum

3  restraints to be connected in a position where

4  Mr. Birtcher's legs would be sort of -- well, strike

5  that.

6          Was there any discussion about connecting

7  the maximum restraints to his ankles in the front of

8  his body versus in the back of his body?

9      A      Not like that, no.  We were just trying

10  to figure out how to apply it with the amount of

11  force he was resisting us with.  So we didn't feel

12  it would be practical to do it in the front.

13      Q      Was your initial plan to apply the

14  maximum restraints in the front and put him in sort

15  of a fetal position?

16      A      My initial plan was just to gain control

17  of him, or gain control of the legs, and really just

18  go from there to try to secure him the best we

19  could.

20      Q      Once the ankle restraints were in place

21  and the next goal was to complete the maximum

22  restraints, was the plan to connect the maximum

23  restraints in the front and restrain him in a

24  semi-fetal position?

25      A      I'm sorry, was that my plan?

1       Q       Correct.

2       A       No, again, my initial plan was just to

3    gain control of the legs, because he was kicking so

4    much and you can exert so much power with your legs

5    that it gives him that more leverage to fight us

6    with.

7       Q       Would you agree that he was at least

8    somewhat restrained by the ankle restraints that you

9    applied initially?

10              MS. VILASECA:  I'll object, it calls for

11   speculation.

12              THE WITNESS:  It limits his movement, but

13   he was still very powerful.

14   BY MR. FATTAHI:

15      Q       Is one way that the ankle restraints

16   limited his movement that he could not move his legs

17   independently?

18      A       Yeah, with the ankle restraints, they're

19   joined, the ankles.

20      Q       At that point when the ankle restraints

21   were connected, would he have been able to walk, for

22   example?

23              MS. VILASECA:  I'll object, it calls for

24   speculation.

25              THE WITNESS:  Some people can a little

1  his buttocks that they were trying to connect the

2  waist strap around Mr. Birtcher's waist, or do you

3  think that happened after?

4      A     No, I think they started to do that

5  before I kind of transitioned.

6      Q     So do you think he would have been double

7  handcuffed before they started to work on the waist

8  restraint or you're not sure?

9      A     I think he would have been double

10 handcuffed before they applied the waist restraint.

11     Q     That would be consistent with the way

12 you're trained to apply the maximum restraints, to

13 start after the handcuffs are connected, the next

14 thing would be the waist restraint or the ankle

15 restraint; correct?

16     A     Yeah.

17     Q     When you tried to push his lower legs

18 towards his buttocks, was part of the reason you did

19 that because you thought you'd be able to restrain

20 him better in that position?

21     A     Yes.

22     Q     Why did you think that would be a better

23 position to restrain him in?

24     A     I felt it would limit his movement a

25 little more.  When I was trying to keep his legs

 1          Was it one of his feet or both of his

 2    feet that made contact with your chest?

 3        A    Both.

 4        Q    After his feet made contact with your

 5    chest, did they extend more than the area where they

 6    made contact with your chest, or did they stop

 7    extending at that point?

 8        A    They kept extending.

 9        Q    Did you sort of move to the side as a

10    result of the contact and then the legs extended

11    past you?

12        A    Moved backwards, kind of off balance.

13        Q    In relation to where Mr. Birtcher was,

14    did you move further away from him or towards the

15    side of -- in relation to him?

16        A    Further away.

17        Q    Did you fall down to the ground or

18    anything like that?

19        A    No.  I was already kind of like in that

20    crouched position.

21        Q    Had any maximum restraint been connected

22    around Mr. Birtcher's waist before he kicked you

23    with his feet?

24        A    I think they were trying to apply it at

25    that point.

1    Q    So it had not been connected around his

2  waist at that point?

3    A    I don't recall if it had been completely

4  applied yet.

5    Q    Do you know one way or the other whether

6  the maximum restraints had been connected from his

7  waist to his ankle restraints at the time when you

8  sustained the kick?

9    A    It had not been applied.

10    Q    Do you remember any discussion about the

11  maximum restraints being applied too loosely or with

12  too much slack or something like that?

13    A    I remember a discussion that once they

14  had been applied, that they were -- there was too

15  much movement in it and they were stretching.

16    Q    Would that have been after you were

17  kicked?

18    A    Yes.

19    Q    Did you sustain any injuries from the

20  kick?

21    A    No.

22    Q    Did you seek any medical attention for

23  it?

24    A    No.

25    Q    Did you feel any painful sensations

1    immediately after the kick?

2         A    No.

3         Q    Did you have any pain at any point later

4    from what you believe was the kick?

5         A    No.

6         Q    What did you do after you lost your

7    balance from the kick?

8         A    I regained my footing and retook the

9    position I had, trying to press his legs back

10   towards his buttocks.

