# Exhibit "A"

# Roger A. Clark

## Police Procedures Consultant, Inc.

10207 Molino Road. Santee, CA 92071
Phone: (208) 351-2458, Fax: (619) 258-0045
rclark9314@aol.com

June 17, 2019

Hang D. Le, Esq
Law Offices of Dale K. Galipo
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367

***Regarding:  A.B. (Birtcher), et al. vs. County of San Diego, et al., Case No.: 3:18-cv-01541-MMS-LL.***

Dear Ms. Le:

Thank you for retaining me to analyze and render opinions regarding the October 14, 2017 Law Enforcement Activity Related Death (LARDS) of Mr. Kristopher M. Birtcher, by San Diego Sheriff's Department (SDSD) Deputies Drew Beatty (Deputy Beatty), Adrien Carrillo (Deputy Carrillo), Roland Garza (Deputy Garza), Joseph Kodadek (Deputy Kodadek), John Robledo (Deputy Robledo), Scott Rossall (Deputy Rossall), Frank Stalzer (Deputy Stalzer) and Scott Winter (Deputy Winter). Pursuant to the requirement of Rule 26, I have studied, the Investigative SDSD reports, Surveillance Video Recordings, Deputy Body Worn Camera (BWC) Recordings, Cell Phone Recordings, Interview Recordings, Policy and Training Documents, Deposition Transcripts, and other materials (as listed below) regarding this case provided to me thus far. Please be advised that if/when any additional information is submitted additional opinions may be required.

## Materials Provided and Reviewed Thus Far:

1.      Plaintiffs' Fourth Amended Complaint for Damages.

2.      Investigation Reports by San Diego Sheriff's Department.

3. Video Recordings:
   a. Hobby Lobby Surveillance.
   b. WinCo Surveillance.
   c. BWC - Deputy Frank Stalzer.
   d. BWC - Deputy Joseph Kodadek.
   e. BWC - Deputy Cory Crawford.
   f. BWC - Sergeant Alan Noble.
   g. Cell Phone Video - Witness Donna Boe.
   h. Cell Phone Video - Witness Alejandro Ramos.
   I. Cell Phone Video - Witness Shiloh Hayes.
   j. Cell Phone Video - Witnesses Stella Myers and Ariel Myers.
   k. Enhanced and synchronized combined videos.

4. Audio Recordings:
   a. Dispatch Communications.
   b. Initial Interview - Deputy Drew Beatty.
   c. Initial Interview - Deputy Adrien Carrillo.
   d. Initial Interview - Deputy Roland Garza.
   e. Initial Interview - Deputy Joseph Kodadek.
   f. Initial Interview - Deputy John Robledo.
   g. Initial Interview - Deputy Scott Rossall.
   h. Initial Interview - Deputy Frank Stalzer.
   I. Initial Interview - Deputy Scott Winter.

5. Deposition Transcripts:
   a. Deputy Drew Beatty.
   b. Deputy Adrien Carrillo.
   c. Deputy Roland Garza.
   d. Deputy Joseph Kodadek.
   e. Sergeant Alan Noble.
   f. Deputy John Robledo.
   g. Deputy Scott Rossall.
   h. Deputy Frank Stalzer.
   I. Deputy Scott Winter.

6. Photographs:
   a. The Scene.
   b. Involved civilian David Arguelles.
   c. Involved Deputies.

**Exhibit A-2**

     d.      Kristopher Birtcher at Palomar Medical Center after the incident.

     e.      Autopsy of Kristopher Birtcher.

7.      Computer Aided Dispatch (CAD) Printouts of the Incident.

8.      San Marcos Fire Department Run Sheet of the Incident.

9.      San Diego Sheriff's Department Policies and Procedures:
   a.      Mentally Ill Persons.
   b.      Major Crimes, Primary Responders.
   c.      Use of Force Guidelines.
   d.      Use of Naloxone.
   e.      Psychiatric Emergency Response Team (PERT).

10.      Positional Asphyxia - Sudden Death Bulletin by the National Law Enforcement Technology Center, June, 1995

11.      International Association of Chiefs of Police (IACP)/National Law Enforcement Policy Center (NLEPC) Article Entitled "The Prone Restraint - Still a Bad Idea," Spring, 1998.

12.      Use of Force Audit of the San Diego County Sheriff's Department by the Office of Independent Review (OIR) Group, June 25, 2007.

13.      Marin County Grand Jury Report: "Hogtieing: A Lethal Restraint?" February 14, 2007.

14.      Custody Death Syndrome Training Key #429, by the International Association of Chiefs of Police (IACP).

15.      San Diego County Sheriff's Department Use of Force Statistical Report, 2016-2017.

16.      2011 Electronic Control Weapon Guidelines. U.S. Department of Justice Office of Community Oriented Policing Services and Police Executive Research Forum, Washington, D.C.

17.      Model Excited Delirium Policy by the International Association of Chiefs of Police (IACP), April, 2017.

18. County of San Diego Citizen's Law Enforcement Review Board (CLERB) Findings on:
    a. Positional restraint death of Lucky Phounsy.
    b. Positional restraint death of Hugo Barragan.
    c. Officer-involved death of Mark Adkins.
    d. Death of Jeff Dewall.
    e. June 11, 2019 Minutes for Death of Kristopher Birtcher.

19. County of San Diego Citizen's Law Enforcement Review Board's (CLERB) August 16, 2018 Response to the 2017-2018 San Diego County Grand Jury Report on CLERB.

20. Special Panel Review of Excited Delirium by the Weapons and Protective Systems Technologies Center, December 2011.

21. San Diego County Sheriff's Department Incident Review Process - Frequently Asked Questions.

22. TASER X2:
    a. Training Videos.
    b. X2 Conducted Electrical Weapon End-Use Course PowerPoint Presentation, Version 20.
    c. TASER Training Academy, TASER X2 Conducted Electrical Weapons (CEWs) End User Certification Test, Part 1.
    d. TASER X2 Handheld CEW Warnings, Instructions, and Information: Law Enforcement.

23. POST Basic Learning Domains:
    a. #1: "Leadership, Professionalism & Ethics"
    b. #2: "Criminal Justice System"
    c. #3: "Policing the Community"
    d. #5: "Introduction to Criminal Law"
    e. #15: "Laws of Arrest"
    f. #20: "Use of Force"
    g. #21: "Patrol Techniques"
    h. #23: "Crimes in Progress"
    i. #33: "Arrest Methods/Defensive Tactics"

       j.     #34: "First Aid and CPR."

       k.     #35: "Firearms/Chemical Agents"

       l.      #37: "People with Disabilities."

24.     NRS 194.010 - Persons capable of committing crimes.

25.     The Los Angeles Police Department Training Bulletin: "In-Custody Deaths." July 1999.

26.     Training Video produced by the Georgia Bureau of Investigation: "Preventing Restraint Asphyxia."

27.     Training Video produced by the New York Police Department: "Best Practices, Positional Asphyxia."

28.     U.S. DOJ: "Investigation of Los Angeles County Sheriffs Department Stations in Antelope Valley," (Regarding blows to the head) June 28, 2013, Page 32.

29.     Anaheim Police Department Policy 306 (Lexipol) "Handcuffing and Restraints."

30.     Images of the incident scene via the internet.

## Brief Overview of Events and Commentary

On **October 14, 2017**, at approximately **3:00 p.m.**, County dispatch received a call from the assistant manager at Hobby Lobby regarding a man, later identified as Kristopher Birtcher (Mr. Birtcher), who was acting strangely and possibly under the influence. However, there was a higher priority call, so the Hobby Lobby call was held pending until a deputy became available.

At approximately **3:45 p.m.**, (45 minutes after the original request) the assistant manager called back and the call was assigned to Deputy John Robledo. Deputy Roland Garza, and his PERT Clinician, Brianna Brasel (PERT Clinician Brasel) monitored the call and assigned themselves to the call. At approximately **3:50 p.m.**, Deputy Garza arrived at the scene and made contact with Mr. Birtcher, noting that Birtcher was picking at a large open wound on his right shoulder. At least twice in the Hobby Lobby video of this phase,

Mr. Birtcher appears to turn around 360 degrees, possibly at Deputy Garza's request, and during one such turn appears to lift his shirt to show he is not concealing any weapons in his waistband.

In order to capture the time that Mr. Birtcher was under duress, I have included a few time notations which are taken from the WinCo Foods closed-circuit video surveillance.

At approximately **3:54 p.m.**, PERT Clinician Brasel announced, over the tactical radio channel, that Mr. Birtcher was semi-cooperative, not agitated, but was having a hard time following directions.

Following PERT Clinician Brasel's announcement, Deputy Garza reached out in an attempt to pat Mr. Birtcher down. Then he became rigid. Deputy Garza did not await Deputy Robledo's arrival and engaged physically one-on-one with Mr. Birtcher and took him forcefully to the ground. At the same time, PERT Clinician Brasel radioed "cover now!" and stated that Deputy Garza was hands-on with the subject. "Cover now" is an "officer needs help!" urgent broadcast for immediate assistance and required a code-3 response to the scene by patrol units in the area.

**3:55:49**
Deputy Robledo arrived on scene and other patrol deputies began responding code 3. When Deputy Robledo arrived, Deputy Garza had his body weight on top of Mr. Birtcher's back while Mr. Birtcher was on the ground on his hands and knees. Deputy Robledo requested that Deputy Garza step back so that he (Deputy Robledo), could deploy his TASER at Mr. Birtcher.

