# Exhibit "A"

**Ronald L. O'Halloran, M.D.**
**2710 Grand Forks Road**
**Henderson, NV 89052**
Phone 805-647-5198
Email vcmedexaminer@yahoo.com

June 16, 2019

Dale Gallipo, Esquire
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367

Re: Kristopher Birtcher death on 10/14/2017 during custody restraint by SDSO

### **REPORT OF DR. RONALD O'HALLORAN**

*This report is prepared and submitted pursuant to Federal Rule of Civil Procedure 26.*

Dear Counsel:

As initially requested in April of 2019, I reviewed the digital records and digital image materials you and attorney John Fattahi sent me concerning the 10/14/2017 death of Kristopher Birtcher while being restrained by San Diego County Sheriff deputies. This report summarizes my conclusions regarding the forensic pathology issues of his cause of death and substantial factors contributing to his death.

### Summary of Forensic Pathology Qualifications

My conclusions are based on my knowledge, training, and experience coupled with a critical examination of the record materials I received.

I am a physician, certified by the American Board of Pathology in the medical specialty of anatomic pathology and the subspecialty of forensic pathology. I worked full-time as a forensic pathologist and medical examiner for 33 years, retiring as the Chief Medical Examiner of Ventura County in California on July 1, 2012. After my retirement from Ventura County I continued to do autopsies and death investigations on contract with the County for another eight months. I continue to consult as a forensic pathologist. I have conducted more than 8,000 forensic autopsies personally. I have had a special interest in the subject of sudden deaths in custody temporally associated with restraint procedures for more than twenty-five years. I have studied the phenomenon, written scientific papers on the subject and lectured about it. During my career I have autopsied 5-10 such deaths that happened within my medical examiner jurisdictions and consulted on more than 90 similar deaths in other jurisdictions of the United States.

Attached are my curriculum vitae, fee schedule and recent testimony list.

**Materials Reviewed**

Prior to preparing this report I reviewed the following records and informational material:
1. Medical Examiner: Autopsy, investigation, toxicology reports, 150+ photos, death certificate
2. Birtcher medical records regarding old right shoulder injury
3. Paramedic ambulance report.
4. Body-cam videos COSD 397-Crawford, 398-Kodadec, 399-Noble, 400-Stalzer
5. WinCo Surveillance Video
6. Multiple witnesses cell phone videos
7. Robert Stabley, M.D. (forensic pathologist, Deputy ME, did autopsy) Deposition 5/4/19
8. Statements and depositions of deputies: Noble, Robledo, Garza, Stalzer, Kodadek, Beatty, Winter, Carrillo and Rossall
9. Combined Video of Incident

*I reserve the right to obtain additional discovery items or records that may assist in my further evaluation of this matter. Additionally, I reserve the right to supplement, add, change, and/or delete any of my conclusions-opinions based on additional facts or evidence that becomes available to me. In that instance a supplemental report may be submitted. I will also make myself available for deposition by defendants prior to the operative discovery cut-off at a mutually agreeable date and time, upon reasonable request.*

**Incident summary**

*Note: I have provided this summary for convenience: it does not necessarily itemize every single fact replied upon by this expert in the formation of my conclusions in this matter, and it is based on my review of the aforementioned records-materials. I do not contend to have direct personal knowledge of the incident facts.*

At the time of his death Kristopher Birtcher (Birtcher) was 34 years old. At autopsy he measured 68.5 inches tall and weighed 165 pounds.

Deputy sheriffs who went hands-on restraining Birtcher (for reference):
1. Deputy **Garza** stated he was 33 years old, 6'0" and 225 pounds at the time of the incident. He arrived first at the scene with a PERT clinician, Briana Brasel. He talked to Bircher at first outside the Hobby Lobby store and then went hands-on with Birtcher and pursued him out to the parking lot where he tried to hold Bitcher prone and get restraints on him.
2. Deputy **Robledo** stated he was 36 years old, 5'6" and 175 pounds without gear. He was the second deputy to arrive at the incident and shot his taser at Bircher as he struggled with Deputy Garza and shot him again as they ran into the parking lot. He tackled Bircher in the parking lot, and punched him in the face and elsewhere. He stated he struck Bircher's right shoulder and wrist with his sap weapon.
3. Deputies **Stalzer** and Kodadek arrived in the same car, 3rd and 4th at the scene. Stalzer stated he was 35 years old, 6'1" and 230 pounds without gear.
4. Deputy **Kodadek** stated he was 31 years old, 6'0" and 230 pounds without gear.
5. Deputy **Carrillo** stated he was 33 years old, 5'10.5" and 220 pounds without gear. He was 5th or 6th to arrive. He initially saw four deputies restraining Birtcher on the ground behind a car. Deputies had applied several handcuffs to Birtcher such that his right hand was near

