**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| A.B., a minor, individually and as successor in interest to decedent, Kristopher Birtcher, by and through her Guardian ad Litem, Ryan Birtcher; MICHAEL BIRTCHER, individually; and CATHERINE BIRTCHER, individually,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO; SAN DIEGO SHERIFF'S DEPARTMENT; WILLIAM D. GORE, Sheriff; DREW BEATTY; ADRIAN CARRILLO; ROLAND GARZA; JOSEPH KODADEK; JOHN ROBLEDO; SCOTT ROSSALL; FRANK STALZER; SCOTT WINTER; and DOES 1-10, inclusive,<br><br>Defendants. | Case No.: 18cv1541-MMA-LL<br><br>**ORDER GRANTING DEFENDANTS' DAUBERT MOTION;**<br><br>[Doc. No. 44]<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' DAUBERT MOTION;**<br><br>[Doc. No. 45]<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' DAUBERT MOTION;**<br><br>[Doc. No. 46]<br><br>**ORDER DENYING DEFENDANTS' DAUBERT MOTION;**<br><br>[Doc. No. 47] |

Plaintiffs A.B., successor in interest to decedent, Kristopher Birtcher ("Kristopher"), by and through her Guardian ad Litem, Ryan Birtcher, as well as Catherine Birtcher and Michael Birtcher (collectively, "Plaintiffs") bring this civil rights action against the County of San Diego ("County"), the San Diego Sheriff's Department ("Sheriff's Department"), Sheriff William D. Gore, and multiple individual San Diego County Sheriff's deputies (collectively, "Defendants"), alleging constitutional violations arising out of Kristopher's death on October 14, 2017. *See* Doc. No. 1. The parties have filed cross-motions for summary judgment and relatedly move to exclude certain opinions proffered by each other's retained experts.[1] *See* Doc. Nos. 44-47, 49-54. As relevant here, Defendants move to exclude certain opinions proffered by Plaintiffs' experts, William Krone ("Krone"), Roger Clark ("Clark"), Dr. Bennet Omalu ("Dr. Omalu"), and Dr. Ronald O'Halloran ("Dr. O'Halloran"). Doc. Nos. 44, 45, 46, 47. For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motions.

**1. Legal Standard**

Rule 702 of the Federal Rules of Evidence provides that expert opinion evidence is admissible if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The proponent of the expert opinion bears the burden of establishing qualification, reliability, and helpfulness by a preponderance of the evidence. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 & n.10 (1993). Expert opinion testimony is reliable if it has a "basis in the knowledge and experience of [the relevant] discipline." *Id*. at 592-93 ("knowledge" requires more than a

---

[1] The Court will address Plaintiffs' *Daubert* motions and the parties' summary judgment motions in separate written rulings.

subjective belief or an unsupported speculation; it requires an appropriate level of validation). As the Ninth Circuit has explained:

> Under *Daubert* and its progeny, including *Daubert* II, a district court's inquiry into admissibility is a flexible one. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). In evaluating proffered expert testimony, the trial court is "a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citation and quotation marks omitted).
>
> "[T]he trial court must assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Id.* at 564 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id.* at 565 (citation and internal quotation marks omitted). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* at 564 (citation omitted). The judge is "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car*, 738 F.3d at 969. Simply put, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id.* at 969-70.

*City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043-44 (9th Cir. 2014). "Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury." *Id.* at 1044.

**2. Discussion**

　　a. <u>Defendants' Motion to Exclude Certain Opinions Proffered by William Krone</u>

Defendants move to exclude certain opinions of William Krone, Plaintiffs' forensic video expert, that purportedly exceed his area of expertise and unhelpfully narrate the video evidence for the jury. *See* Doc. No. 44-1 ("Krone *Daubert*") at 1. Plaintiffs filed

an opposition (Doc. No. 61 ("Krone Opp.")), to which Defendants replied.  Doc. No. 75.

Defendants argue that Krone was designated as an expert to proffer testimony on the process of video editing and syncing, yet his opinions exceed this expertise by discussing which events in the video are "significant."  *See* Krone *Daubert* at 3-6.  Defendants further argue that Krone's narration of the video evidence would be unhelpful to the jury and therefore should be excluded as such under Federal Rule of Evidence ("Rule") 702 and as unduly prejudicial under Rule 403.  *See id.* at 6-7.  Plaintiffs respond that "[i]t is unlikely that Krone will even need to testify at trial, so long as the parties are able to reach an agreement regarding the admissibility of his overall synchronized video, additional demonstrative clips based on his synchronization, and a neutrally worded timeline of undisputed facts depicted in the videos."  Krone Opp. at 1.  Plaintiffs go on to "agree that neither Krone nor Defendants' expert Jeffrey Martin should be permitted to testify regarding what events" are significant, nor regarding the content of the video footage, "except to the extent that various audio or visual material was used to perform the synchronization or establish a timeline."  *Id.*