11        Q    Did you try to use more body weight than

12   you were using before as a result of having lost

13   your balance previously?

14        A    Initially just to get his legs back in

15   place, and then like I said, it was constantly

16   variable.  I was kind of matching the force that he

17   was applying with his forces against me.

18        Q    Did any other deputies assist by using

19   either their hands or body weight to try to increase

20   the amount of pressure onto Mr. Birtcher's ankles

21   after the kick?

22        A    Yeah.

23        Q    Who was that?

24        A    Deputy Garza.

25        Q    And after the point when Deputy Garza

1    helped apply more downward pressure to

2    Mr. Birtcher's ankles, did they ever extend outward

3    at more than, say, a 90-degree angle of his knees?

4         A    No.

5         Q    How long after Deputy Garza helped you

6    restrain Mr. Birtcher's legs with the ankles towards

7    the buttocks did the maximum restraint initially get

8    connected to the ankles from the waist?

9         A    How long after Deputy Garza helped me did

10   they get connected?

11        Q    Correct.

12             MS. VILASECA:  If you can say.  Don't

13   guess.

14             THE WITNESS:  I can't recall the time

15   frame it took from that point to them being

16   connected.

17   BY MR. FATTAHI:

18        Q    Did you make any observations whether

19   other deputies were applying body weight to

20   Mr. Birtcher's chest area while he was in a prone

21   position in the moments before you were kicked off

22   by his feet?

23        A    I don't recall seeing that, no.

24        Q    Was Mr. Birtcher looking in your

25   direction at the time when he kicked you off of him?

```
 1      A      I don't know.  I couldn't see.  I wasn't
 2   looking at his head.
 3      Q      Did you have any training before this
 4   incident that if somebody is restrained in a prone
 5   position with body weight on their back, it might
 6   make it difficult for them to breathe?
 7      A      Yeah.
 8      Q      Did you have any training that a person
 9   who is restrained prone with body weight on their
10   back may attempt to move their body in an effort to
11   breathe more adequately?
12      A      Yeah.
13      Q      Did you have any training that an officer
14   might interpret the person's attempts to breathe as
15   resistance?  Did you ever have that specific
16   training?
17      A      No.
18      Q      Did you have any specific training that a
19   person might -- a person who is being restrained in
20   a prone position with body weight on their back
21   might attempt to use their arms or legs to alleviate
22   pressure on their chest in order to breathe better?
23      A      I've had training regarding all those
24   topics and restrained people with those, but -- and
25   those topics are all -- have been encompassed by
```

1  after the time when he made contact with your chest

2  with his feet?

3      A    Before and after.

4      Q    Do you remember a conversation about

5  whether the maximum restraint was too long to

6  restrain Mr. Birtcher adequately before any maximum

7  restraints were connected to his ankles, from his

8  waist?

9      A    No, I don't recall that.

10      Q    Did you see a waist strap being connected

11  to Mr. Birtcher's ankle restraints when it was done,

12  or is that something you observed after it was done?

13      A    I guess I observed it after it was done.

14      Q    Did you ever see a maximum restraint from

15  his waist connected to his ankle restraints that

16  looked like it had slack or was loose based on your

17  observations?

18      A    I don't recall ever seeing it loose, no.

19      Q    Did you ever see Mr. Birtcher extend his

20  legs out more than a 90-degree angle in his knees

21  after the waist strap was connected to his ankle

22  restraint?

23      A    I can't recall the angle of his legs.  I

24  don't know.

25      Q    Did you ever see his legs fully extended

1   restraints were being applied?  In other words, was

2   he alternating between more active movements versus

3   less active movements?

4        A     Sorry, could you rephrase that whole

5   question?

6        Q     Sure.  During the time period when the

7   maximum restraints were being applied...

8        A     Okay.

9        Q     Did Mr. Birtcher alternate between being

10  more active and being less active in his movements?

11       A     Yeah.  He'd go through intervals.

12       Q     Were there times while the maximum

13  restraints were being applied that it seemed like he

14  was reducing his level of activity and trying to

15  catch his breath?

16       A     He was generally fairly active while they

17  were being applied.  He was more -- like immediately

18  after being applied, then he would be a little more

19  sub -- like subdued or it seems like he would be a

20  little bit less violent during those times.

21       Q     Did it seem to you like after the maximum

22  restraints were applied, that he was trying to catch

23  his breath?

24             MS. VILASECA:  I'm going to object.  It

25  calls for speculation.

1    A    It's hard to say.  My attention was on

2  his legs.  I didn't have a good view of his arms or

3  anything.

4    Q    But did you ever specifically see from

5  what you did observe of him that he was trying to

6  punch somebody?

7    A    No.  I didn't see any punches get thrown.

8    Q    Did you ever see him breathing heavily

9  while the maximum restraints were being applied?