**3:55:55**
Deputy Robledo then deployed his TASER into Mr. Birtcher, while Deputy Garza was in the process of stepping back. The TASER internal recording documents that the first deployment lasted for approximately 8 seconds with an Arc. Video from the WinCo surveillance camera shows Mr. Birtcher reacted physically to the TASER deployment before standing up and backing away from Deputy Robledo.

After the TASER deployment, Deputy Robledo immediately deployed his TASER for a second time as Mr. Birtcher attempted to run away. Mr. Birtcher then ran away from Deputy Robledo and towards Deputy Garza before diverting his direction and running into the parking lot of the shopping plaza.

**3:56:01**
The WinCo surveillance video shows Mr. Birtcher reach his arm or arms out in the direction of Deputy Garza prior to running into the plaza parking lot; however, it is unclear whether this was due to an involuntary reaction from the TASER, a reaction to prevent himself from falling, or reaching his arm out in some other manner. Based on the Deputies' narratives, neither deputy reported that they believed Mr. Birtcher was trying to assault Deputy Garza at this time or trying to obtain Deputy Garza's weapon.

**3:56:03 - 3:56:21**
Both deputies chased after Mr. Birtcher and Deputy Robledo tackled Mr. Birtcher to the ground and began to repeatedly punch him in head. Civilian observers expressing concern are recorded. In the WinCo surveillance video, Mr. Birtcher can be seen covering his head before Deputy Robledo punched him several more times.

While Deputy Robledo and Mr. Birtcher were on the ground, Deputy Garza pointed his TASER at Mr. Birtcher and at some point deployed his TASER at Mr. Birtcher. According to the TASER download, Deputy Garza deployed his TASER for a second time after the first TASER deployment. After the TASER deployment, Mr. Birtcher managed to get up and attempted to run in between two parked cars but was successfully pulled back by both deputies. At this point, a civilian, later identified as David Arguelles, provided assistance to the deputies in getting Mr. Birtcher to the ground.

**3:56:40 - 4:00:00**
Once Mr. Birtcher was taken to the ground, two more civilians approached and assisted the deputies and Mr. Arguelles in detaining Mr. Birtcher. Deputy Robledo managed to cuff Mr. Birtcher's right hand with one set of cuffs. It appeared that at this point, Mr. Birtcher's right hand, specifically the area between his index and middle fingers, momentarily came into contact with the expandable baton Deputy Robledo had dropped on the ground but the contact appears incidental, and Mr. Birtcher never grasped, held, or attempted to lift the baton that Deputy Robledo had carelessly placed close to Mr. Birtcher's reach.

The deputies and civilians then turned Mr. Birtcher partially onto his right side and Deputy Robledo handed Mr. Arguelles another set of handcuffs to cuff Mr. Birtcher's left hand. Deputy Robledo then pushed down on Mr. Birtcher's head and right arm as Mr. Arguelles attempted to handcuff Mr. Birtcher's left hand.

PERT Clinician Brasel broadcasted that the deputies were still hands on with Mr. Birtcher and unable to get Mr. Birtcher cuffed as additional deputies arrived on scene. While Mr. Birtcher was on the ground on his right side Deputy Robledo struck Mr. Birtcher several

**Exhibit A-7**

times in the head with hammer-fist strikes before he removed his sap from his pocket and continued to strike Mr. Birtcher in the head area with his sap (Deputy Robledo used 8 sap strikes). Mr. Birtcher could be heard yelling "no stop" during the strikes. It appears that Deputy Robledo struck Mr. Birtcher's head area approximately eighteen times, between fist strikes and sap strikes, causing Mr. Birtcher to bleed from a laceration on his upper forehead.

After the head strikes, Deputy Frank Stalzer and Deputy Joseph Kodadek arrived on scene and took over for the civilians by applying their body weight to Mr. Birtcher's back using their fists and knees.

At this point, Mr. Birtcher had already been rolled completely onto his stomach. Deputy Stalzer then interlocked the two separate sets of cuffs and double-cuffed Mr. Birtcher behind his back, while Deputy Robledo pushed down on Mr. Birtcher's right shoulder with his body weight.

### 4:00:01 - 4:03:22
Deputy Drew Beatty then arrived and hobbled Mr. Birtcher's ankles and then held Mr. Birtcher's legs down. Deputy Robledo then applied a maximum restraint cord cuff around Mr. Birtcher's waist as Deputy Stalzer continued to apply pressure to Mr. Birtcher's back. Deputy Beatty pushed Mr. Birtcher's ankles down into his buttocks using his body weight, while the others were atop Mr. Birtcher.

Mr. Birtcher responded by yelling out "help" and "get it off me." It did not appear that Mr. Birtcher was resisting at this time. It appeared that Mr. Birtcher attempted to alleviate the pressure on his chest by lifting his head slightly and yelling "help," to which the deputies responded by forcefully pushing down to immobilize Mr. Birtcher's chest. Mr. Birtcher could be heard making grunting noises as he appeared to be struggling to breathe. At some point, the deputies connected the waist restraint to the ankle restraints - commonly referred to as "hog tying".

Deputies Adrien Carrillo, Scott Rossall, and Sergeant Alan Noble, arrived on scene while the other deputies continued to restrain Mr. Birtcher. While on the ground, Mr. Birtcher spat a small quantity of what appears to be clear saliva an inch or two away onto the asphalt. Deputy Stalzer, while maintaining pressure to Mr. Birtcher's back, commanded Mr. Birtcher to "stop" and "don't start spitting."

Although Mr. Birtcher did not spit or clear his throat again, Deputy Stalzer requested that Deputy Kodadek apply a spit sock. Mr. Birtcher replied "no I'm good [or something like that]." Regardless of Mr. Birtcher's response, Deputy Kodadek applied the spit sock on

**Exhibit A-8**

Mr. Birtcher. When Mr. Birtcher attempted to lift his head again, Deputy Kodadek pushed down on his head and held Mr. Birtcher's head against the black asphalt parking surface.

After Deputy Kodadek applied the spit sock, someone can be heard saying that there was too much slack on the max restraint. Deputy Robledo then applied additional handcuffs to connect Mr. Birtcher's ankle restraint to his rear belt loop. As Mr. Birtcher struggled to lift his head again, Deputy Kodadek told him to stop and that he was not taking it off (the spit sock). Mr. Birtcher begged the deputies to "get it off me" to which Deputy Kodadek again told Mr. Birtcher that he was not taking it off. Mr. Birtcher then attempted to move the front of the spit sock away from his mouth and nose with his right hand and said that he could not breathe. Deputy Kodadek responded by commanding Mr. Birtcher to let go and held Mr. Birtcher's head down against the ground again by the back of his neck while also holding down Mr. Birtcher's right hand. At this time, Deputy Robledo also placed pressure on Mr. Birtcher's mid back. Once Mr. Birtcher's right hand was free, he attempted to move the front of the spit sock away from his mouth and nose again.

### 4:03:23 - 4:10:33
The deputies then moved Mr. Birtcher away from the car while his ankles were bound together and pulled toward his buttocks. Deputy Kodadek continued pushing down on the back of Mr. Birtcher's neck while his other hand pushed down on Mr. Birtcher's mid back. Deputy Robledo's right hand was also pushing down on Mr. Birtcher's back at this time.

Deputy Kodadek released his hand off of Mr. Birtcher's neck and Mr. Birtcher could be seen attempting to lift his head. Mr. Birtcher then extended his legs out, prompting Deputy Beatty to push down on them. Deputy Garza attempted to assist Deputy Beatty by pushing Deputy Beatty down while Deputy Beatty is pushing down on Mr. Birtcher's leg.

At this time, Deputy Kodadek was also applying substantial weight on Mr. Birtcher's back and back of the neck. Deputy Carrillo was placing weight on Mr. Birtcher's upper right back and Deputy Scott Winter was also placing weight on Mr. Birtcher's mid back via Birtcher's handcuffed left wrist.

As Deputy Robledo and then Deputy Rossall attempted to connect another cord cuff, Deputy Kodadek pushed down on Mr. Birtcher's back with both fists and Deputy Carrillo pushed down on Mr. Birtcher's left upper back. Deputy Garza and Deputy Beatty continued to push Mr. Birtcher's legs down against his buttocks. Deputy Rossall also placed weight on Mr. Birtcher's back by placing his left knee on Mr. Birtcher's mid back.

**Exhibit A-9**

At this point, someone asked whether Mr. Birtcher was still breathing and Deputy Kodadek shook Mr. Birtcher's head and asked, "You there?" and Mr. Birtcher did not respond. The deputies continued to ask whether Mr. Birtcher was still breathing and when it appeared that Mr. Birtcher was no longer conscious, the deputies finished applying the maximum restraints then rolled Mr. Birtcher onto his right side.

Mr. Birtcher was not moving and appeared unresponsive at this time. Deputy Rossall performed a sternum rub and looked underneath the spit sock. Someone then said "He's breathing" "I got movement. He's breathing." Deputy Winter appeared to take a carotid pulse and stated "He has a really weak pulse." Deputy Winter asked whether it looked like Mr. Birtcher was on heroin or something and Deputy Garza replied that Mr. Birtcher would not shut his eyes, his eyes were wide open, and his pupils pinpoint. Deputy Winter testified that he then made the decision to administer Naloxone.

After the administration of Naloxone, the deputies discussed taking advantage of Mr. Birtcher's state of unconsciousness and applying a single set of cuffs. Mr. Birtcher was then placed on his stomach again with four deputies holding him down while reapplying handcuffs and conducting a person search, during which no weapons or contraband was found.