his right hand was near his right shoulder rather than behind his back. They were applying a restraint cord to the legs.

6. Deputy **Beatty** stated he was 28 years old, 6'2" and 220 pounds without gear. He was 5th or 6th to arrive at the scene and saw the first four deputies trying to restrain and handcuff Birtcher prone on the parking lot.
7. Deputy **Rossall** stated he was 28 years old, 6'2" and 205 pounds without gear. He was the 7th to arrive, just after Beatty.
8. Deputy **Winter** stated he was 40 years old, 185 pounds and 6'1" without gear. On arrival he saw about 5-6 deputies surrounding Birtcher applying restraints. Birtcher was yelling and struggling. Two pairs of handcuffs were linked behind his back. A stretched out cord cuff was around his ankles. Winter said he saw Birtcher spit blood at deputies and saw deputies put a spit sock on his head in response. Winter got control of Bircher's left upper arm. Birtcher was yelling and resisting for a while then stopped suddenly. He thought Birtcher stopped resisting right after they got the second braided nylon rope leg restraint looped through the linked handcuffs chain tightly. Winter said he felt a left carotid artery pulse at first but then it faded. Winter reported he also monitored breathing when they rolled Bircher onto his side. After Birtcher was in the recovery position, Winter testified he felt a weak carotid pulse that was regular and slow. He said he could hear Birtcher breathing and see his chest rise, but it was shallow breathing. Carrillo gave two doses of Naloxone (opioid receptor blocker) in Bircher's nose by temporarily lifting the spit sock for access. Winter said he noted an increase in pulse and breathing right after the Naloxone administration, but stopped monitoring vital signs after Bircher was laid prone again. In his deposition, however, he testified that there was no response to the naloxone. Winter went back to adjusting the restraints when Bircher was again rolled prone and didn't monitor Birtcher's vital signs again.

Events summary

Mr. Birtcher was noted to be acting oddly at a Hobby Lobby store at a large shopping mall. He was escorted without resistance out of the store by a store manager who called 911 to report the incident. 40 minutes later the manager called the police again, describing Birtcher and his behavior. Deputy Garza arrived at the incident first, about 7 minutes after the second 911 call. A PERT clinician rode with him.

Birtcher was detained on a sidewalk area near the Hobby Lobby by Deputy Garza who eventually went hands-on with Birtcher while the PERT clinician called for sheriff backup. Deputy Robledo arrived minutes after the call for assistance and fired a taser at Birtcher which appeared to have little effect on him. Birtcher managed to run about 50 feet to the main parking lot where he was tackled and shot with the taser again with little effect. Robledo struck Birtcher many times in the head and other areas with fists and a sap. Birtcher struggled initially with the two deputies and two civilians who tried to help police restrain Bircher. As more deputies arrived, they replaced the civilians. Eventually, 8 deputies were hands-on restraining Birtcher and binding him with multiple handcuffs and restraint cords.

Deputies got Birtcher prone on the asphalt of the parking lot fairly quickly. They held him down with pressure on the back of his chest, using hands and knees. Handcuffing and leg restraints application proceeded with difficulty and improvisation for more than 6 minutes until a deputy noticed Birtcher didn't appear to be breathing and had been unresponsive a while.

Complicating the handcuffing process was a years-old injury of Birtcher's right shoulder which limited his range of shoulder motion such that he couldn't put his right arm behind his back.

3

**Exhibit A-3**

Further, complicating the restraint process was that deputies responded to Birtcher spitting clear saliva once on the pavement two inches from his mouth by applying a spit sock over his face and neck. This happened about four minutes into the prone restraint with chest compression and restraints application procedures. Two minutes after the spit sock was put in place, Birtcher said he couldn't breathe.