The Court finds that it is not within Krone's expertise and qualifications to narrate for the jury and comment on which events in the video evidence are significant.  Krone was designated as a "forensic video expert" to testify regarding the process of video editing and syncing.  *See* Doc. No. 48, Ex. A at 4.  Plaintiffs agree that Krone should not be able to narrate the video evidence for the jury or opine on the relative significance of depicted events, except to the extent necessary to proffer testimony regarding his video editing and synchronization process.  *See* Krone Opp. at 1.  Accordingly, the Court **GRANTS** Defendants' motion to exclude Krone's narrative opinions, as well as those regarding events in the video that he deems significant.  Consistent with the Court's Order denying Plaintiffs' motion to exclude certain narrative opinions by Defendants' expert, Jeffrey Martin, the Court will allow testimony from Krone that is necessary to explain the basis for his admissible opinions regarding video editing and synchronization.  Should the parties take issue with whether the proffered testimony is necessary to explain

the basis for otherwise admissible opinions, the Court will hear and rule on any such objections at trial.

          b. <u>Defendants' Motion to Exclude Certain Opinions Proffered by Roger Clark</u>

Defendants move to exclude the following categories of opinions proffered by Plaintiff's police practices expert, Roger Clark: (1) purported medical opinions; (2) opinions regarding the use and efficacy of Tasers; (3) opinions regarding spit sock application; and (4) purportedly legal conclusions. *See* Doc. No. 45-1 ("Clark *Daubert*") at 1. Plaintiffs filed an opposition (Doc. No. 62 ("Clark Opp.")), to which Defendants replied. Doc. No. 76 ("Clark Reply").

          i. *Medical Opinions*

Defendants argue that Clark impermissibly proffers medical opinions that are outside of his expertise as a police practices expert and cumulative of the opinions proffered by Plaintiffs' other experts. *See* Clark *Daubert* at 3-4. Plaintiffs respond that Clark is qualified to proffer "opinions regarding proper police training on positional or restraint asphyxia[,]" as shown by persuasive case law supporting the same. Clark Opp. at 2-3 (citations omitted).

The Court finds that Clark is qualified to proffer the opinions on positional restraint asphyxia. Defendants complain that Clark is not qualified to proffer these "medical" opinions, but a reading of his report and deposition transcript demonstrate otherwise. In his report, Clark opines in terms of what "[p]roperly trained officers know" regarding positional asphyxia. *See* Doc. No. 48, Ex. E at 13-14. As Plaintiffs point out, Clark is qualified to opine as such based on his 27 years of experience with the Los Angeles County Sherriff's Department, his California Peace Officer Standards and Training ("POST") training, and other extensive experience in police training. *See* Clark Opp. at 2 (citing Doc. No. 48, Ex. E at 33-38). Moreover, Defendants' citations to Clark's deposition demonstrate their attempt to avoid exploring the police practices basis for Clark's opinions. *See* Doc. No. 48, Ex. G at 222 (after testifying that his positional asphyxia opinions are based on certain training videos, defense counsel clarifies to be

"asking about scientific literature, not police practices literature"). As in *LeBlanc v. City of Los Angeles*, Clark "should be permitted to testify that the officer's conduct violated the relevant guideline's warnings about asphyxiation." No. 04-CV-8250, 2006 WL 4752614, at *10 (C.D. Cal. Aug. 16, 2006). Further, the probative value of Clark's *police practices* opinion on positional asphyxia (*i.e.*, opinions as to whether the conduct here was consistent with applicable police standards) is not substantially outweighed by the danger of the needless presentation of cumulative evidence, since the other opinions identified by Defendants are *medical* opinions proffered by Plaintiffs' other experts. Accordingly, the Court **DENIES** Defendants' motion to exclude Clark's opinions regarding positional asphyxia.

      ii. *Taser-Related Opinions*

Defendants next move to exclude Clark's Taser-related opinions on the grounds that he is not qualified to opine on such matters and that the opinions are unreliable. *See* Clark *Daubert* at 5-7. Those Taser-related opinions concern Clark's discussion of Kristopher being "immobilized" by the Taser, the amount of time that the Taser made contact with Kristopher, and the distance between Kristopher and the deputies at the time of Taser deployment. *See id.* at 6 (citations omitted). Plaintiffs counter that Clark's Taser-related opinions fall within his area of expertise in police practices and are reliably based on law enforcement standards that Clark identified in his report. *See* Clark Opp. at 3-6.