10    A    Yeah.

11    Q    Do you remember anybody asking if

12  Mr. Birtcher was breathing before he was placed in a

13  recovery position?

14    A    I can't say whether that was asked before

15  or after.  He was placed in the recovery position

16  fairly quickly once we got the second max restraint

17  on.

18    Q    Do you have any estimate of how much time

19  passed from when the maximum restraint -- the second

20  maximum restraint was fully connected to when

21  Mr. Birtcher was placed in the recovery position?

22    A    I would say almost immediately.

23    Q    Did Mr. Birtcher appear to be conscious

24  when he was placed in the recovery position?

25    A    Yeah.

1  recovery position, based on your training?

2      A      It's just -- yeah, it's a noncompromising

3  position.  They're able to breathe and we can see if

4  they're like vomiting or anything, if there's

5  anything preventing them from breathing.

6      Q      Were you trained that somebody who has

7  been put in maximum restraints may have difficulty

8  breathing if they're left in a prone position for a

9  period of time?

10     A      Yeah.

11     Q      You were trained that if they were put in

12 the maximum restraints, one purpose of putting them

13 in the recovery position was so that they could

14 breathe better than if they were on their stomach?

15     A      Yes.

16     Q      Did you have any contact with

17 Mr. Birtcher after he was placed in the recovery

18 position, for example, to try to hold him in place

19 so he didn't roll over or something like that?

20     A      I don't believe so, no.  I think when he

21 was placed in the recovery position, I'm pretty sure

22 that was the end of my physical involvement with

23 him.

24     Q      Did you ever observe whether or not

25 Mr. Birtcher had made any movements other than what

1  you're supposed to try to minimize the amount of

2  time the person is restrained in a prone position

3  with body weight being applied?

4         MS. VILASECA:  I'll object, it's vague.

5         THE WITNESS:  I'll say, yeah, the

6  training is try to apply the maximum restraints with

7  minimal amount of -- I don't know, I don't know how

8  to describe it.  Can you ask me the question again?

9         MR. FATTAHI:  Okay.

10  BY MR. FATTAHI:

11     Q    Did you have training that when applying

12  maximum restraints you should try to minimize the

13  amount of time that a person is held in a prone

14  position with body weight?

15         MS. VILASECA:  Same objection.

16         THE WITNESS:  Yes, that's something I

17  would try to do.

18  BY MR. FATTAHI:

19     Q    Do you remember any specific training on

20  trying to minimize the amount of time someone is

21  held in a prone position with body weight while

22  maximum restraints are being applied?

23     A    Yeah, same -- I thought that was the

24  question I was answering originally.  I'm not sure

25  if it was something else.  But yes, I remember --

1  yeah, I'd say it's fair to say that that's in our

2  training.

3      Q     Okay, thank you.  Now, we were talking

4  about after Mr. Birtcher was placed in the recovery

5  position, I think you said the next thing you

6  remembered was Deputy Winter monitoring his blood

7  pressure and pulse; is that right?

8      A     His breathing and his pulse.

9      Q     Breathing and pulse, that's right.  Do

10 you remember anything Deputy Winter or anybody else

11 said about his breathing or pulse while he was in

12 the recovery position?

13     A     Not specifically, no.

14     Q     Just so I have the order right, he would

15 have had the first set of maximum restraints

16 applied, and also the second set of maximum

17 restraints would have been applied before he was

18 rolled into the recovery position; is that right?

19     A     Yeah, I believe so.

20     Q     Where were you when Deputy Winter was

21 monitoring Mr. Birtcher's pulse and breathing?

22     A     I would have been standing at this point,

23 kind of more down towards Mr. Birtcher's feet.

24     Q     At that point, did you see the connection

25 between the waist strap and Mr. Birtcher's ankle

```
 1   cord cuff?

 2        A    No.

 3        Q    Were you looking at Mr. Birtcher's upper

 4   body to see if you could depict him breathing or not

 5   at that point?

 6        A    Yeah, I was looking at more towards his

 7   head.

 8        Q    Did you see any movement of

 9   Mr. Birtcher's head or upper body when he was in the

10   recovery position?

11        A    Not to extent that it was earlier, not as

12   dramatic.  I don't recall if I can see anything

13   else.

14        Q    What type of movement did you observe in

15   his head and upper body when he was in the recovery

16   position?

17        A    I wasn't observing any movement at that

18   time.

19        Q    Could you tell whether or not

20   Mr. Birtcher was breathing when he was in the

21   recovery position from your own observations?

22        A    No.

23        Q    At that point was Mr. Birtcher put back

24   into a prone position after he was in the recovery

25   position?
```

```
 1        Q     Did you ever hear anybody ask for F-D
 2   over the radio, meaning fire department?
 3        A     It might have been that.  It might have
 4   been 1141 or F-D, I don't recall specifically what
 5   was said.
 6        Q     Based on your experience, is there any
 7   difference between asking for F-D or asking for 1141
 8   over dispatch?
 9        A     No.
10        Q     At that point did you see any blood on
11   Mr. Birtcher's face or head area?
12        A     No.
13        Q     At any point, did you see blood on the
14   spit sock that was over Mr. Birtcher's head?
15        A     No, I don't recall.  I didn't spend a lot
16   of time up near his head during the incident.
17        Q     At some point, did you believe that
18   Mr. Birtcher might be in a state of excited
19   delirium?
20        A     Yeah.
21        Q     Is that something that you received
22   training on?
23        A     Yes.
24        Q     At what point did you first start to
25   think that Mr. Birtcher might be in a state of
```