**4:10:34**
Firefighters and paramedics arrived at the scene and were informed that Mr. Birtcher may be experiencing excited delirium, possibly under the influence of methamphetamine, had struggled with two deputies, and was tased 4 times in the chest area. Fire then asked whether they could place Mr. Birtcher on the gurney and handcuff Mr. Birtcher to the gurney. Deputy Rossall replied that Mr. Birtcher should be cuffed behind his back.

Approximately one minute later, a firefighter noted that Mr. Birtcher looked a bit purple. A crying bystander can be heard exclaiming, "He's not breathing." Someone else stated "I can't find a pulse on the wrist." The firefighters and paramedics continually requested that Mr. Birtcher's restraints be removed but were denied until Sergeant Noble finally directed deputies to cuff each wrist to the gurney rails. Mr. Birtcher was then wheeled away and loaded onto the back of the ambulance where CPR was initiated. Mr. Birtcher died as a result of this incident.

**Paramedic Narrative (Tim Bergon):**

"RA143 and T-141 responded to a parking lot in San Marcos for a reported

assault.

We arrived on scene to find a 34 year old male lying prone on the ground in the parking lot being held down by three sheriff deputies with multiple deputies on scene. Patient's hands were handcuffed behind his back. Patient's legs were tied at the ankles. Patient had a bloody spit sock over his head. According to the deputies on scene, they were dispatched to the scene for a person acting abnormally. When they approached the victim he was acting erratically and presenting like an excited delirium patient. They attempted to subdue the patient. The patient was tasered two times by the deputies. A physical struggled ensued, and the deputy states it took multiple deputies to bring the patient to the ground. He was then handcuffed and tied. The deputies state they noticed that the patient had constricted pupils so they gave 4mg of narcan.

We found the patient unresponsive and being held down prone on the pavement appearing apneic. In an attempt to get the patient into a more stable environment to allow for a thorough assessment, the gurney was used to expedite movement of the patient to the ambulance. The patient was lifted onto the gurney and placed into the left lateral recumbent position. The deputy was then asked to remove the handcuffs from behind the patient's back. The patient was then placed supine on the gurney with his hands at his side handcuffed to the gurney handrails. The patient's legs were left tied together. The spit sock was removed from the patient's head. It was then noticed that the patient had bleeding and bruising to his forehead. Eyes were fixed and dilated at approximately 7mm. Once in the back of the ambulance it was confirmed that the patient was pulseless and apneic with asystole on the monitor and CPR was initiated.

CPR was performed for the duration of the incident. A red OPA was inserted and a BVM was used with inline EtCO2 monitoring connected. A breath was given every 6 seconds. Pulse rhythm checks were performed every 2 minutes. 1 attempt was made at an IV without success. A blue 25mm 10 needle was successfully inserted into the right tibia' site. Epinephrine Img was given X 2. After Epi, and upon offload, rhythm was noted to be PEA at a rate —20. A 7.0 endotracheal tube was successfully inserted to 24cm at the teeth.

Patient was transported code 3 to the PMC trauma room with a deputy onboard. A full turnover was given and care was assumed by MD and staff.

**Exhibit A-11**

PCR completed by Paramedic intent Joshua Sherlock l20221."

## San Marcos Fire Department Narrative (Dean White):

Units responded to the dispatched location for an assault. T141 was the first arriving unit, but did not status on scene with the MDC resulting in a 16 minute, 45 second response time. The actual arrival time was just prior to the arrival of RA 143.

Upon arrival, T141 personnel found a number of SDSO deputies holding the patient face down. The patient was handcuffed behind his back and his ankles were tied. The patient also had a spit sock over his head and laser barbs in his back. There was blood on the patient's forehead which could be seen through the spit sock. The patient appeared to be unresponsive, but deputies stated that he was breathing. Due to the position of the patient, the restraints and spit sock, an assessment of breathing was very difficult for fire personnel. On the ground adjacent to the patient and deputies was a black case and empty container of Naloxone. As it was a Saturday afternoon, the parking lot had a large number of bystanders witnessing the events from a safe distance.

RA 143 arrived on scene shortly after T 141 and the patient was moved to the gurney and into the ambulance as a more controlled environment for the assessment. Personnel requested that the handcuffs be removed in order to access and assess the patient. The handcuffs were removed from behind his back and reconnected to the gurney rails. The patient's feet were left tied together. Once inside the ambulance it was determined that the patient was not breathing and CPR was initiated. The patient was transported to Palomar hospital with a deputy and FEPM Wagner from T141 on board.

## The Positional or Restraint Asphyxia Occurrence:

Law enforcement officers very frequently encounter situations that require them to restrain persons. As a national standard, police officers are taught that it is imperative that only the force necessary to make an arrest or subdue a combative or resistive person may be used. This is because officers are responsible at all times for the safety and well being of persons they take into their custody, as well as for their own safety and that of bystanders and persons who are improperly restrained can suffer severe injury or death.

Properly trained officers learn how improper restraining techniques can block the flow of air into the individual's lungs contributing to a life-threatening condition known as Positional, or Restraint, Asphyxia. Proper training also covers the multiple effective options available such as side-control techniques which involve control holds of the person's upper arms, avoiding compression of the chest, rolling the subject over on his side, sitting or standing the subject up, proper hobbling methods (which excludes hogtying), sitting the subject in the police unit, summoning EMS to the scene early so that chemical restraints may be employed, etc.

Just restraining someone in a face-down position with their hands handcuffed behind their back is not generally sufficient in and of itself to cause sudden and unexpected death. Chest compression, the presence of illegal drugs such as cocaine or methamphetamine and the fact that many victims of positional/restraint asphyxia have been involved in physical exertion prior to their restraint all work together to result in a scenario that can cause a sudden and unexpected death. Key risk factors include all or some of the following conditions:

- Obesity.
- Pre-existing medical conditions such as heart problems or head and neck injuries.
- The length of any struggle.
- The physical environment in which the struggle takes place.
- Whether the suspect suffers from a mental condition.
- Whether the suspect has been drinking alcohol.
- The presence of depressant or stimulant drugs (substances such as cocaine and methamphetamine.

Experts have stated that excessive restraint, combined with one or more of these factors, can wreak havoc on the cardiovascular and respiratory systems.

Properly trained officers know that breathing requires two actions: Increasing the size of the chest by expanding the ribs, and contracting the diaphragm, allowing air to fill the lungs. When a person is lying face down, performing both of these functions can be more difficult. The contents of the abdomen are pressing against the diaphragm. In order to raise the ribs or use the diaphragm when forced into a prone position, the weight of the body must be lifted. An officer kneeling or lying on the individual's back, aggravates the situation (several deputies violated this precept, per video evidence), because the additional weight of the officer(s) must be lifted along with the weight of the persons' body. The greater the weight or more intense the compression, the harder it becomes to breathe. As a result, the suspect struggles more violently, and the untrained or

incompetent officers respond by using more force. With no reserve oxygen left and unable to take deep breaths, the individual slips into unconsciousness and in minutes could be dead. This training has been widely used since at least the 1990s and is commonly referred to as the physiology of a struggle.

As stated above, the majority of positional or restraint asphyxia incidents have occurred after physical exertion and struggle. Both of these activities stress the heart and lungs, depleting reserve oxygen stored in the muscles.

Competently trained officers know this scenario can be easily avoided by using proper restraint techniques and following simple guidelines that are key to the possibility that a struggling subject could be in danger of death due to positional or restraint asphyxia. One of the most important of these factors is the longer the physical contact, the more fatigued the body will become.

Further, officers are trained that they must act quickly to return the subject to an upright position, especially when risk factors are present because the restraint techniques used could mean the difference between life and death. Basic guidelines include avoiding placing weight on the neck or back, avoiding "straddle" positions and "pile-ons," and immediately positioning the subject so he can breathe.

Lastly, officers are taught that it is not possible for a law enforcement officer to actively determine who is at risk for sudden and unexpected death while suspects are being restrained. As a consequence, the law enforcement officer must assume that any person being restrained presents a risk of sudden and unexpected death. The risk that restraint asphyxia and accidental death will occur is only controlled by using proper restraining techniques.

Properly trained officers are trained that excessive restraint, combined with one or more of these factors, several of which were present in this instance, can impair the cardiovascular and respiratory systems.

Based on video evidence, it appears that several deputies applied body weight (by kneeing on Mr. Birtcher) to Mr. Birtcher's upper torso, neck, and shoulders, while Mr. Birtcher was handcuffed. It appears that the Defendant Deputies failed to follow policy, and reason when they placed body weight on Mr. Birtcher while he was handcuffed.