Deputies pulled Birtcher away from the back of the car, reportedly to facilitate placement of leg restraints. They continued to compress his back with body weight and left the spit sock covering his head. Birtcher made his last audibly recorded sound, a groan, 2 and 3/4 minutes after the spit sock placement. Up to 5 deputies continued to compress Birtcher's back as restraints were being applied and adjusted.

About a minute after Birtcher made his last vocalization a deputy asked if Birtcher was still breathing. Deputy Winter and Kodadek found Bircher was unresponsive to sound and touch. Deputies then rolled Birtcher onto his right side and held him there in the "recovery position". Winter checked under the spit sock and reported Bircher had a weak neck pulse. He was still bound with handcuffs and leg restraints fastened tightly together in a hog-tie position. A deputy said he thought Birtcher was still breathing; another thought he still felt Birtcher moving, and Winter said he continued to feel a weak pulse. Deputies called for ambulance and medics to come over.

Deputies discussed whether to administer Naloxone to an unresponsive Birtcher while waiting for the medics. They decided to do so but it didn't help revive him. Deputies decided to adjust the restraints some more while waiting for medics. Deputies rolled Bircher's bound body to a prone position again to make the cuffs and cords tighter. They removed the double-linked cuffs and replaced them with just one set of handcuffs, locked behind his back, now in the usual fashion.

The three medics who first approached Birtcher and the restraining deputies were told Birtcher still had a very weak pulse per Deputy Winter. Deputies were discussing options for transporting Birtcher on the gurney with medics. A gurney was rolled close by, one minute after paramedics arrived at Birtcher's side.

About two minutes after the gurney arrived Birtcher's body was lifted onto the gurney, still restrained with handcuffs and cords. The spit sock was still over his head. Paramedics did a quick assessment of their new patient and found no signs of life. Medics asked deputies to remove the handcuffs in the back so they could better do CPR. Deputies removed the handcuffs from the back and instead attached separate wrist handcuffs to the left and right gurney hand rails. After the handcuffs were re-positioned, medics wheeled Birtcher to the ambulance for CPR, ALS and assessment. Birtcher never regained any signs of life. In the ambulance they initially noted Birtcher had a pulseless, bradycardic (slow) electrocardiogram rhythm. He was pronounced dead at the hospital emergency department a few minutes after arrival, never having regained any vital signs.

Investigation and autopsy by the San Diego County Medical Examiner Department revealed multiple external injuries consistent with the described restraint forces used. Toxicology showed a relatively large amount of methamphetamine in the decedent's blood postmortem. The physician medical examiner, having only seen one overall video before starting the autopsy, determined the cause of death was "Sudden cardiac arrest while restrained". "Acute methamphetamine intoxication" was listed as a contributing condition. The manner of death

4

**Exhibit A-4**

was classified as "Homicide". How the injury occurred was listed as "Restrained by on-duty police officer".

More details are in the "timeline" below.

**Timeline:** (COSD 402 WinCo video used as base with deputy body-cams synchronized to it in minutes:seconds. The **real time is given in bold hours:minutes**.)