The Court finds that Clark is qualified to proffer the Taser-related opinions and that such opinions are reliable. As discussed above, Clark has extensive experience in law enforcement. Even though his personal experience with using a Taser is limited, such experience is not the only way to become qualified to proffer opinions regarding Tasers. Clark may proffer Taser-related opinions based on specialized knowledge, the acquisition of which he has demonstrated in his expert report. As Plaintiffs identified, "Clark discusses relevant Taser standards and training promulgated by the U.S. Department of Justice, International Association of Chiefs of Police, TASER

1  International, and the County of San Diego itself." Clark Opp. at 3 (citing Doc. No. 48,
2  Ex. E at 20-24).
3     Turning to the particular "opinions" with which Defendants take issue, the Court
4  finds Defendants first two complaints are without merit.  As for the deposition testimony
5  – in which Clark discussed immobilization and the amount of time that the Taser made
6  contact with Kristopher – it is unclear to the Court whether such deposition testimony
7  constitute "opinions" that Clark intends to proffer at trial.  Nevertheless, the Court finds
8  no reason to exclude the deposition testimony.  Clark's testimony regarding the Taser's
9  contact time with Kristopher is merely an observation that he gave in response to a
10 deposition question not disclosed to the Court in Defendants' exhibit in support of its
11 motion.  *See* Doc. No. 48, Ex. G at 167.  Further, Clark's testimony regarding
12 immobilization first referred to his general "opinion that, based on how the [Tasers]
13 work[], the fact that they were deployed, that there was a spread sufficient that
14 [immobilization is] what would have occurred." *Id*. at 168.  When pressed by defense
15 counsel on whether Kristopher was *actually* immobilized, Clark then testified that he was
16 unaware of whether Kristopher was actually immobilized because the video recordings
17 were "not clear enough." *Id*. at 169.  Turning to Clark's actual Taser-related opinion in
18 his report, Clark does not speak to whether Kristopher was actually immobilized, but
19 instead he refers to San Diego Sherriff's Department's use of force guidelines "stat[ing]
20 that a subject is typically immobilized within two to three seconds but recovers rapidly . .
21 .." *Id*., Ex. E at 28.  Therefore, seeing no opinion from Clark that Kristopher was actually
22 immobilized, the Court will not exclude Clark's deposition testimony about the Taser's
23 ability to immobilize a subject.
24     On the other hand, the Court finds Clark's opinion on the distance of effective
25 Taser deployment to be unreliable.  Specifically, Clark stated in his report that, based on
26 his review of the video evidence, "Deputy Garza and Deputy Robledo were not standing
27 far enough away from Mr. Birtcher to achieve effective neuromuscular incapacitation at
28 the times of TASER deployment." *Id*., Ex. E at 28.  Clark discussed this matter based on

the "training materials provided by the [Taser] manufacturer," and it appears to be a sub-opinion for his overall opinion that "[a]ny use of the TASER was totally unnecessary and unjustified."[2] *Id.* at 27. Plaintiffs' reference to the County's Federal Rule of Civil Procedure 30(b)(6) witness's testimony does not support Clark's opinion because the testimony speaks to a "preferred target distance" from "7-15 feet" and an "increase" of "effectiveness" with "greater probe spreads." Clark Opp. at 5. Clark's opinion here, however, speaks to the *ineffectiveness* of Taser deployment merely based on the Taser manufacturer's training materials stating that "the greater the spread of the probes, the higher the likelihood [o]f neuromuscular incapacitation." Doc. No. 48, Ex. E at 28. The opinion also appears to be inconsistent with Clark's deposition testimony discussed above, that immobilization "would have occurred" based on his review of the evidence. Doc. No. 48, Ex. G at 168. In sum, Plaintiffs have not sufficiently identified the requisite basis for Clark's opinion here. Accordingly, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to exclude Clark's Taser-related opinions.

          iii.  *Spit Sock Opinions*

Defendants further move to exclude Clark's opinions regarding the deputies' use of a spit sock in their encounter with Kristopher. *See* Clark *Daubert* at 7-8. Defendants argue that Clark is unqualified to proffer such opinions. *See id.* Plaintiffs respond that Clark is so qualified because they are "based on his training and experience, the County's own policies, other agencies' policies and training including standardized policies created by Lexipol, and police standards and training regarding general obligations regarding arrestees' medical needs." Clark Opp. at 6.