 1   excited delirium?

 2       A    Probably while I was trying to control

 3   his legs initially.

 4       Q    Would that be pretty shortly after you

 5   arrived on the scene?

 6       A    Yeah.

 7       Q    What was it that you observed that made

 8   you think that he might be in a state of excited

 9   delirium?

10       A    Just that he appeared highly agitated, a

11   lot of yelling, just the amount of strength he was

12   able to exert.  In the initial radio call, I think

13   there was details that he might -- he may be under

14   the influence of something, can't really specify

15   what.

16       Q    And in your training about excited

17   delirium, were you ever trained that excited

18   delirium is a medical emergency?

19       A    That it's a medical emergency as well as

20   a law enforcement emergency.

21       Q    Were you trained that a person in a state

22   of excited delirium is at a risk of sudden death if

23   there's a prolonged struggle?

24       A    Yes.

25       Q    Were you still in a position near

1    the incident?

2         A     No.

3         Q     Did you ever have any information, either

4    before you arrived or during the incident, that

5    Mr. Birtcher had tried to punch anybody?

6         A     No.

7         Q     Did you have any information that

8    Mr. Birtcher tried to bite anybody?

9         A     No.

10        Q     Did you have any information that

11   Mr. Birtcher had tried to obtain any weapons?

12        A     No.

13        Q     Did you ever believe that Mr. Birtcher

14   posed an imminent threat of death or serious bodily

15   injury to anyone?

16        A     Yeah, that's always a possibility when

17   you're involved in a fight with someone.

18        Q     I guess I'm not asking whether you

19   thought that was possible, but I'm asking if you

20   believed he ever posed an imminent threat.  Do you

21   have some training --

22             MS. VILASECA:  From what he saw; right?

23   From what he observed.

24             MR. FATTAHI:  Let me just finish the

25   question real quick.

```
 1   BY MR. FATTAHI:

 2        Q      Have you had some training on the concept

 3   of an imminent threat at the academy or from the

 4   department?

 5        A      Yeah, I guess -- finish your question.

 6        Q      Sure.  And did you have some training on

 7   the concept of deadly force at the academy and at

 8   the department?

 9        A      Yeah.

10        Q      What's your understanding of when it's

11   appropriate for a peace officer to use deadly force?

12        A      Yeah, generally when there's some threat

13   of great bodily injury or death, then yeah, I

14   understand now what you're asking, imminent threat.

15        Q      Were you trained that that threat has to

16   be imminent in order to justify the use of deadly

17   force?

18        A      Yes.

19        Q      Did Mr. Birtcher ever appear to you to

20   pose an imminent threat of death or serious bodily

21   injury to anyone?

22        A      No, not to the extent that I would use

23   deadly force on him.

24        Q      Did you ever observe that Mr. Birtcher

25   was sweating profusely?
```

1                    REPORTER'S CERTIFICATE

2            I, Valerie C. Rodriguez, a Certified

3    Shorthand Reporter for the State of California, do

4    hereby certify:

5                  That the foregoing proceedings were taken

6    before me at the time and place herein set forth;

7    that any witnesses prior to testifying, were placed

8    under oath; that a verbatim record of the

9    proceedings was made by me using machine shorthand

10   which was thereafter transcribed under my direction;

11   further, that the foregoing is a true record of the

12   testimony given; that the dismantling, unsealing, or

13   unbinding of the original transcript will render the

14   reporter's certificate null and void.

15                  Before completion of the deposition,

16   review of the transcript was requested.  If

17   requested, any changes made by the deponent (and

18   provided to the reporter) during the period allowed

19   are appended hereto.

20                  I further certify that I am neither

21   counsel for, nor related to any party to said

22   action, nor in any way interested in the outcome

23   thereof. IN WITNESS WHEREOF, I have subscribed my

24   name this 5th day of May, 2019.

25   _____

     VALERIE C. RODRIGUEZ, CSR No. 12871