Page 14 of 40

**Exhibit A-14**

**POST Training Regarding Force Options**

What cannot be lost in this set of facts is that Mr. Birtcher never threatened, molested, or otherwise, fettered any patron, Hobby Lobby employee, or Deputy, as evinced by closed-circuit surveillance video taken from inside the Hobby Lobby, Deputy videos, and investigative testimony. For example:

Q.   Did you ever hear him verbally threaten Deputy Garza?
A.   I did not.
Q.   Did he ever verbally threaten you at that point?
A.   No. (Deputy Robeldo, Page 23)

Q.   Was -- before you got there -- or before any of the deputies got there, was it your understanding that the reported crime for Mr. Birtcher was possibly under the influence?
A.   Correct.
Q.   And there was no information, was there, that he had any weapons?
A.   Correct.
Q.   And no information that he had threatened anyone verbally or physically?
A.   I don't believe so. (Robledo, Page 103)

Q.   Okay.· Was there any specific reported criminal activity?
A.   Nonspecific.· What -- it was just a description of -- of the behaviors that -- that the -- that the subject was displaying.
Q.   Okay.· For example, did you have any information that the person had a weapon?
A.   No, I didn't have that information.
Q.   Any information that the person had robbed someone?
A.   No information on that.
Q.   Injured someone?
A.   No.
Q.   Threatened someone?
A.   No.
Q.   Just a suspicious person?
A.   It was a suspicious person. (Garza, Pages 12-13)

Q.   Okay.· Up to that point in time, had he tried to punch you in any way?
A.   I don't remember him trying to punch.

Q. Did he verbally threatened you at all up to that point in time?
A. I don't remember much of what he was saying. (Garza, Pages 33-34)

Law Enforcement Officers are trained by POST and department policy that a subjects' resistance/actions to an arrest will determine the type of force used by peace officers. The following chart illustrates how a subject's resistance/actions can correlate to the force applied by an officer. (Listed as Subject's Actions, Description of Resistance and Possible Force Option):

*Cooperative* - Subject offers no resistance:
- Mere professional appearance
- Nonverbal actions
- Verbal requests and commands

*Passive non-compliance* - Does not respond to verbal commands but also offers no physical form of resistance:
- Verbal requests and commands
- Officer's strength to take physical control, including lifting/carrying
- Control holds and techniques to direct movement or immobilize a subject

*Active resistance* - Physically evasive movements to defeat an officer's attempt at control, including bracing, tensing, running away, or verbally signaling an intention to avoid or prevent being taken into or retained in custody:
- Control holds and techniques to control the subject and situation
- Use of personal weapons in self-defense and to gain advantage over the subject
- Use of devices to secure compliance and ultimately gain control of the situation

*Assaultive* - Aggressive or combative; attempting or threatening to assault the officer or another person:
- Use of devices and/or techniques to secure compliance and ultimately gain control of the situation
- Use of personal body weapons in self-defense and to gain advantage over the subject

Page 16 of 40

**Exhibit A-16**

*Life-threatening* - Any action likely to result in serious injury or possibly the death of the officer or another person
- Utilizing firearms or any other available weapon or action in defense of self and others

Officers are trained that they must take into account the *totality of the circumstances* when selecting an appropriate and reasonable force option. And that they must use the force option appropriate for the situation as conditions may change rapidly, and be prepared to transition as needed to the appropriate force options. (LD 20: Chapter 2 – Force Options, pages 2-6 & 2-7 )

In this case responding officers had information that Mr. Birtcher was simply acting strangely and possibly under the influence of a drug. Key known facts that should have determined their response includes:
- There was no criminal assault or attempted assault in progress when they arrived on scene.
- When they observed him he had no weapon in hand.
- When they Deputy Garza, and PERT Clinician Brasel tried to communicate with him, Mr. Birtcher demonstrated an obvious lack of awareness of his circumstances and any ability to respond to inquiries and/or instructions.
- When they encountered him Mr. Birtcher was alone.
- Mr. Birtcher was not harming himself when first observed.
- Mr. Birtcher had no weapon.
- Mr. Birtcher did not attack and deputy during the encounter.
- Mr. Birtcher's movements were to avoid contact with the deputies and/or flee the scene to avoid contact.
- Mr. Birtcher was disoriented but as not reported to have done anything threatening or illegal (other than possibly being under hte influence) for nearly a full hour.

Officers are trained that they must take into account the *totality of the circumstances* when selecting an appropriate and reasonable force option. And that they must use the force option appropriate for the situation as conditions may change rapidly, and be prepared to transition as needed to the appropriate force options. (LD 20: Chapter 2 – Force Options, pages 2-6 & 2-7 )

Additionally, an entire chapter in POST Learning Domain #20 is devoted to the "Consequences of Unreasonable Force." Cruelty and malicious assaults are absolutely forbidden:

"**Unreasonable force** occurs when the type, degree and duration of force employed was not necessary or appropriate."

When the force used is unreasonable, the officer can face criminal and civil liability, and agency disciplinary action." (POST #20, 6-4.)

Officers are also trained that although Penal Code Section 834a states that the person being arrested must submit to an arrest, if unlawful or unreasonable force is used to effect the arrest, the person being arrested may lawfully resist to overcome that force. The penal code sections include: Section 692 (Lawful resistance to the commission of a public offense may be made by the party about to be injured or by other parties); Section 693 (Resistance sufficient to prevent the offense may be made by the party about to be injured to prevent an offense against his person, or his family or some member thereof. To prevent an illegal attempt by force to take or injure property in his lawful possession; and Section 694 (Any other person, in aid or defense of the person about to be injured, may make resistance sufficient to prevent the offense)." As stated above, the necessity for a direct intervention by officers occurs in the context of the "totality of circumstances."

Under the facts cited above, Mr. Birtcher was nothing more than "actively resistive" and was never "assaultive" or "combative" or "life threatening." Accordingly, methods to deal with an actively resistant subject in the totality of this incident (a single non-threatening, non-assaultive subject with other officers available) nothing further than officer presence, verbal skills, firm grip and/or grappling to handcuff would be justified (as trained) - this did not occur.

## Information and Training Regarding the Taser Weapon:

The taser is classified as an Electronic Control Weapon (ECW) [originally called Conducted Energy Device - CED], and is a unique use-of-force tool typically used by law enforcement officers to overcome a suspect's assaultive/combative behavior. The most common ECWs in use throughout the nation are manufactured by Taser International, now called Axon Enterprise.

The Taser is designed to discharge electrical charges into a subject to create involuntary muscle contractions that override the suspect's voluntary motor responses. The weapon has three modes of use: "probe," "touch-stun," and "elongated stun" modes. Projectiles with wires are contained in an ECW cartridge. When fired in the probe mode, a cartridge projects, through a set of wires, a pair of barbs (or darts with hooks) that attach to clothing or penetrate the skin after the Taser is fired, delivering an electrical charge. As

**Exhibit A-18**

the barbs penetrate, the electrical current is sent down the wires and through the body between the two barb points. The application of the electrical energy painfully influences and incapacitates the subjects' muscles and nerves.

The effect of the taser on a suspect through the application of an electrical pulse is called "neuromuscular incapacitation" (NMI). The NMI pulse provides electrical energy that provides the officer the ability to dominate a suspect's motor nervous system by interfering with electrical signals sent to the skeletal muscles by the central nervous system. Since the incapacitation is proportional to the muscle mass captured by the NMI, the amount of distance between the two probes when they embed is directly proportional to the effectiveness of the NMI. It must be also noted that the infliction of pain occurs regardless of the distance between the two probes. Thus, despite the distance between the embedded probes (and NMI result), significant pain is inflicted regardless of the existence or absence of NMI.

Taser models are designed to discharge for 5 seconds when the trigger is pulled. The weapon will shut off automatically unless the officer keeps the trigger depressed. The two Taser X2 Models used on Mr. Birtcher have cartridges that contain two sets of probes each and provide features that allow the user to select the discharge of one or both probes. (The record is clear that four probes were fired into Mr. Birtcher's body.) Additionally, the X2 has an internal memory chip that records each application of the weapon. The investigative report of the download data from each weapon used is as follows:

> "I reviewed the CED downloads and learned the following; Deputy Garza deployed both cartridges on his CED. The first cartridge was discharged for a total of five seconds. The second cartridge was deployed immediately following the completion of the first cartridge being discharged. The second cartridge was also discharged for a total of five seconds. There was a one second "arc" discharge, following the second cartridge deployment."

> "Deputy Robledo also discharged both cartridges on his CED. The first cartridge was discharged for a total of eight seconds. There was a three second "arc" discharged during the first cartridge discharge. The two discharges overlapped for a total time of seven to eight seconds (According to Axon/Taser, the timer rounds up or down. There is no way to know the exact time of the discharges). There was a two second pause before the second cartridge was deployed. The second cartridge was discharged for a total of five seconds." (Detective Dan Barns, COSD 000007.)

**Standards Regarding the Use of the Taser Weapon:**

The U.S. Department of Justice (DOJ), the International Association of Chiefs of Police (IACP), the Office of Community Oriented Policing Services (COPS), the Bureau of Justice Assistance (BJA), the National Institute of Justice (NIJ), and other policing organizations and associations developed and published in 2006 and 2011 defining documents regarding the use of the Taser weapon (listed as item 16 on page 3 of this report.) Among other issues, 53 specific and necessary guidelines governing the use of the Taser weapon are listed in the 2011 publication. These guidelines include limiting taser use to no more than 3 cycles (15 seconds) and to avoid firing the weapon into the chest. As such, the 2006 and 2011 publications expresses the accepted professional standard of care and as endorsed by the U.S. Department of Justice. They have not been revised since 2011.

*TASER Training/Warnings Sent To All User Agencies Regarding Chest Shots:*

Following the original 2006 DOJ publication, in 2009 TASER International published *Training Bulletin 15.0* which acknowledged and endorsed the DOJ 2006 published guidelines (including the 15 second limit), and added to their training to avoid firing the darts into the chest. This product warning was acknowledged in the 2011 DOJ publication as follows:

"In October 2009, TASER International released "Training Bulletin 15.0 Regarding Medical Research Update and Revised Warnings," which offered a new preferred target zone for ECWs. It lowered the recommended target area from "center of mass" to "lower center of mass" for front shots. By avoiding the chest whenever possible, TASER International indicated that law enforcement agencies may avoid the "controversy about whether [ECWs] do or do not affect the human heart." (DOJ 2011 Publication, page 37.)