**14:54**    Birtcher (S) walks into Hobby Lobby (video).
**15:04**    Store manager makes 1st call to 911.
**15:43**    Store manager calls again, gives dispatcher a description of S.
**15:55**    2nd deputy arrives and approach S.
      00:00    S being detained in front of Hobby Lobby; gets away from one deputy while another discharges his taser without apparent effective shock.
**15:56**
      00:15    S runs toward parking lot; 2 deputies pursue, deploy taser again, tackle S in parking lot.
      01:00    S is on pavement struggling with 2 deputies; can see deployed Taser wires in video.
      01:45    **S is now prone on the ground**. 2 deputies with 3 civilians are trying to handcuff S.
**15:57**
      02:25    <span style="color:darkred">COSD 398 & 400 Kodadek and Stalzer body cam videos.</span> 2 arriving deputies go hands on with prone S.
      02:40    Start of 7 minutes of continuous prone compression of Birtcher's back. S yells for help.
      02:50    4 deputies now restrain S without bystanders; one heavy deputy kneeling on S back.
**15:59**    S is now double cuffed with deputies pushing down on his back to immobilize S.
      04:40    The heavy deputy kneeling on S's back stands up. S's feet are pushed to buttocks.
**16:01**    Prone S spits small amount saliva without blood onto pavement 2-3 inches away.
      05:30    A deputy takes a spit sock out of his pocket.
      05:45    The **spit sock is put around S's head** and neck.
**16:03**
      07:15    <span style="color:blue">COSD 397 Crawford body cam video.</span> S says **"I can't breathe"**.
      07:25    S is pulled farther away from the trunk of car, remaining prone.
      07:45    Video shows spit mask still over S's face and head.
      08:09    S's back is still being compressed while 4 deputies work on the restraints.
**16:04**    S is still being compressed, with up to 5 officers pushing down his back, others on legs.
      08:27    <span style="color:darkred">COSD 398 & 400 Kodadek and Stalzer body cam videos.</span> **Hear S's last verbalization, a groan sound.**
      08:27    <span style="color:blue">COSD 397 Crawford body cam video.</span> See officers pushing hard on S's back.
      08:30    Now 5 deputies are on the ground restraining S and adjusting restraints.
      08:40    <span style="color:blue">COSD 397 Crawford body cam video.</span> S's face is pushed into pavement by a hand grip around back of neck.
**16:05**    **Deputies realize S is unresponsive and not breathing.**
      09:25    <span style="color:darkred">COSD 398 & 400 Kodadek and Stalzer body cam videos.</span> An officer asks: "Is he still breathing?"
      09:30    Now 6 deputies kneel or squat around S working on restraints and holding S down.
      09:40    S is now rolled to his right side **"recovery position"**; cannot see any movement by S.
      09:45    A deputy tries a sternal rub on S without effect.
      10:00    Sun-glassed deputy kneels in front of S, one hand on hip, other on spit sock on neck.
**16:06**    Deputies say: "He is breathing", then "I got movement; he's breathing"
      10:05    <span style="color:orange">COSD 399 body cam Noble</span>: "**Call an ambulance** - he has a very weak pulse."
      Deputy: "Weak pulse but we got it." Deputies discuss administering naloxone.
**16:08**    Deputy says the "pulse is weak".
**16:10**    Naloxone is administered by deputy Carrillo in Birtcher's nose by lifting spit sock. Deputies discuss fixing S's cuffs before throwing S on the the gurney. Deputy says: "Since he is 'out' right now, maybe we should take advantage and adjust his handcuffs."

| | | |
|---|---|---|
| | 14:00 | COSD 399 body cam Noble: Deputies roll S prone again to adjust and tighten the handcuffs and cords restraints. |
| | 14:34 | COSD 400 Stalzer body cam video. Fire/Paramedic truck is pulling up to scene. |
| | 16:00 | 3 paramedics have entered restraint scene and put on gloves. |
| **16:11** | | A deputy asks another deputy to take over monitoring breathing. A deputy tells medics S has "shallow breathing" and another deputy says "excited delirium". |
| **16:12** | | Fire paramedic asks if S is breathing now; deputy says yes. Paramedic asks if they can put S on gurney now. Deputy says S should be cuffed behind back for safety. |
| | 16:30 | Ambulance gurney wheeled into scene. |
| | 17:00 | S still prone as deputies continue to adjust/remove restraints. Paramedics waiting. |
| | 18:10 | S lifted onto gurney. More restraint adjustments. Spit sock still over S's head. No CPR. |
| **16:13** | | A firefighter comments to a paramedic that S looks purple. A paramedic says he cannot feel a pulse in the wrist. Paramedics want handcuffs removed for medical assessment/treatment. Medics and deputies compromise on removing handcuffs link in back. Deputies then attach handcuffs to gurney rails. |
| **16:14** | | |
| | 18:30 | 398 & 400 Kodadek and Stalzer body cam videos. Medics assess S on gurney. One appears to check for neck pulse per 398 Kodadek body cam video. No signs of life. |
| **16:15** | | |
| | 18:55 | S with spit sock still on wheeled to ambulance and placed inside with no signs of life. |
| **16:18** | | Ambulance starts driving away. |
| | 22:50 | COSD 399 body cam Noble. Fire/ambulance rig leaves scene with S. |
| **16:27** | | Ambulance arrives at hospital. |
| **16:32** | | Birtcher is pronounced dead by ER doctor. |

**Emergency Medical Response:**

San Marcos Fire-Rescue made the response to the scene. They never observed any signs of life at the restraint scene and despite ALS measures inside the ambulance and in transit to the hospital. He never regained any signs of life. Kristopher Birtcher was pronounced dead a few minutes after arrival at hospital.