The Court will limit Clark's opinions regarding the deputies' use of the spit sock. On one hand, the Court agrees with Defendants that the Anaheim Police Department's

---

[2] However, the Court is unclear as to why Clark proffers this sub-opinion if he is taking the position that Taser use was "unnecessary and unjustified" in the first instance. The Court will nevertheless address Defendants' arguments only, which suffice to exclude the opinion under Rule 702.

policy regarding use of a spit sock is not a proper basis for an opinion involving the San Diego Sheriff's Department deputies' use of a spit sock. Contrary to Plaintiffs' argument, it is unclear whether the Anaheim Police Department's policy is based on national police standards. Thus, the Court finds that Plaintiffs have not carried their burden to demonstrate that Clark's opinion here is reliably based on this particular policy. However, after arguing "the only discernible basis" for Clark's opinion was this "sole policy document" (Clark *Daubert* at 7), Defendants reverse course in their reply, noting they are not challenging "Clark's opinion that the use of the spit sock here did not comply with the Sheriff's Department's policies that he reviewed." Clark Reply at 4. Therefore, the Court finds Clark may proffer his spit sock opinion as it relates to whether the deputies' use of the spit sock complied with the Sheriff's Department's policies. However, the Court concludes: (1) it would be unhelpful to the jury for Clark to opine that the spit sock application did not comply with an Anaheim Police Department Policy; and (2) Plaintiffs have failed to demonstrate a reliable basis for any opinion from Clark that the spit sock application did not comply with national standards. Accordingly, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to exclude Clark's opinions regarding the spit sock application.

### iv. *Legal Conclusions*

Finally, Defendants move to exclude purportedly improper legal conclusions proffered by Clark. *See* Clark *Daubert* at 8-10. Plaintiffs respond that Defendants are mischaracterizing Clark's opinions, which are more accurately summarized as "opinions that various aspects of Defendants' conduct were unreasonable or excessive in light of police standards and training." Clark Opp. at 6-7.

"Though expert testimony is appropriate where 'scientific, technical, or other specialized knowledge will assist the trier of fact,' expert testimony consisting of legal conclusions is generally inappropriate." *CFM Commc'ns, LLC v. Mitts Telecasting Co.*, 424 F. Supp. 2d 1229, 1233 (E.D. Cal. 2005) (quoting *Aguilar v. Int'l Longshoremen's Union Local # 10*, 966 F.2d 443, 447 (9th Cir.1992) (upholding district court's exclusion

of expert legal opinion as "utterly unhelpful")). Under Rule 704(a), "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Although under this rule, expert witnesses can testify to the ultimate issue to be decided by the jury, they may not testify to legal conclusions that are intertwined with the ultimate issue. *See Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051, 1058 (9th Cir. 2008) ("Resolving doubtful questions of law is the distinct and exclusive province of the trial judge") (*quoting United States v. Weitzenhoff*, 35 F.3d 1275, 1287 (9th Cir.1993)). "An expert witness therefore cannot offer testimony as to the reasonableness of an officer's actions and whether his use of force was appropriate under the facts of the case." *Sanchez v. Jiles*, No. 10-CV-9384, 2012 WL 13005996, at *31 (C.D. Cal. June 14, 2012) (citing *Tubar v. Clift*, No. 05-CV-1154, 2009 WL 1325952, *3 (W.D. Wash. May 12, 2009) (holding that a police practices expert was precluded from offering an opinion as to whether an officer had "probable cause" to believe he was in imminent danger, whether he acted "unconstitutionally," and whether his use of force was objectively unreasonable, as these were conclusions concerning ultimate issues of law)); *see also Shirar v. Guerrero*, No. 1-CV-3906, 2017 WL 6001270, at *5 (C.D. Cal. Aug. 2, 2017) ("Police practices experts may only testify as to whether an action conformed with a reasonable standard of practice, not whether the particular officer's action was reasonable under the specific circumstances he faced.").

The Court agrees with Defendants that several of Clark's opinions cross the line into impermissible legal conclusions. For example, Clark opines that "it was ***excessive and unreasonable*** for the deputies to apply maximum restraints . . .." Doc. No. 48, Ex. E at 30. Opinions such as these, separated from what a reasonable officer would do given "*applicable procedures and policies*," are improper legal conclusions. *Godinez v. Huerta*, No. 16-CV-0236, 2018 WL 2018048, at *6 (S.D. Cal. May 1, 2018) (excluding Clark's opinions including "judicially defined or legally specialized terms" but allowing Clark to testify about whether a deputy's conduct comported with applicable procedures

and policies) (emphasis in original).  Moreover, "Plaintiffs concede Clark should not [opine] that, from a causation perspective, Birtcher would not have died if Defendants had followed such training and standards." Clark Opp. at 7.  Thus, the Court finds this opinion on causation should also be excluded.  On the other hand, it appears as though Clark purports to proffer some of the challenged opinions in a permissible manner by evaluating the deputies' conduct in terms of applicable procedures and policies.  For example, after identifying a deputy's conduct as "unreasonable," Clark then sets forth a POST standard for evaluating the deputy's conduct.  Doc. No. 48, Ex. E at 26.