Since 2009, the TASER International Training/Certification lesson plans and their Product Warnings have included the 15 second limit and the increased risks to the heart when taser darts are fired into the chest.

> "Experts have identified dart-to-heart distances and transcardiac (across the heart) vectors as being key determining factors in whether an ECD can effect the heart. *The further an ECD dart is away from the heart the lower the risk of affecting the heart.*" (Taser Version 18 User Update (2012), page 44. Emphasis added.)

When the DOJ updated the 2006 publication in 2011, they included even more specific cautions regarding the medical risks connected to a Taser's use on a subject are quoted as follows:

*"Medical Considerations: Repeated or multiple applications may increase risk of death:"*

"It is important to recognize that ECWs have been cited by medical authorities as a cause of, or contributing factor in, some deaths. A number of factors appear to be associated with fatal and other serious outcomes. These factors include how the ECW was used and the physical or medical condition of the subject who received an ECW application. Indeed, in July 2010 the American Academy of Emergency Medicine issued a Clinical Practice Statement advising physicians that they should consider additional evaluation and treatment for individuals who experienced an ECW application longer than 15 seconds."

"Although causation factors are not clear, the most common factors that appear to be associated with fatal and other serious outcomes include 1) repeated and multiple applications, 2) cycling time that exceeds 15 seconds in duration, whether the time is consecutive or cumulative, and 3) simultaneous applications by more than one ECW. Officers must be trained to understand that repeated applications and continuous cycling of ECWs may increase the risk of death or serious injury and should be avoided." (Page 13.)

*"Medical Considerations: High-risk populations:"*

"Some populations currently believed to be at a heightened risk for serious injury or death following an ECW application include pregnant women, elderly persons, young children, visibly frail persons or persons with a slight build, persons with known heart conditions, persons in medical/*mental crisis*, and persons under the influence of drugs (prescription and illegal) or alcohol. (Emphasis added.) Personnel should be trained about the medical complications that may occur after ECW use and should be made aware that certain individuals, such as those in a state of excited delirium, may be at a heightened risk for serious injury or death when subjected to ECW application or other uses of force to subdue them." (Page 14.)

**Exhibit A-21**

*"Drive Stun: Avoid use as a pain-compliance tactic:"*

"The most commonly used ECWs can be used in two modes: probe and drive stun. Many police managers and officers erroneously believe that applications of drive stun are as effective as applications with probes, but that is not correct. The drive stun mode can be used to complete the circuit in the event that one of the probes is ineffective or becomes dislodged. The drive stun mode can also be used in close quarters for the purpose of protecting the officer or creating a safe distance between the officer and subject. Absent these circumstances, using the ECW in drive stun mode is of questionable value. The primary function of the drive stun mode, when not used to complete the circuit, is to gain subject compliance through the administration of pain. Using the ECW to achieve pain compliance may have limited effectiveness and, when used repeatedly, may even exacerbate the situation by inducing rage in the subject. For these reasons, agencies should carefully consider policy and training regarding when and how personnel use the drive stun mode, and should discourage its use as a pain compliance tactic. Drive stun has an applicable but limited purpose that should be taught, explained, and monitored during ECW training and field use." (Page 14.)

I have noted specific apparent departures from the guidelines which, in my opinion contributed significantly to this incident. They are stated below and identified by number in the sequence of the 53 guidelines enumerated as follows (Pages 17-24):

*Electronic Control Weapon Guidelines:*

1.  Before any agency personnel (e.g., officers, jail personnel, auxiliary/reserve officers, civilian staff) are armed with ECWs, they should receive all mandated training and achieve all qualification requirements.

2.  Agencies should use scenario and judgment-based training that recognizes the limitations of ECW application and the need for personnel to be prepared to transition to other force options as needed.

3.  ECW recertification should occur at least annually and should

consist of physical competency and weapon retention, agency policy including any changes, technology changes, and reviews of local and national trends in ECW use. Recertification should also include scenario-based training.

4. Personnel should be trained to use an ECW for one standard cycle (five seconds) and then evaluate the situation to determine if subsequent cycles are necessary. Training protocols should emphasize that multiple applications or continuous cycling of an ECW resulting in an exposure longer than 15 seconds (whether continuous or cumulative) may increase the risk of serious injury or death and should be avoided.

5. Training protocols should emphasize the risk of positional asphyxia, and thus officers should be trained to use a restraint technique that does not impair the subject's respiration following an ECW application.

6. Personnel should be trained to attempt hands-on control tactics during ECW application, including handcuffing the subject during ECW application (i.e., handcuffing under power). Training should emphasize that personnel who touch a subject during ECW application will not receive exposure to the electrical charge, so long as caution is taken not to touch the subject along the circuit (i.e., between the locations of the two probes).

7. Command staff, supervisors, and investigators should receive ECW awareness training appropriate to the investigations they conduct and review.

8. Personnel should use an ECW for one standard cycle (five seconds) and then evaluate the situation to determine if subsequent cycles are necessary. Personnel should consider that exposure to the ECW for longer than 15 seconds (whether due to multiple applications or continuous cycling) may increase the risk of death or serious injury. Any subsequent applications should be independently justifiable, and the risks should be weighed against other force options.

9. Personnel should not intentionally activate more than one ECW at a

time against a subject.

10.     Fleeing should not be the sole justification for using an ECW against a subject. Personnel should consider the severity of the offense, the subject's threat level to others, and the risk of serious injury to the subject before deciding to use an ECW on a fleeing subject.

11.     Personnel should be aware that there is a higher risk of sudden death in subjects under the influence of drugs and/or exhibiting symptoms associated with excited delirium.

12.     ECW activations should be tracked in the agency's early intervention system (EIS).

13.     Agencies should periodically conduct random audits of ECW data downloads and reconcile use-of-force reports with recorded activations. Agencies should take necessary action as appropriate when inconsistencies are detected.

14.     Audits should be conducted to verify that all personnel who carry ECWs have attended initial and recertification training." (*2011 Electronic Control Weapon Guidelines*. U.S. Department of Justice Office of Community Oriented Policing Services and Police Executive Research Forum (PERF), Washington, D.C., March, 2011.)

## POST Training Regarding the Use of Impact Weapons:

It is uncontested that Mr. Birtcher sustained injuries to his head, face, and body, which appear consistent with blunt force caused by Deputy Robledo's closed-fisted and sap blows to Mr. Birtcher's head. I had expected to review a commentary regarding internal injuries to his head and brain as noted in his autopsy. They were not included in the autopsy report provided in this case. The use of an impact weapon to the head is a very serious consideration. POST training in this regard states:

"Every peace officer must understand that an impact weapon (i.e. baton) should be used only when an officer is acting in a reasonable manner or to repel and protect in certain tactical considerations." (Post Learning Domain

#33, page 7-3. Emphasis added.)

"A peace officer's impact weapon is a deadly weapon as defined in Penal Code Section 22210. In law enforcement, however, to be used In an authorized manner, it must be used reasonably to repel or protect." (Post Learning Domain #33, page 7-3. Emphasis added.)

"Illegal use by an officer:

"Any officer who uses an impact weapon against a subject beyond objectively reasonable (i.e., Graham vs. Connor) force can be criminally liable under the following statutes."

"Penal Code 149:    Any officer unnecessarily assaulting or beating any person under color of authority."

"Penal Code 245:    Assault with a deadly weapon or force likely to produce great bodily injury." (Post Learning Domain #33, page 7-4.)

Further, officers are taught (and as recently stated by the 9th Circuit) that among other obvious injuries, the use of the baton can cause deep bruising and clotting that can eventually reach the heart and/or lungs and cause stroke and/or death. In the matrix of subject behaviors, the use of any object to the head is justified only as a response to aggressive or combative acts. Deputies have testified that they considered Mr. Birtcher's behaviors a threat, yet they admit Mr. Birtcher never aggressed or threatened them. Under these set of facts, the admitted blows to the head and body by a sap and fists are not justified.


## Consequences of Blows/Kicks to the Head:

It is important to note that the autopsy reports does note blunt force surface injuries which appears consistent with blows to Mr. Birtcher's head. Officers are trained that blows to the head can result in serious injury and death, and are not to use blows to the head absent the protection of life. With multiple deputies present, and Mr. Birtcher on the ground, no deputy's life was in danger; therefore, any blows to the head of Mr. Birtcher were out of policy.

"Punches to the head or face can cause severe injuries to the individual, and

**Exhibit A-25**

additionally carry a high risk of injury to the deputy using such force. Deputies should only use this extremely dangerous level of force where lower force levels are not available or are ineffective, especially when the individual is already handcuffed and less severe use of force alternatives are available. See Graham, 490 U.S. at 396. LASD's Deputy Field Operations Manual and Defensive Tactics Manual state that "personnel are discouraged from striking an attacker's head with a fist," and encourages deputies "to use an open hand palm heel strike to lessen the potential of cutting injuries." LASD policy prescribing situational uses of force essentially ranks head strikes as akin to deadly force, stating they are appropriate only when a subject's behavior is "likely to result in serious injury or possibly in the death of a person." Punches to the face, as opposed to the head, are not considered deadly force, but this poor tactic can result in more injury to a subject and a deputy. The pattern of head and face strikes against handcuffed individuals we observed in LASD appears unreasonable under the Fourth Amendment." (DOJ Correspondence: "Investigation of Los Angeles County Sheriffs Department Stations in Antelope Valley," June 28, 2013, Page 32.)