**Medical Examiner File records**

ME/Coroner Investigator Jennifer Wright Report

Per interview with SDSO homicide detective Palmer: Kristopher Birtcher was inside the Hobby Lobby store exhibiting odd behavior. He was escorted outside and staff called 911 at 1543 hours. Deputies arrived and Birtcher became combative and ran into the parking lot. Deputies deployed tasers several times. Subject was restrained and became unresponsive. San Marcos paramedics were called and found him in asystole. They transported subject to the ER arriving unresponsive at 16:30 hours. He was pronounced dead without gaining any vital signs at the ER on 10/14/17 at 16:32 hours.
Apparently no body temperature was obtained.

Autopsy by Robert Stabley, M.D., Deputy ME. on 10/15/17 morning.

In his opinion, which included a summary of investigative information as he knew it, Dr. Stabley wrote: "Responding paramedics found him in asystole and continued CPR." This implies that Dr. Stabley misunderstood that CPR was being done by police officers prior to paramedics arriving. He had viewed "a video" of the incident outside the store with homicide detectives.

6

**Exhibit A-6**

Dr. Stabley described the clothing on the body, including a partially cut off red T-shirt with 3 taser barbs stuck in it. He described evidence of medical therapy including an endotracheal tube; multiple needle punctures in right anticubital fossa; CO2 monitor on finger; Intraosseous catheter in right leg attached to saline bag, and ECG leads on upper chest. The measured height was 68.5 inches and weight was 165 pounds.

Injuries:
- The autopsy report described multiple blunt force injuries of the head and neck including a laceration of the left side of the head; multiple abrasions and contusions of the face and sides of the head, and a 1x1 inch area of intra-scalp hemorrhage on the top of the head.
- The report described multiple blunt force injuries of the torso, front and back. It also described a puncture-type injury lateral to the left nipple consistent with a taser dart penetration site.
- Multiple abrasions were noted on the back of the right shoulder, on the skin of the right anticubital fossa area and on the left elbow. Multiple fresh abrasions were described on the anterior left wrist but not on the right wrist.
- Injuries of the lower extremities included multiple contusions of the inner aspect of the right ankle; multiple contusions on the anterior right foot, ankle and lower leg, and an abrasion on the back of the right leg. Abrasions were also on the lateral left thigh, on the front of the left lower leg and on the top of the left foot.

Internal examination revealed no other injuries. The heart weighted 340 grams with no evidence of disease other than slight redundancy of the mitral valve. The lung weights were right 390 grams and left 370 grams. No pills or pill fragments were seen in the stomach. No bite marks were on the tongue. The brain weighed 1500 grams without evidence of injury. X-rays of the body revealed no acute trauma. Microscopic examination of biopsied tissues revealed no significant abnormalities.

Toxicology: Peripheral blood samples revealed methamphetamine present in a concentration of 3.6 mg/L and a methamphetamine metabolite, amphetamine, present in a concentration of 0.11 mg/L. No alcohol or other drugs were found.

The final, amended **death certificate** was issued about five months after death as:
Cause of death:         **Sudden cardiac arrest while restrained**
Contributing condition: **Acute methamphetamine intoxication**
Manner of death:        **Homicide**
How injury occurred:    **Restrained by on-duty police officer**


**Robert Stabley, M.D. (Deputy ME, autopsy surgeon) Deposition 5/4/19**
Dr. Stabley testified that just before the autopsy he saw one video of the incident, possibly the Hobby Lobby video, that started with Birtcher in the Hobby Lobby store and ended with the ambulance and medics arriving or later. He saw Birtcher apparently agitated in the store; leaving the store when told to do so; the struggle with deputies in the parking lot; Birtcher appearing to become less agitated, and become unresponsive at some point while he was prone. Dr. Stabley knew about the spit sock. He didn't know about a sap being used. He briefly discussed positional asphyxia and mechanical asphyxia. He testified that a respiratory arrest can be followed by up to six minutes of continued heart beats and that agonal respiratory efforts can persist after loss of consciousness for minutes.