In sum, like the court in *Godinez*, this Court will allow Clark to opine as to whether the deputies' conduct comported with applicable procedures and policies; however, his opinions are excluded to the extent they exceed this limitation and improperly invade the province of the jury.  As in *Valtierra v. City of Los Angeles*, if Plaintiffs would like to elicit Clark's testimony as to whether the "use of force was excessive or unreasonable" in light of the facts and circumstances confronting the deputies, then they may explore Clark's testimony "through hypothetical questioning so as to avoid invading the province of the jury." 99 F. Supp. 3d 1190, 1198 (C.D. Cal. 2015).

Accordingly, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to exclude Clark's opinions couched in legal terms.

### c. Defendants' Motion to Exclude Certain Opinions Proffered by Dr. Bennet Omalu

Defendants move to exclude Plaintiffs' pathology expert Dr. Bennet Omalu's opinions regarding (1) Kristopher experiencing pain and suffering during his encounter with the deputies; (2) the purported subjective motivations for and reasons behind individuals' actions; and (3) the cause and manner of Kristopher's death.  *See* Doc. No. 46-1 ("Omalu *Daubert*") at 1.  Plaintiffs filed an opposition (Doc. No. 63 ("Omalu Opp."), to which Defendants replied.  Doc. No. 77 ("Omalu Reply").

///

### i. *Pain and Suffering*

First, Defendants move to exclude as unreliable, unhelpful, and unduly prejudicial, Dr. Omalu's opinions regarding Kristopher experiencing "conscious pain and suffering" during his encounter with the deputies (hereinafter, "pain and suffering opinion"). Omalu *Daubert* at 4-7. Plaintiffs respond that Dr. Omalu reliably based such opinions on his review of relevant evidence in this case, as well as "generally accepted principles of medicine, as reflected in specifically identified texts." Omalu Opp. at 2 (citing Doc. No. 48, Exs. I at 3-8, J at 168-69).

As an initial matter, for the first time in their reply, Defendants argue that Dr. Omalu is not qualified to opine on Kristopher experiencing pain and suffering. *See* Omalu Reply at 2. Not only is this argument untimely, it is also unpersuasive. Plaintiffs cite to several cases in which a forensic pathologist was allowed to opine on a decedent's conscious pain and suffering prior to death. *See* Omalu Opp. at 3 (citing *White v. Gerardot*, No. 05-CV-382, 2008 WL 4372019, at *12-13 (N.D. Ind. Sept. 23, 2008); *Figaniak v. Fraternal Order of Owl's Home Nest*, No. 15-CV-111, 2017 WL 10442122, at *2 (N.D.W. Va. July 14, 2017)). Moreover, Defendants' reliance on *Neal-Lomax v. Las Vegas Metro. Police Dep't* is misplaced, because at issue there was a forensic pathologist's opinion regarding a Taser being the cause of death, not pain and suffering. *See* 574 F. Supp. 2d 1193, 1203 (D. Nev. 2008) ("[Forensic pathologist] has little to no knowledge, training, experience, education, or expertise related to electronic control devices generally or the Taser specifically."). In sum, the Court finds that Dr. Omalu's training and experience in forensic pathology renders him qualified to proffer the pain and suffering opinion.

The Court further finds that Dr. Omalu's pain and suffering opinion is reliable. In his report, Dr. Omalu provides that he based his opinion "on the prevailing forensic scenario [*i.e.*, materials reviewed in preparing the report, *see* Doc. No. 48, Ex. I at 3], and on the generally accepted principles and common knowledge of medicine and science, and based on the global constellation, configurations, and anatomic conformations of the

multimodal and multifaceted traumas sustained by Kristopher Birtcher . . ..” *Id*. at 16. Further, in his deposition, Dr. Omalu testified regarding the "generally accepted principles of medicine," specifying that he relied on "Guyton's Textbook of Physiology and Gray's Anatomy." *Id*., Ex. J at 168. Yet, Defendants contend that these bases are insufficient for Dr. Omalu's pain and suffering opinion, apparently because he discusses "the degree and duration of pain and suffering that Birtcher [] was subjectively feeling . . .." Omalu Opp. at 5 (emphasis omitted). Defendants primarily rely on *Myers-Clark v. Frahler Elec. Co.* to support their position. No. 05-CV-5553, 2007 WL 189248, at *3 (W.D. Wash. Jan. 22, 2007). There, the court excluded as unreliable an expert's opinion that a decedent "likely experienced 45 to 50 seconds of conscious pain and suffering before losing consciousness." *Id*. The court reasoned that the expert's deposition transcript did not provide sufficient support that the opinion was based on "a reasonable medical certainty." *Id*.