**Opinions Thus Far:**

1.   From my review of the materials provided, the initial decision by Deputy Garza to try and handcuff and pat down Mr. Birtcher by himself and subsequently take Mr. Birtcher down by the shoulders by himself was unreasonable. POST Basic Learning Domain #33 "Arrest Methods/Defense Tactics," Chapter 2 - Person Searches instructs that in order to lawfully conduct a cursory/frisk search, officers must have articulable facts which support a reasonable suspicion that the subject may be armed or dangerous. Here, Deputy Garza was only detaining Mr. Birtcher to investigate the possibility of Mr. Birtcher being under the influence of drugs. It does not appear that Deputy Garza had any articulable facts to support a reasonable suspicion that Mr. Birtcher may be armed or dangerous. Although Deputy Garza claims that Mr. Birtcher kept reaching into his pockets, I am unable to find anything on the record that corroborates his claim and the Hobby Lobby surveillance videos do not show Mr. Birtcher ever reaching into his pockets. POST Basic Learning Domain #33 "Arrest Methods/Defense Tactics," Chapter 2 - Person

**Exhibit A-26**

Searches further instructs officers that there should ideally be two officers available when conducting a person search. Here, Deputy Garza should not have handcuffed and attempted to conduct a pat down of Mr. Birtcher by himself when he knew that backup was going to be there within seconds. Lastly, the April 2017 IACP Model Policy on Excited Delirium instructs that when a an officer suspects that someone is in a state of delirium or disorientation, especially excited delirium, and there is no apparent threat of immediate injury to the person or others, an officer should wait for backup and EMS assistance before controlling the subject. EMS should be pre-staged and should provide sedation if necessary. Deputy Garza should have waited until he had backup before physically detaining Mr. Birtcher, attempting to pat Mr. Birtcher down, and attempting to take Mr. Birtcher down by the shoulders.

2.      From my review of the materials provided, the use of force and restraint inflicted on Mr. Birtcher by Deputies Garza, Robledo, Stalzer, Kodadek, Beatty, Carrillo, Rossall, and Winter was excessive and unreasonable, including but not limited to the use of the TASER, punching Mr. Birtcher repeatedly in the head and face area, striking Mr. Birtcher with a sap repeatedly in the head and face area, the use of a hobble, the use of multiple max restraint cord cuffs and handcuffs to connect Mr. Birtcher's ankles to his waist, the use of the spit sock, and the deputies pressing down and applying weight on Mr. Birtcher's legs, back, neck, and head. Across the nation for decades Law Enforcement Agencies have trained their personnel on the proper tactical responses, use of force options, use of restraint options and medical assessment and care of persons they take into custody in order to avoid injuries and/or deaths—such as what occurred in this case. These methods are well-known and proven effective for the safety and welfare of both officers and the public. In my opinion, the deputies in this case utterly failed to follow these standards and their training in this incident. Had they done so, Mr. Birtcher would not have died during his encounter with the defendant deputies.

3.      Any use of the TASER was totally unnecessary and unjustified. The SDSO use of force guidelines state that the TASER "shall only be used as a means of subduing and gaining control of a subject

displaying assaultive behavior." From my review of the materials, Mr. Birtcher did not display any assaultive behavior before Deputy Robledo deployed his TASER. The guidelines further state that a subject is typically immobilized within two to three seconds but recovers rapidly, thus deputies should move in quickly to restrain the subject. From my review of the materials, Deputy Garza and Deputy Robledo did not move in quickly after any of the TASER deployments and were not prepared to do so. The guidelines also state that deputies should evaluate whether the use of the TASER is appropriate based on the subject's physical condition, including whether the subject is under the influence, versus the level of threat posed by the subject. From my review of the materials, Deputy Garza and Deputy Robledo failed engage in this evaluation. Had they done so, they would have determined that Mr. Birtcher was possibly under the influence and did not pose an immediate threat at any time prior to the TASER deployments. In addition to the TASER guidelines provided by SDSO, the TASER manufacturer also cautions law enforcement against TASER exposure to a subject's chest area as it can lead to cardiac capture, cardiac arrest, serious injury, or death. Deputy Garza and Deputy Robledo disregarded this warning when they deployed their TASERs at Mr. Birtcher's chest area. Further, the training materials provided by the manufacturer instructs that the greater the spread of the probes, the higher likelihood if neuromuscular incapacitation. The greater the distance the officer is standing away from the subject at the time of deployment, the greater the spread (with each feet accounting for one additional inch of spread). From my review of the incident videos, it appears that Deputy Garza and Deputy Robledo were not standing far enough away from Mr. Birtcher to achieve effective neuromuscular incapacitation at the times of TASER deployment. Lastly, the TASER training materials instruct that a full 5-second spark test should be conducted once every 24 hours or prior to the start of an officer's shift to check that the TASER is sparking and to check battery performance. Here, it appears that neither Deputy Garza nor Deputy Robledo conducted a spark test 24 hours prior or on the day of the incident and at least two of the TASER cartridges they used were expired.

4. According to the SDSO use of force guidelines, deputies may use

**Exhibit A-28**

punching techniques if a subject is aggressive, combative, or exhibits signs of imminent physical attack. The guidelines also recommend that a deputy use an open hand (palm heel) technique to reduce the likelihood of injury to the deputy's hand. Here, Deputy Robledo used hammer-fist strikes to Mr. Birtcher's head and face area even though Mr. Birtcher was never aggressive, combative, or exhibited signs of imminent physical attack. The guidelines also state that deputies should avoid hitting a subject's head unless the subject's action suggests an imminent threat of death or serious bodily injury to the deputy and no reasonable alternatives are available. A reasonable deputy knows or should know that blows to the head with an impact weapon could potentially be deadly force. Here, Deputy Robledo struck Mr. Birtcher's head several times with his fists and sap even though Mr. Birtcher never posed an imminent threat of death or serious bodily injury to Deputy Robledo and Deputy Robledo had reasonable alternatives available to gain Mr. Birtcher's compliance. A properly trained and reasonable deputy would have known that if a deputy uses unreasonable and excessive force against a subject, that subject has the right to defend himself. From my review of the materials, it appears that Mr. Birtcher attempted to defend himself from the deputies' use of excessive force and restraint.

5.  In my opinion, the application of the "maximum restraint technique" was excessive, unnecessary, and unjustified. The deputies are trained that the maximum restraint technique should only be used on violent subjects who cannot be controlled by other means. Here, the deputies used the maximum restraint technique even though Mr. Birtcher was never violent. The deputies are also trained that as soon as possible after the subject is maximally restrained, the subject should be rolled onto his side or placed in a seated position and the deputies must continually monitor the subject for consciousness and breathing. Here, the deputies failed to roll Mr. Birtcher over or monitor his breathing after the first maximum restraint was applied or after the handcuff was used to connect Mr. Birtcher's ankles to his belt loop. It should be noted that numerous if not most law enforcement departments have banned hogtie restraints long ago due to the potentially dangerous and lethal risks associated with hogtieing. This is because hogtying may lead to positional or restraint asphyxia. It should further be noted that POST Learning Domain #33 "Arrest Methods/Defensive Tactics" defines "general control" as the degree

of influence and officer must exert over a subject in order to take the subject into custody and that the subject may still have options for movement while under general control. Here, it appears that the deputies' objective was complete immobilization of Mr. Birtcher, which is not the objective defined under "general control." In my opinion, it was excessive and unreasonable for the deputies to apply maximum restraints to Mr. Birtcher due to the dangers associated with this restraint technique and the risk of death by asphyxia.

6. A reasonable deputy is trained that the sustained application of pressure or weight on the torso or hips of a subject who is prone on the ground may make it more difficult for the subject to breathe. From my review of the materials, it was unreasonable for the deputies to continue to apply pressure and body weight on Mr. Birtcher after Mr. Birtcher was handcuffed. It was also was unreasonable for the deputies to continue to apply pressure and body weight on Mr. Birtcher after Mr. Birtcher was hobbled and certainly after the maximum restraint technique had been used, even if there was some slack in the connection. The deputies' application of pressure and body weight on Mr. Birtcher's legs, back, neck, and head violated their training and a properly trained deputy would have known that the this application of pressure and body weight could significantly contribute to a positional asphyxia condition. Deputies are also subject to a policy that they may apply a spit sock on a subject if the subject is assaulting or attacking another with his spit. Here, Mr. Birtcher never attempted to attack or assault any of the deputies by spitting. Regardless, a spit sock was applied in violation of policy. The deputies should also be trained per their policy that if signs of medical distress develop after the spit sock as used, the deputy should remove the spit sock and seek immediate medical attention. Here, Mr. Birtcher repeatedly attempted to adjust the spit sock away from his nose and face and told the deputies that he could not breathe. Despite all of this, the deputies failed to remove the spit sock from Mr. Birtcher and seek medical attention, and instead, prevented Mr. Birtcher from clearing his nose and mouth from the spit sock. Even after Mr. Birtcher became unconscious and unresponsive, deputies failed to remove the spit sock. It is my opinion that a properly trained deputy would have known that the application of pressure and body weight on Mr. Birtcher while he was prone on the ground and the application of the spit sock and

failure to remove the sock after Mr. Birtcher exclaimed that he could not breathe would have made it difficult for Mr. Birtcher to breathe and could ultimately cause a positional asphyxia condition.