**Conclusions (Opinions) and Bases**

*Note that all of my opinions expressed herein are to a reasonable degree of medical probability or certainty unless expressed otherwise.*


**Conclusion 1 – Kristopher Birtcher died from asphyxia by chest compression and by oral and nasal obstruction during prone restraint by police officers.**

Conclusion 1 is based primarily on the following considerations:

- <u>The reports, statements, interview transcripts by police, and videos.</u>  These include descriptions of the prone restraint of Mr. Birtcher with 7 minutes of prolonged continuous compression of his back by up to five deputies.  Concurrently, a spit sock was put over Mr. Birtcher's head and neck while he was being compressed on the ground, manually restrained and bound with sets of handcuffs and cords.

- <u>The time-line of the restraint process as documented in various video and audio recordings.</u>  These indicate that there was at least 7 minutes of forceful prone chest compression by deputies.  A spit sock was put over Birtcher's head about 3 minutes after the continuous chest compression started.  The spit sock stayed in place for a total of about 13 minutes, until Birtcher was put on the ambulance gurney.   A minute and a half after the spit sock was put over his head Birtcher was struggling to get the blood-soaked spit sock material away from his nose and mouth, and said he couldn't breathe.  A minute and 15 seconds later Birtcher made his last gasp.  About 10-15 seconds later a video shows Birtcher's face being compressed into the pavement by a deputy's hand around the back of his neck with the spit sock in between.  45 seconds later a deputy first questioned whether Birtcher was still conscious.  His loss of consciousness happened when both chest compression and spit sock related nose and mouth obstruction were taking place.

- The <u>persistent carotid pulse</u> reported felt by Deputy Winter after Mr. Birtcher was clearly unresponsive indicates Birtcher likely lost consciousness from asphyxia first, but his heart continued beating with weakening pulsation over the next few minutes, a common occurrence in asphyxial deaths.  Officer Winter, San Marcos PD, reported feeling a pulse in Birtcher's carotid artery for several minutes *after* he was rolled onto his side and was unresponsive in the "recovery position".  The pulseless electrical activity (PEA) with bradycardia seen by paramedics on a cardiogram taken in the ambulance supports the probability that a respiratory arrest from asphyxia was the likely cause of Mr. Bircher's loss of consciousness and later his loss of cardiac contractions and loss of pulse.  It is unlikely that a sudden cardiac fatal arrhythmia was the primary cause of death.


**Conclusion 2 – In the much less likely event that Mr. Birtcher didn't die from asphyxia during restraint, but rather died from an acute cardiac arrhythmia during restraint, the restraint activities by police would still be direct, significant, causal factors in the death.**

Conclusion 2 is based primarily on the following considerations:

- The physical stress of the exertion against restraint; the fear stress from the restraint event, and the pain stress from the multiple inflicted injuries he received put adrenergic stress on the

**Exhibit A-8**

heart making it more susceptible to a fatal cardiac arrhythmia.  Methamphetamine toxicity would still be a probable contributing factor to causing death.

**Conclusion 3 – I agree with the final opinion of the medical examiner's office about the cause and manner of Mr. Birtcher's death certificate, given the limited information the medical examiner had at the time the final death certificate was issued.  Note the medical examiner left the cause of death open-ended, linking the cardiac arrest to the police restraining activities, at least temporally.**

Cause of death - line107A: "**Sudden cardiac arrest while restrained**"
Manner of death - line 119:  "**Homicide**"
Other conditions contributing to death - line 120:  "**Acute methamphetamine toxicity**"
How injury occurred - line 124:  "**Restrained by on-duty police officer**"

**Closing Remarks**
The foregoing conclusions are stated to a reasonable degree of medical/scientific probability or certainty and are based on my educational background, training, and experience and my review of the record materials previously identified.  I reserve the right to supplement, add, change, and/or delete any of my conclusions-opinions based on additional facts or evidence that becomes available to me, at which time a supplemental report may be submitted.

Respectfully,

*[signature: Ron O'Halloran]*

Ronald L. O'Halloran, MD