Plaintiffs' reliance on *White* is more persuasive. Like Dr. Omalu here, the expert in *White* opined that a decedent experienced three minutes of conscious pain and suffering before death. 2008 WL 4372019, at *11. The court denied the motion to exclude the expert's opinion, finding *Myers-Clark* distinguishable for two reasons. First, the expert in *White* did render his opinion to a reasonable medical certainty. *Id*. at *12. Second, the expert in *White* stated with particularity why he opined that the decedent experienced three minutes of conscious pain and suffering. *Id*. ("He explains that [decedent] had no injury to his central nervous system above the shoulders and that the gunshots were not immediately fatal, that is, [decedent] died of blood loss five to six minutes after the gunshots."). Turning to the case here, the Court finds that Dr. Omalu's pain and suffering opinion is reliable for several reasons. First, Dr. Omalu rendered his "opinions with a reasonable degree of medical certainty." Doc. No. 48, Ex. I at 21. Second, Dr. Omalu stated with scientific particularity why he proffered opinions as to Kristopher experiencing conscious pain and suffering prior to death. *See id.* at 16-20. Third, Dr. Omalu also provided the aforementioned specific bases for his pain and

suffering opinion. *Id*. at 16; *Id*., Ex. J at 168. Defendants' grievance with the opinion is more appropriately reserved for cross-examination at trial. *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

The Court also finds that Dr. Omalu's pain and suffering opinion would be helpful to the jury. As Plaintiffs point out, the pain and suffering opinion is informative as to "the degree of force used by Defendants, the degree of resistance by Birtcher, and the extent of survival damages under § 1983." Omalu Opp. at 3 (citations omitted). Moreover, Dr. Omalu's pain and suffering opinion is responsive to two arguments that may be advanced by Defendants: (1) that Kristopher had a high tolerance to pain, and (2) that Kristopher experienced pleasurable feelings when the level of oxygen in his blood decreased. *See id*. at 4 (citing Doc. No. 50-2, Ex. A at 16; Doc. No. 48, Ex. J at 170). These arguments are at least partially based on Kristopher being under the influence of drugs at the time of his death, and they concern matters outside the knowledge of the average juror. Accordingly, the pain and suffering opinion would be helpful to the jury in considering these issues. *See United States v. Cazares*, 788 F.3d 956, 977 (9th Cir. 2015) ("Experts may be used to testify to matters outside the expected knowledge of the average juror.").

The Court finds that the probative value of Dr. Omalu's pain and suffering opinion is not substantially outweighed by the risk of unfair prejudice to Defendants. As discussed above, the opinion is reliable and would assist should the jury have to resolve such issues in this case. Moreover, Defendants' perception of any prejudice that may result from the opinion does not rise to the level of "unfair" prejudice—the relevant Rule 403 concern here. Rather, Dr. Omalu's pain and suffering opinion bears on material issues to be determined at trial, such as whether Plaintiffs are entitled to pain and suffering damages. Moreover, as discussed above, the opinion is responsive to arguments that Defendants may advance at trial.

Accordingly, the Court **DENIES** Defendants' motion to exclude Dr. Omalu's pain and suffering opinion.

        ii. *Subjective and Reflex Opinions*

Next, Defendants move to exclude four opinions that they characterize as Dr. Omalu opining "as to the subjective thoughts of persons involved in this incident, as well as the reasons behind their actions." Omalu *Daubert* at 7-8. Defendants argue that such opinions are speculative and therefore should be excluded as unreliable. *See id*. Plaintiffs concede that Dr. Omalu may not opine as to the subjective motivations of the deputies; however, they argue that Dr. Omalu may reliably proffer opinions regarding Kristopher's fear, fright, and flight response based on "generally accepted principles of physiology, biochemistry, and neuropathology." Omalu Opp. at 4-5.

The Court finds that Dr. Omalu's first and second opinions are unreliable. The first opinion – that "[t]he primary objective of hammer-first and slapjack strikes to the human head is to cause concussive injuries to the brain" – is not grounded in Dr. Omalu's expertise in forensic pathology. Plaintiffs essentially concede this point, as they argue this is "simply . . . the obvious proposition that such techniques are designed to stun a person into submission." Omalu Opp. at 4. If the proposition is so obvious, then Dr. Omalu's recitation of it will not assist the jury in this case either. Dr. Omalu's second opinion – that "it was seemingly more important to the arresting deputies to maintain Kristopher Birtcher in a state of hogtie restraint than to untie him and provide life-saving cardiac support" – is likewise not grounded in Dr. Omalu's expertise. Plaintiffs expressly concede that "Dr. Omalu may not opine as to the subjective motivations of the deputies . . . ." *Id*. Accordingly, the Court **GRANTS** Defendants' motion to exclude these opinions (hereinafter, "subjective opinions").