7.  The deputies were subject to a policy warning them that some subjects may be at risk of sudden death syndrome after a physical confrontation due to drug-induced psychosis, genetic psychosis, or excited delirium. The deputies are trained to watch out for a number of symptoms including delirium, paranoia, non-purposeful behavior, and confusion and to have a subject exhibiting those symptoms to be immediately evaluated by a physician at an approved hospital. The decision to transport the subject by patrol car or paramedics should be based on the option that provides the fastest access to professional medical care. Here, it appears that Mr. Birtcher exhibited such symptoms but the deputies violated their training by failing to either have EMS standing by before attempting to restrain him, or transporting Mr. Birtcher to a medical care facility themselves if that would have been faster than waiting for EMS.

8.  In my opinion, the deputies' actions of rolling Mr. Birtcher back onto his stomach after he had been maximally restrained and was unconscious for the stated purpose of adjusting his handcuffs and/or searching him was unreasonable and showed a reckless indifference to Mr. Birtcher's safety and is reflective of extremely improper and inadequate training. His positioning and the deputies' resistance to removing or adjusting Mr. Birtcher's restraints also appears to have delayed the Fire Department's ability to access, assess, and treat Mr. Birtcher. Additionally, POST Learning Domain # 34 "First Aid & CPR" instructs that officers are to assume the role of First Responder in a situation involving a medical emergency. In this role, officers should assume the responsibility of initiating actions regarding the well-being and care of an ill or injured person, including but not limited to conducting an assessment of the person's airway, breathing, and circulation, and provide CPR, rescue breathing, or aid in breathing if the person is unconscious. Officers are trained that they may be held liable for failure to provide such medical care. The deputies here failed to provide any CPR, rescue breathing, or aid in breathing to Mr. Birtcher.

9. It is imperative that law enforcement agencies conduct adequate investigation regarding critical use of force incidents that involved similar uses of force and resulted in death or serious bodily injury. In my opinion, the County of San Diego had a custom and practice of condoning the use of excessive and unreasonable force based on this case and the numerous other cases I am aware of or in the cases I have been retained as an expert. Further, from my review of the materials, it appears that the written policies and training of SDSO are deliberately indifferent to the constitutional rights of people like Mr. Birtcher and can foreseeably lead to the use of excessive force by its deputies. This includes the SDSO policy of allowing the use of maximum restraints (essentially hogtying an individual) and the failure to instruct deputies about the physiology of a struggle and to minimize the length of a struggle with an person at-risk of sudden death. The Sheriff's Department had notice that several other people had recently died after being restrained in maximum restraints, and/or having body weight applied in a prone position, and/or restrained with spit socks, and/or having a prolonged struggle against restraint, and/or deployed multiple TASER devices, yet it does not appear to have ensured that its Deputies were adequately trained to restrain in a safe and effective manner. The Department also was aware that deputies had used inherently dangerous restraint methods, including holding an inmate in place with body weight for several minutes, that severely compromised his ability to breathe and resulted in death due to positional asphyxia. Reasonable officers are provided with proper training and are subject to proper policies regarding the use of force and summoning or obtaining medical attention for persons in their custody. Even though I have yet to receive the complete training records as of yet, it appears that the deputies involved in this incident were not disciplined or directed to attend any remedial training as a result of this incident, indicating that the Sheriff's Department's training programs are inadequate and it either failed to properly investigate this critical incident and enforce its policies, or it deliberately ratified conduct it knew to violate its policies.

## My Qualifications To Review This Case:

My opinions are based in part on my training, professional experience and education. I am a twenty seven year veteran of the Los Angeles County Sheriff's Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant. I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5, 1988). The POST Command College was a Masters level two-year course of study requiring a thesis, in Police Administration, with the diploma awarded by the California Department of Justice (and not the California University system).

During the course of my service with the department, I had a wide range of duties. Those duties included an 18 month assignment as a staff jail deputy and two years as an Administrator/Lieutenant in the same jail facility (Men's Central Jail). I also served on the department as a patrol officer, field supervisor, jail watch commander and administrator, station watch commander, and commanding officer of investigative units. I was a field training officer while assigned as a patrol deputy, and I trained new officers in POST and department approved patrol procedures, field investigations, apprehension techniques, and emergency procedures.

I was a Station Detective and, as such, reviewed and assessed cases passed on to me by the patrol officers. Those cases included possible complaints relating to both misdemeanor and felony crimes. They frequently required follow up investigations and interviews before the exact nature of the case could be determined. As a field officer and detective, I was trained in interview and interrogation methods and subsequently trained other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives as they took complaints and conducted preliminary investigations regarding criminal and administrative matters.

As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the POST accepted patrol tactics, and investigation and apprehension methods.

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer-involved shootings. I was also assigned by my Department to sit as a member of Departmental review committees regarding the reasonable or unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's Central Jail (MCJ) for a period of 18 months as a line officer. Upon my subsequent promotion to Lieutenant, I returned to the same facility approximately 10 years later. During that time, I was assigned as a Jail Watch Commander, and as the Facility Training and Logistics Administrator. At the time of my assignment, the MCJ held a daily population in excess of 7,000 inmates, including a hospital, which was serviced by a staff of more than 900 sworn and civilian personnel.

During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I worked closely with the State of California Peace Officer Standards and Training in revamping our Reserve Academy to bring it into state compliance. This process gave me an expertise in the POST Basic curriculum. I also supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. Among other topics, I lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

During the 1984 Olympics held in Los Angeles, I was assigned and served as the Department's Intelligence Officer at the Los Angeles Olympics Emergency Operations Center.

During the last five and one half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals. I held this position until my retirement from the Department on March 31, 1993.

Criminals investigated and arrested by N.O.R.S.A.T. included suspects involved with homicide, robbery, kidnaping, extortion, burglary, major narcotics violations and police corruption. The majority of our cases were homicide cases, including the murder of police officers. Arrests frequently occurred in dynamic circumstances including crimes in progress.

My unit also conducted major narcotics investigations including undercover narcotics buys, buy busts, and reverse stings. We frequently deployed at the request of investigative units, such as Narcotics, which provided the initial investigative leads for our operations. These narcotics cases usually involved multiple kilogram quantities of drugs and amounts of money ranging from one hundred thousand to more than one million dollars.

Approximately 80% of cases assigned to N.O.R.S.A.T. were active Homicide

investigations. In that regard, the unit processed, under my command and supervision, various aspects (depending on the complexity of the cases involved) of approximately 1,000 Homicides ranging from deaths of police officers to serial homicide suspects.

Additionally, the majority of the over 1750 cases for which I have been retained as a consultant (since 1993) have involved injuries or deaths connected with some aspect of force during either apprehension or while in police custody.

During the first three months of my command of N.O.R.S.A.T., the unit had three justifiable shooting incidents. From that time, and over the next five years of my command, N.O.R.S.A.T. established a remarkable record of more than two thousand arrests of career criminals without a single shot fired – either by my officers or by the suspects whom we arrested.

Many of these suspects were armed and considered to be very dangerous. Some were apprehended during the course of their crimes and were very prone to use firearms to escape apprehension. This record of excellence was accomplished through the use of proper tactics, management and supervision of personnel, training in correct apprehension methods, and adherence to the moral and ethical standards endorsed by California POST and my Department. These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel." This order remained in force 20 years (until September 30, 2009), and included the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

Since my retirement, I have testified as an expert on use of force, jail procedures and jail administration, investigations, police procedures, police tactics, investigative procedures, shooting scene reconstruction, and police administration in Arizona State Courts, California State Courts, Washington State Courts and Federal Courts in Arizona, California, Colorado, Florida, Illinois, Indiana, Louisiana, Missouri, Nevada, Ohio, Oregon, Pennsylvania, Texas, Utah, Washington, New Mexico, New York and Wisconsin. I have testified before the Los Angeles Police Department Board of Rights and the Los Angeles County Civil Service Commission. I have testified before the Harris County (Texas) Grand Jury and the Cleveland Grand Jury. I have also submitted written opinions in matters before Alaska, Delaware, Idaho, Montana, North Carolina, New

York, Oregon, Kentucky, and Wyoming Federal and State Courts. I was selected (January 20, 2007) to present on the topic of: "Police Experts" at the National Police Accountability Project held at Loyola Law School, Los Angeles, California. I was selected (September 23, 2010) to present on the topic of: "Using POST Modules to Establish Police Officer' Standard of Care" at the National Police Accountability Project, National Lawyers Guild Convention, in New Orleans, Louisiana. I was selected (March 30, 2012) to present to the Kern County Public Defenders in Bakersfield, California, on the topics of "Ethics, Police Investigations, the California POST Curriculum, and the M26 and X26 Taser weapons." On August 7, 2013 I was invited and presented to the Texas Civil Rights Project (TCRP) 2013 Annual Legal Summit in Austin, Texas on the topic: "Ethically Working with Experts from the Prospective of a Police Expert." On October 15, 2015 I was the invited presenter at a Community Forum in Victorville, California on the topics of Police Procedures, Community Policing, Use of Force, and features of the M26, X26 and X2 Taser weapons.

I have worked on several projects with the Paso Del Norte (El Paso, Texas) Civil Rights Project and the Texas Civil Rights Project (Austin, Texas). As a result of my expert testimony in *Border Network, et al. v. Otero County, et al.*, Case No. 07-cv-01045 (D.N.M. 2008), a federal court issued a temporary injunction to stop the illegal and widespread immigration raids in Chaparral, New Mexico, implemented pursuant to Operation Stonegarden. The case resulted in the adoption of a model policy for inquiring into a person's immigration status, which has been adopted nationwide and has also been presented to the United States Senate, the Secretary of Homeland Security, and other government officials seeking to reform immigration enforcement.