On the other hand, the Court finds that Dr. Omalu's third and fourth challenged opinions are reliably based on his expertise in forensic pathology. Defendants take issue with these opinions regarding Kristopher's "reflexes of fear, fright and flight" and decreasing "blood oxygen levels," both of which, in Dr. Omalu's opinion, caused

Kristopher to struggle and experience pain and suffering (hereinafter, "reflex opinions"). *See* Omalu *Daubert* at 7 (citing Doc. No. 48, Ex. I at 18-19). These opinions, however, are couched in forensic pathology terms, as Dr. Omalu is describing the fear, fight, and flight "primitive human reflexes" (as opposed to a subjective state of mind) that Kristopher may have experienced in his encounter with the deputies. In *White*, the court allowed the admission of similar opinions regarding pain and suffering, even though the pathology expert testified at his deposition that he was of the opinion the decedent experienced "physical pain and the fear of impending death." 2008 WL 4372019, at *11. In another analogous case, *Potdevin v. Dorset Hotel Co.*, the court had before it motions for reduction of the verdict based on the argument that the jury had no factual basis for any award of damages for the decedent's conscious pain and suffering. *See* No. 87-CV-3603, 1991 WL 12312, at *3 (S.D.N.Y. Jan. 30, 1991). The court found the pathology expert's testimony on the possibility of pain and suffering, and "the inference that [decedent] endured acute and excruciating pain, fear and anguish[,]" provided a factual basis for the jury's award of conscious pain and suffering damages. *Id*. The court remarked that it "instructed the jury before deliberations began that they were free to accept all of [the pathology expert's] testimony, to accept some of it, or to disregard it entirely." *Id*. Here, the Court can similarly instruct the jury before deliberations to address any concerns from Defendants' that the jury will simply adopt Dr. Omalu's conclusion; however, the Court will not exclude the reflex opinions as speculative, since they are sufficiently based on Dr. Omalu's expertise in forensic pathology and neuropathology. *See* Doc. No. 48, Ex. I at 1-2. Accordingly, the Court **DENIES** Defendants' motion to exclude the reflex opinions.

                iii.   *Cause and Manner of Death*

Finally, Defendants move to exclude Dr. Omalu's opinion on Kristopher's cause of death as cumulative of Dr. O'Halloran's opinion on Kristopher's cause of death. *See* Omalu *Daubert* at 8-9. Plaintiffs counter that Dr. Omalu and Dr. O'Halloran may permissibly proffer overlapping opinions on Kristopher's cause of death since these

experts "have different areas of expertise and different methods of reaching their opinions." Omalu Opp. at 5-8.

The Court declines to exclude Dr. Omalu's cause of death opinion pursuant to Rule 403. Plaintiffs' reliance on *Garlick v. Cty. of Kern* is persuasive. There, the court denied a motion in limine to exclude cause of death opinions from four medical experts as a needless presentation of cumulative evidence. *See* No. 13-CV-01051, 2016 WL 1461841, at *4 (E.D. Cal. Apr. 14, 2016). The court found that "each [expert] has a different background from the others and arrives at conclusions from the formation of different processes." *Id*. Here, Drs. Omalu and O'Halloran similarly have different backgrounds and arrive at conclusions from the formation of different processes. For example, Dr. Omalu is board-certified in forensic pathology and neuropathology with major areas of interest in brain pathophysiology, brain injuries, and brain trauma. *See* Doc. No. 48, Ex. I at 1-2. On the other hand, Dr. O'Halloran is board-certified in anatomic pathology and forensic pathology with a special interest in the subject of sudden deaths in custody temporally associated with restraint procedures. *See id.*, Ex. K at 1. Moreover, "[w]hile Dr. O'Halloran's opinions in this case relate solely to the issue of restraint asphyxia, . . . Dr. Omalu's opinions relate primarily to his highly specialized expertise in neuropathology." Omalu Opp. at 6.