I have been recognized, and my expert report was quoted by the USDC in *Burns v. City of Redwood City*, 737 F.Supp2nd.1047. I have been recognized, and my expert report was quoted by, the United States Court of Appeals for the Ninth Circuit as an expert in Police Administration and Use of Force in *Blankenhorn v. City of Orange, et al.*, 485 F.3d 463, 485 (9th Cir. 2007). The Ninth Circuit also drew from my expert report in a second published case involving Police Detective Investigations. *Torres, et al. v. City of Los Angeles, et al.*, 540 F.3d 1031, 1042-43 (9th Cir. 2008). The *Torres* case was appealed to the U.S. Supreme Court and returned for trial. I provided the expert opinion in *Chavies Hoskin v. City of Milwaukee, et al.* (USDC Case No. 13-cv-0920), regarding field strip and cavity searches, hiring, training, discipline and supervision, and which resulted in significant policy changes within the MPD. My opinions supported argument in the Ninth Circuit case: *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1102 (9th Cir. 2014). The Ninth Circuit also drew from my expert reports regarding credible threats justifying the use of force, *Hayes v. County of San Diego*, 658 F.3d 867 (9th Cir. 2011), and *Young*

*v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding Jail Administration and Administrative Responsibilities, *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding an officer's violation of the 14ᵗʰ Amendment if an officer kills a suspect when acting with the purpose to harm, unrelated to a legitimate law enforcement objective, in *AD v. California Highway Patrol*, 712 F. 3d 446 (9th Cir. 2013). The Fifth Circuit drew from my expert report regarding search and seizure, investigations and no-knock requirements in *Bishop et al. v. Arcuri et al.*, 674 F.3d 456 (5th Cir. 2012). The Ninth Circuit also drew from my expert report regarding the use of impact weapons (PepperBall) on civilians in *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012). I was the expert in the Ninth Circuit opinion regarding the allegations proffered by police officers and their use/display of firearms against civilians in *Green v. City and County of San Francisco*, 751 F. 3d 1039 (9th Cir. 2014). Most recently, I was the expert in an important Ninth Circuit opinion regarding the allegations proffered by police officers and their use of lethal force against unarmed persons in *Jennifer Cruz, et al., v. City of Anaheim, et al.*, 765 F.3d 1076 (9th Cir. 2014). I was the expert at trial in the Ninth Circuit opinion regarding the order of evidence at trial in *Estate of Manuel Diaz, v. City of Anaheim*, et al., No. 14-55644. My opinion is quoted in the Ninth Circuit opinion regarding the use of lethal force in *A.K.H. a minor, et al, v. City of Tustin, et al.*, No. 14-55184. My opinions supported argument in the Ninth Circuit case: *Estate of Angel Lopez, et al., v. Kristopher Michael Walb*, No. 14-57007 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court. My opinions supported argument in the Ninth Circuit case: *Estate of Shakina Ortega, et al., v. City of San Diego, et al.* No. 14-56824 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court. My opinions supported argument in the Ninth Circuit case: *Jerry Newmaker, et al., v. City of Fortuna, et al.* No. 14-15098 (for publication). My opinions supported argument in the Ninth Circuit Case: *Tonya E. Shirar, v. Miguel Guerrero, et al.* regarding use of lethal force and "suicide by cop," No. 15-55029 (not for publication). My opinions supported argument in the Ninth Circuit Case *Angel Mendez; Jennifer Lynn Garcia, v County of Los Angeles, et al.*, Nos. 13-56686, and 13-57072 (for publication) and which was settled before the Supreme Court, No. 16-369, regarding the use of lethal force and searches. My opinions supported argument in the Ninth Circuit case: *Chien Van Bui, et al, v City and County of San Francisco, et al*, No. 14-16585 (not for publication), regarding the use of lethal force. My opinions supported argument in the Sixth Circuit opinion, Case No. 16-5322, *Carey Woodcock v. City of Bowling Green, et al*, Originating Case No. 1:13-cv-00124 regarding the use of lethal force. My opinions supported argument in the Ninth Circuit opinion, Case No. No. 14-17388 (for publication), *Johnathan Jones, et al v. Las Vegas Metropolitan Police Department, et al*, Originating Case No. 2:12-cv-01636- regarding

Exhibit A-37

the use of lethal force and Taser weapons. My opinions supported argument in the Ninth Circuit opinion, Case No. 16-15606 (for publication), *Christian Longoria, et al v. Pinal County, et al,* Originating Case No. 2:15-cv-00043, PHX SRB, regarding the use of lethal force after a vehicle pursuit. My opinions supported argument in the Ninth Circuit case: *S. B. v. County of San Diego,* 864 F.3rd 1010 (9th Cir. 2017), (for publication) regarding issues of qualified immunity. My opinions supported argument in the Tenth Circuit case: *Russell Tenorio v. Brian Pitzer,* Case No. 2012-CV-01295 (U.S. Supreme Court No. 15-795) regarding issues of qualified immunity and use of deadly force. I participated as a retained expert in the USDC Fifth District case, Stephen McCollum et al., v. Texas Department of Criminal Justice, et al., Case No.3:12-CV-02037 regarding in-custody hyperthermia deaths. My opinions supported argument (and I was cited by name) in the Ninth Circuit opinion, Case No. 17-55116 (for publication), *Susan Mellen, et al v. Marcella Winn, et al,* D.C. Case No. 2:15-cv-03006, GW AJW, regarding Detective Investigations and Qualified Immunity. My opinions supported argument in the Ninth Circuit Case *Richard Vos; Jenelle Bernacchi, v City of Newport Beach, et al.,* Nos. 16-56791 (for publication) and which was settled by the Supreme Court, No. 16-56791, regarding the use of lethal force and mental illness.

The California Court of Appeal (Second Appellate District) drew in part from my expert report regarding search warrant service, *Macias v. County of Los Angeles,* 144 Cal. App.4th 313, 50 Cal. Rptr.3d 364 (2006). The California Supreme Court drew in part from my expert opinion regarding police tactics and the use of deadly force, *Hayes et al. v. County of San Diego et al.,* 57 Cal.4th 622 (2013). I was quoted by the California Appellate Court (Second Appellate District, Division Three) in *B.B., a Minor, etc., et al., v. County of Los Angeles, et al.,* Case No. B264946 Super. Ct. Nos. TC027341, TC027438, BC505918 regarding positional asphyxia issues.

On February 10, 1989, I was personally commended at the Los Angeles County Hall of Administration by United States Attorney General, the Honorable Edwin Meese III, for my work to establish California Penal Code Section 311.11 (forbidding the Possession of Child Pornography). On February 22, 1993 (at the time of my retirement), Mr. Meese presented a second personal commendation for the success of this critical five-year effort to bring this law into effect. California Penal Code Section 311.11 is required training for all Law Enforcement Officers in California and taught extensively in the POST Basic Learning Domain #9: "Crimes Against Children,"pages 1-18 to pages 1-21.

On December 7, 2015 I was requested by the Cleveland District Attorney to present my opinions to the Cleveland Grand Jury regarding the November 22, 2014 shooting death of Tamir Rice by City of Cleveland police officers. In March, 2016 I was requested by the

Delaware Attorney General to review and provide my opinions regarding the shooting death of Jeremy McDole. The AG report was published May 12, 2016.

I have been found competent by both Federal and State Courts to render opinions as to responsibilities as occurred in this case. A number of my cases have involved law enforcement officers as civil plaintiffs and as criminal defendants.

Since my retirement, I have become an expert in the features and the use of TASER International's products, including the Model M26, Model X26 and Model X2 ECDs. I own each, along with the download software. I have reviewed all the TASER training materials and am familiar with the risks and tactics associated with these potentially lethal devices. I have qualified as an expert on TASER products and testified both in deposition and before juries on their usage. Two published examples are *Lee v. Nashville*, 596 F. Supp. 2d 1101, 1121-22 (M.D. Tenn. 2009), and *Heston v. City of Salinas*, 2007 U.S. Dist. LEXIS 98433, *25-*26 (E.D. Cal. 2007). My most recent Federal acceptance/certifications as an expert in the general use and deployment of the TASER weapon (including Taser International product warnings/bulletins sent to every agency using the Taser weapon) occurred in Los Angles, California on November 7, 2017 in *William Mears, et al., v. City of Los Angeles, et al,* USDC Case No.: CV 15-08441 JAK (AJWx) and on February 22, 2018 in *Maria Hernandez; A.J., Jr., et al, v. City of Los Angeles, et al,* USDC Case No. 2:16-c-02689 AB (JEMx), and on May 3, 2018 in Heleine Tchayou, et al. v. City of Los Angeles, et al., Case No. 16-cv-06073-TJH-MRW, and on November 1, 2018 in Alma Rosa Godinez, v. San Diego County, et al. Case No. 3:16-cv-00236 BAS-NLS. There are many others.

Attached as Exhibit A is a statement listing my law enforcement qualifications and experience; Exhibit B is my fee schedule; Exhibit C is a listing of matters in which I have testified in the last four years as an expert.

I reserve the right to modify my opinions to the extent additional information is provided.

I declare under penalty of perjury that the foregoing is true and correct. Executed June 17, 2019 at Santee, CA.

**Exhibit A-39**

_Roger A. Clark_

Roger A. Clark

Page 40 of 40

**Exhibit A-40**