In their reply, Defendants do not provide any persuasive reason as to why Drs. Omalu and O'Halloran cannot opine on the cause of death despite having different backgrounds and forming conclusions from different processes. Further, Defendants provide no explanation as to why the two cause of death opinions from Plaintiffs' experts should be excluded as a needless presentation of cumulative evidence, but the cause of death opinions from their own two medical experts, Drs. Gary Vilke and Binh Ly, should not. In sum, the Court is not persuaded that the probative value of Drs. Omalu's and O'Halloran's cause of death opinions are "substantially outweighed by [the] danger of . . . needlessly presenting cumulative evidence." Fed. R. Evid. 403. Accordingly, the Court **DENIES** Defendants' motion to exclude Dr. Omalu's cause of death opinion.

        d. <u>Defendants' Motion to Exclude Certain Opinions Proffered by Ronald O'Halloran</u>

Defendants move to exclude opinions of Plaintiffs' additional pathology expert, Dr. Ronald O'Halloran, that criticize the Sheriff's Department's training of its deputies. *See* Doc. No. 47-1 ("O'Halloran *Daubert*") at 3. The specific opinions (hereinafter, "training opinions") at issue are as follows:

1. The Sheriff's Department's training videos do not "address the issues in the case of Kristopher Birtcher's prolonged restraint and death at the hands of San Diego County deputy sheriffs;"
2. "Training peace officers on restraint methods that are associated with asphyxia deaths, without warning them about the risk, can and does lead to preventable deaths such as that of Mr. Birtcher;" and
3. The Sheriff's Department's training video on excited delirium "does not address the relatively frequent issues of restrain asphyxia present in the Birtcher restraint and asphyxia death."

O'Halloran *Daubert* at 3-4 (citing Doc. No. 48, Ex. L at 3-4). Plaintiffs filed an opposition (Doc. No. 64 ("O'Halloran Opp.")), to which Defendants replied. Doc. No. 78.

Defendants argue that Dr. O'Halloran is unqualified to render the training opinions and that they are unreliable. *See* O'Halloran *Daubert* at 3-5. Plaintiffs respond that Dr. O'Halloran is well-qualified with his medical experience, expertise in forensic pathology and neuropathology, and special interest in sudden deaths in police custody to render the training opinions. *See* O'Halloran Opp. at 1-4. Plaintiffs further argue that Dr. O'Halloran sufficiently based his training opinions on his experience and expertise to address the County's reliance on medical opinions in devising its training programs. *See id*. at 3-4.

The Court finds that Dr. O'Halloran is qualified to render the training opinions, and that such opinions are reliable. As Plaintiffs note, Dr. Gary Vilke, one of Defendants' medical experts, worked with the County and Sheriff's Department in

developing the Sheriff's Department's training videos on maximum restraint and excited delirium. *See* O'Halloran Opp. at 2 (citing Doc. No. 48, Ex. L at 1-2). Nevertheless, Defendants curiously argue Dr. O'Halloran is not qualified to render opinions purporting to undermine the adequacy of the medical underpinnings of the training videos. The Court is not persuaded. Dr. O'Halloran is board certified in anatomic and forensic pathology; has 33 years of experience as a forensic pathologist and medical examiner; has had a special interest in the subject of sudden deaths in custody temporally associated with restraint procedures for over 25 years; has studied the phenomenon, written scientific papers on the subject and lectured about it; and has reviewed approximately 100 incidents of asphyxia deaths during custody restraint. *See* Doc. No. 48, Ex. K at 1. Surely Dr. O'Halloran's extensive experience, particularly on the subject of restraint asphyxia in police custody, renders him qualified and provides him a sufficient basis to opine on the adequacy of the County's training videos. Indeed, Dr. O'Halloran expressly stated in his supplemental report that his training opinions were based on this extensive experience. *See id.*, Ex. L at 3-4. Accordingly, the Court **DENIES** Defendants' motion to exclude Dr. O'Halloran's training opinions.

## CONCLUSION

Based on the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' *Daubert* motions. Specifically, the Court:

1. **GRANTS** Defendants' motion to exclude Krone's narrative opinions, as well as those regarding events in the video that Krone deems significant.;
2. **DENIES** Defendants' motion to exclude Clark's opinions regarding positional asphyxia; **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to exclude Clark's Taser-related opinions; **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to exclude Clark's opinions regarding the spit sock application; and **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to exclude Clark's opinions couched in legal terms;
3. **DENIES** Defendants' motion to exclude Dr. Omalu's pain and suffering opinion;

**GRANTS** Defendants' motion to exclude Dr. Omalu's subjective opinions;

**DENIES** Defendants' motion to exclude Dr. Omalu's reflex opinions; and

**DENIES** Defendants' motion to exclude Dr. Omalu's cause of death opinion; and

4. **DENIES** Defendants' motion to exclude Dr. O'Halloran's training opinions.

**IT IS SO ORDERED.**

Dated: July 31, 2020

HON. MICHAEL M. ANELLO
United States District Judge