1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| A.B., a minor, individually and as successor in interest to decedent Kristopher Birtcher, by and through her Guardian ad Litem, Ryan Birtcher; MICHAEL BIRTCHER, individually; and CATHERINE BIRTCHER, individually,<br><br><div align="right">Plaintiffs,</div><br>v.<br><br>COUNTY OF SAN DIEGO; SAN DIEGO SHERIFF'S DEPARTMENT; WILLIAM D. GORE, Sheriff; DREW BEATTY; ADRIAN CARRILLO; ROLAND GARZA; JOSEPH KODADEK; JOHN ROBLEDO; SCOTT ROSSALL; FRANK STALZER; SCOTT WINTER; and DOES 1-10, inclusive,<br><br><div align="right">Defendants.</div> | Case No. 18cv1541-MMA-LL<br><br>**ORDER GRANTING DEPUTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT;**<br><br>[Doc. No. 53]<br><br>**GRANTING COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>[Doc. No. 54]<br><br>**DENYING PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>[Doc. No. 58] |

Plaintiffs A.B., a minor, individually and as successor in interest to decedent Kristopher Birtcher, by and through her Guardian ad Litem, Ryan Birtcher, Michael Birtcher, and Catherine Birtcher (collectively "Plaintiffs") bring this action asserting civil rights violations pursuant to 42 U.S.C. § 1983, as well as state law claims for battery, negligence, and violation of California Civil Code section 52.1. *See* Doc. No. 1. Defendants County of San Diego, San Diego Sheriff's Department, and San Diego

1   Sheriff William D. Gore (collectively "County Defendants"), as well as Defendant San

2   Diego Sheriff's Deputies Drew Beatty, Adrien Carrillo, Roland Garza, Joseph Kodadek,

3   John Robledo, Scott Rossall, Frank Stalzer, and Scott Winter (collectively "Deputy

4   Defendants"), move for summary judgment, or in the alternative, partial summary

5   judgment as to all remaining claims.[1]  *See* Doc. Nos. 53, 54.  Plaintiffs oppose the

6   motions and cross-move for summary judgment on several grounds.  *See* Doc. Nos. 56,

7   58, 60, 72.  For the reasons set forth below, the Court **GRANTS** the Deputy Defendants'

8   and County Defendants' motions for summary judgment and **DENIES** Plaintiffs' cross-

9   motion for summary judgment.

10                          B̲A̲C̲K̲G̲R̲O̲U̲N̲D̲[2]

11          This action arises out of events occurring on October 14, 2017 when the manager

12   of a Hobby Lobby store in San Marcos, California summoned law enforcement because a

13   man was acting strangely at the store.  Manager Larry Cady observed that the man, later

14   identified as Kristopher Birtcher ("Kristopher"), appeared disoriented, was staggering,

15   "falling backwards a lot and going sideways a lot."  Doc. No. 58-3 ("Fattahi Decl."), Ex.

---

18   [1] Plaintiffs have indicated that they wish to "voluntarily dismiss" their First, Fifth, Sixth, Eighth,
19   Eleventh, and Twelfth causes of action as set forth in their complaint.  *See* Doc. No. 53-6 ("Vilaseca
     Decl.") ¶ 2; Ex. BB.  As such, neither party seeks summary judgment as to these claims.  However, the
20   Court notes that Federal Rule of Civil Procedure 41(a) "does not allow for piecemeal dismissals.
     Instead, withdrawals of individual claims against a given defendant are governed by [Rule] 15, which
21   addresses amendments to pleadings."  *Hells Canyon Pres. Council v. United States Forest Serv.*, 403
     F.3d 683, 687 (9th Cir. 2005) (citing *Ethridge v. Harbor House Restaurant*, 861 F.2d 1389 (9th Cir.
22   1988)).  "Federal Rule of Civil Procedure 15(a) is the appropriate mechanism where a plaintiff desires to
     eliminate an issue, or one or more but less than all of several claims, but without dismissing as to any of
23   the defendants."  *Ethridge*, 861 F.2d at 1392 (internal quotation omitted).  Accordingly, the Court
     construes Plaintiffs' "voluntary dismissal" of these claims as a stipulated constructive amendment to
24   their complaint pursuant to Rule 15(a)(2).  And, of course, "[i]t is axiomatic that prejudice does not
     attach to a claim that is properly dropped from a complaint under Rule 15(a) prior to final judgment."
25   *Hells Canyon Pres. Council*, 403 F.3d at 690.

26   [2] These material facts are taken from the parties' separate statements of undisputed facts and responses
27   thereto, as well as the supporting declarations and exhibits.  Facts that are immaterial or not genuinely
     disputed for purposes of resolving the current motions are not included in this recitation.  To the extent
28   any such facts are nevertheless relevant to the Court's analysis, they are discussed as appropriate *infra*.

1  C ("Cady Depo.") at 27:11-23, 31:22-24;[3] Doc. No. 58-2 ("Plaintiffs' Separate
2  Statement" or "PSS") No. 35.  Cady and another Hobby Lobby employee awaited law
3  enforcement's arrival while observing Kristopher, who was standing in front of the
4  store's entrance where numerous patrons were entering and exiting.  *See* Doc. No. 53-3
5  ("Defendants' Notice of Lodgment" or "NOL"), Ex. A ("Krone Composite Video" or
6  "KCV") beginning at 03:18:00.[4]
7       Deputy Garza was the first to respond to the dispatch and arrive at the scene along
8  with a mental health clinician, Briana Brasel; together, the two comprised a Psychiatric
9  Emergency Response Team ("PERT").  *See* NOL, Ex. D ("Garza Depo.") at 14:22-15:18.
10 Deputy Garza attempted to speak with Kristopher, who was unable to hold a coherent
11 conversation.  *See id.* at 18:1-7.  Deputy Garza observed that Kristopher was fidgety and
12 had pinpoint pupils which, based on Deputy Garza's experience and training, may have
13 indicated that Kristopher was under the influence of a hallucinogenic drug.  *See id.* at
14 18:1-19.  According to Deputy Garza, he observed Kristopher repeatedly putting his
15 hands in and out of his pockets, which appeared to be full.[5]  *See id.* at 20:5-21:11.  Based
16 on these observations, Deputy Garza determined that Kristopher was either mentally ill,

17

18  [3] Citations to deposition transcripts generally refer either to the pagination assigned by the reporter of
19  the deposition or to the pagination assigned by the filer of the document, as well as the corresponding
20  line numbers.

21  [4] Citations refer to the composite video time stamp.

22  [5] Despite Plaintiffs' claim that "the material facts" in this case "are not in genuine dispute," Doc. No. 85
23  ("Ps Reply") at 1, the Court notes that there are various instances where Plaintiffs appear to dispute
    material facts by citing testimony showing a witness does not remember a detail that another witness has
24  confirmed under oath based on personal knowledge.  For example, Plaintiffs seek to cast Cady's and
    Brasel's unclear memories about whether Kristopher repeatedly reached into his pockets as sufficient to
25  genuinely dispute Deputy Garza's testimony that he observed Kristopher doing so.  *Compare* Garza
    Depo. at 20:5-21:11 *with* Fattahi Decl., Ex. B ("Brasel Depo.") at 21:4-6, 55:25-56:2, 57:15-18; Cady
26  Depo. at 35:19-36:8, 37:24-38:10.  However, it is well-established that "failure to remember and lack of
    knowledge are not sufficient to create a genuine dispute."  *See Fed. Election Comm'n. v. Toledano*, 317
27  F.3d 939, 950 (9th Cir. 2002).  Moreover, Cady testified that he observed Kristopher "looking, trying to
    go through his pockets" after Deputy Garza requested to see Kristopher's identification.  Cady Depo. at
28  38:2-4.

under the influence of drugs, or both, and therefore, Deputy Garza decided to detain Kristopher in handcuffs to allow Ms. Brasel safely to evaluate him.[6]  *See id.* at 25:14-26:3.

After telling Kristopher to put his hands behind his back, Deputy Garza attempted to handcuff Kristopher, who pulled away and began to turn towards Deputy Garza.  *See id.* at 31:25-33:11, 50:6-14; Fattahi Decl., Ex. H (also "Garza Depo.") at 29:1-17. Observing Kristopher's sudden movement, Deputy Garza grabbed Kristopher's shoulders and pushed downward to place him on the ground in a seated position.  *See* Garza Depo. at 33:4-11; KCV at 30:20:95-30:39:74.  Deputy Garza attempted to handcuff Kristopher and used downward force with his body weight to prevent Kristopher from rising to his feet, but Kristopher continued to resist being handcuffed and attempted to rise.  *See* Garza Depo. at 33:15-21; KCV at 30:42:97-31:19:00.  Upon seeing the struggle, Ms. Brasel radioed for "code cover," an emergency call that summons available nearby deputies to the scene using their lights and sirens.  *See* Garza Depo. at 34:7-13; PSS No. 6.

Deputy Robledo was "dispatched to the call, and [Kristopher] was described as near the front entrance, staggering, eyes wide open, doesn't know where he is, possibly under the influence, with no shoes."  PSS No. 40.  Deputy Robledo arrived at the scene and observed the struggle between Deputy Garza and Kristopher.  *See* NOL, Ex. G ("Robledo Depo.") at 19:2-25; 23:8-19.  Deputy Robledo approached and yelled a warning that he was going to deploy his taser electronic control device (referred to

---

[6] The Court notes that this is one of multiple instances where Plaintiffs claim a particular fact is in dispute but actually cite the same record evidence as Defendants and merely describe or recharacterize the fact in an immaterially different way.  *See* PSS No. 4.

hereafter as "Taser").[7, 8]  *See* Robledo Depo. at 20:25-26:15; 29:19-30:23.  Deputy Robledo then deployed his Taser at Kristopher from approximately seven feet away.  *See id*. at 24:3-23.  In response to the Taser shot, Kristopher doubled over at the waist momentarily before moving towards Deputy Garza, then ran into the Hobby Lobby parking lot.  *See* KCV at 31:20:00-31:30:00; Garza Depo. at 37:2-24.

As Kristopher ran toward the parking lot, Deputy Robledo pursued Kristopher and deployed his Taser a second time, which did not immobilize Kristopher.  *See* KCV at 31:26:00-31:33:00; Garza Depo. at 38:8-19, 40:15-41:8; Robledo Depo. at 31:9-16.  Deputy Garza followed the chase, deploying his Taser twice, but again the Taser did not have its intended effect of immobilizing Kristopher.  *See id.*  Deputy Robledo then tackled Kristopher to the ground as he fled, Kristopher got up and attempted to get away, and a struggle between the two ensued.  *See* KCV at 31:30:00-31:45:00.  Deputy Robledo struck Kristopher's face with a closed fist approximately three times.  *See* Robledo Depo. at 31:6-33:14, 35:3-15; *see also* KCV at 31:31:00-32:00:00.  Deputy Robledo's strikes did not subdue Kristopher.  *See* KCV at 31:33:00-31:45:00.  Deputies Robledo and Garza struggled to control Kristopher such that several civilian passersby intervened to actively assist in restraining Kristopher.  *See* KCV at 31:44:00-32:50:00; Garza Depo. at 43:6-23; Robledo Depo. at 42:16-43:10.  As the deputies and civilians attempted to restrain Kristopher, Deputy Robledo placed his baton on the ground; Kristopher grabbed it during the struggle until Deputy Robledo was able to knock it away.  *See* KCV at 32:25:00-32:55:00; NOL, Ex. E (also "Brasel Depo.") at 31:5-22.

The deputies and civilians then attempted to place handcuffs on Kristopher but

---

[7] When used in "probe mode," as the case was for the Taser deployments during this incident, a Taser shoots out two tiny metal darts attached to thin wires.  Under ideal circumstances, a high voltage, low-amperage electronic shock temporarily causes loss of muscle control.  *See, e.g.*, *Marquez v. City of Phoenix*, No. 08-CV-1132, 2010 WL 3342000, at *2 n.4 (D. Ariz. Aug. 25, 2010).

[8] According to Plaintiffs, "Robledo quickly ran toward Garza and yelled to Garza, 'Get up, I'm going to tase him,' then deployed his Taser."  PSS No. 8.

were only able to secure the handcuffs on one of Kristopher's wrists.  *See* Robledo Depo. at 47:15-48:17; KCV at 32:40:00-33:54:00.  Unable to place Kristopher's other wrist in the handcuffs, Deputy Robledo struck Kristopher in the area of his hands, head, and shoulders with approximately four hammer-fist strikes, then with about six close-range strikes with a sap.[9]  *See* Robledo Depo. at 47:15-48:6, 53:11-54:10, 56:10-19, 59:2-21; Brasel Depo. at 33:4-9, 65:20-66:5; Cady Depo. at 48:17-49:8, 76:15-24, 78:6-12, 78:23-79:10, 79:20-80:1.

As the struggle continued, Deputies Beatty, Carrillo, Kodadek, Rossall, Stalzer, and Winter responded to the radio call for cover and traveled to the scene.  *See* PSS No. 14.  Deputies Kodadek and Stalzer were next to arrive at the scene to see the struggle taking place, moving the assisting civilians out of the way to assist Deputies Garza and Robledo.  *See* PSS No. 15.  Several deputies then applied downward force to control Kristopher's movements.  *See* KCV at 34:05:00-34:30:00.  Deputy Kodadek applied downward pressure with his left knee to Kristopher's left shoulder, incorporating downward pressure with his right hand as Kristopher appeared to increase his resistance and movements.  *See* KCV at 34:00:00-34:45:00; NOL, Ex. F ("Kodadek Depo.") at 23:2-20.  Deputy Stalzer used his hands to control Kristopher's upper back and keep him from rising, varying the downward pressure in response to Kristopher's level of resistance.  *See* KCV at 34:00:00-34:55:00; NOL, Ex. I ("Stalzer Depo.") at 21:8-22:3, 25:1-20, 71:8-72:11.

As Kristopher struggled, Deputy Stalzer helped connect two pairs of handcuffs, each of which were partly secured around each of Kristopher's wrists.  *See* KCV at 34:00:00-34:55:00; Stalzer Depo. at 31:8-32:20, 42:7-21, 43:4-8, 46:1-11, 71:8-72:11.  Deputy Robledo tried to control Kristopher's upper body first by applying downward force with his left elbow, then used his hands to control Kristopher's head.  *See* KCV at

---

[9] A sap, distinct from a baton, is a leather impact weapon weighted with lead.  *See United States v. Smith*, 811 F.3d 907, 911 (7th Cir. 2016).

34:00:00-34:55:00.  Deputy Robledo also assisted Deputy Stalzer by handing over the partly applied handcuffs around Kristopher's right wrist.  *See id*.  Deputy Garza held onto Kristopher's legs.  *See* Garza Depo. at 46:10-47:6.

Deputies Beatty, Carrillo, Rossall, and Winter were next to arrive at the scene.  Upon his arrival, Deputy Carrillo observed Kristopher struggling in an attempt to stand up and tried to control Kristopher's right arm.  *See* NOL, Ex. C ("Carillo Depo.") at 23:16-24:6, 30:17-31:19.  According to Deputy Carillo, he heard Kristopher spitting at various points during the struggle and felt Kristopher squeezing his finger during the restraint.  *See id*. at 30:17-31:19, 37:16-19, 42:5-14, 88:5-12.  Deputy Beatty helped, then relieved, Deputy Garza in trying to hold and control Kristopher's legs by pushing them toward the ground.  *See* NOL, Ex. B ("Beatty Depo.") at 26:19-27:8, 28:14-24; Garza Depo. at 46:10-47:6; PSS No. 20.  Deputy Beatty also applied cord cuffs to Kristopher's ankles so that the deputies could place Kristopher in maximum restraints.[10]  *See* Beatty Depo. at 29:7-21, 37:5-38:5.  Deputy Rossall relieved Deputy Robledo, who sustained a broken finger during the struggle.[11]  *See* NOL, Ex. H ("Rossall Depo.") at 16:5-8, 18:15-18; Robledo Depo. at 122:3-16.  Deputy Rossall applied downward force with his hands to Kristopher's right arm and at times with his knee.  *See* KCV at 40:24:00-40:45:00.  Deputy Winter tried to control Kristopher's left arm by holding and applying downward pressure onto his bicep with both hands.  *See* NOL, Ex. J ("Winter Depo.") at 26:16-22, 39:11-19.

---

[10] "Maximum restraints" refers to the process of using two cords to restrain a suspect's legs.  One cord is wrapped around the ankles, binding them together; a second cord is wrapped around the waist.  *See* Doc. No. 53-4 ("Rossall Decl.") ¶ 3.  The waist restraint is then connected to the ankle restraint, and the waist restraint will be lengthened or shortened to the point where a suspect is unable to fully extend his or her legs.  *See id*.

[11] The parties dispute whether Deputy Robledo had his finger broken by Kristopher's grabbing at it or from Deputy Robledo's punches.  *See* PSS No. 18.  The evidence cited by the parties does not establish the cause of Deputy Robledo's broken finger and the Court finds it immaterial to the ultimate disposition in this case.

18cv1541-MMA-LL

1    Kristopher physically resisted during the struggle.  *See* Beatty Depo. at 44:17-45:3,

2    46:7-11, 47:7-14; Carillo Depo. at 37:16-19, 88:5-12; Garza Depo. at 43:6-23; Rossall

3    Depo. at 23:5-7, 82:11-83:4, 83:11-14; Robledo Depo. at 32:12-13, 33:7-14, 53:1-7,

4    90:21-91:5, 122:3-16; Winter Depo. at 38:20-39:10, 61:5-9.  Kristopher also spat towards

5    the ground, leading to the deputies deciding to place a "spit sock" over Kristopher's

6    head.[12]  *See* PSS No. 23; Carillo Depo. at 36:8-13; Kodadek Depo. at 32:13-25; Stalzer

7    Depo. at 46:12-17, 46:22-47:7; Winter Depo. at 27:20-28:14; *see also* KCV at 36:26:00-

8    37:13:00.  During the process of placing Kristopher in maximum restraints, Kristopher

9    kicked at Deputy Beatty's chest.  *See* Beatty Depo. at 46:7-11, 47:7-14; Rossall Depo. at

10   20:16-18, 21:4-10, 22:1-4; Winter Depo. at 61:5-9; Rossall Decl. ¶ 5.  During the

11   continued struggle, the deputies decided to replace the initial restraint with a more secure

12   one.  *See* Rossall Depo. at 20:16-18, 21:4-10, 22:1-22, 23:1-13, 33:2-7; Winter Depo. at

13   33:2-21, 35:5-15; Rossall Decl. ¶ 5.  At that point, the deputies noticed that Kristopher

14   had stopped moving, so they placed him into a recovery position on his side and

15   monitored his pulse and breathing.  *See* KCV at 40:47:00-43:00:00; Carrillo Depo. at

16   50:22-51:13, 52:21-53:15; Winter Depo. at 42:1-9, 43:7-45:2, 46:5-25.

17   Meanwhile, an Emergency Services Dispatcher at the Sheriff's Communications

18   Center had summoned San Marcos Fire Department ("SMFD") paramedics after

19   Deputies Garza and Robledo deployed their Tasers.  *See* Doc. No. 53-5 ("McCorkell

20   Decl.") ¶ 10.[13]  The dispatcher "advised that there was an ongoing situation at the San

21   Marcos Hobby Lobby, a Taser had been deployed, and they should get the fire

22   department medics underway."  *Id.*  The dispatcher continued to communicate updates to

23   SMFD as they traveled to the scene.  *See id.* ¶¶ 11-13.

---

26   [12] A spit sock "is made of mesh material and its purpose is to limit officer exposure to spit, blood and
     vomit."  *Garlick v. Cty. of Kern*, 167 F. Supp. 3d 1117, 1136 (E.D. Cal. 2016).

28   [13] Plaintiffs' objection to the Declaration of Ann McCorkell in Support of the Deputy Defendants'
     motion for summary judgment is addressed below along with the parties' other evidentiary objections.

1    While waiting for SMFD paramedics to arrive, Deputies Carrillo and Winter

2    monitored Kristopher's breathing and pulse and observed that both vitals were shallow

3    and slow, respectively.  *See* Beatty Depo. at 7-:6-10; Carillo Depo. at 52:21-54:9, 55:13-

4    57:21, 63:3-64:13, 70:1-72:22; Garza Depo. at 55:18-56:14; Winter Depo. at 48:10-

5    49:25, 50:9-15; Fattahi Decl., Ex. HHH beginning at 22:30.  Deputy Winter recognized

6    the shallow breathing and slow pulse, as well as Kristopher's previously demonstrated

7    high level of strength, as indicia consistent with a drug overdose.  *See* Winter Depo. at

8    49:6-25.  Deputy Winter administered Naloxone, a drug used to counteract the effects of

9    an overdose.  *See id*. at 49:7-50:20.  The deputies subsequently decided to administer a

10    second dosage of Naloxone and return Kristopher to a prone position to reduce the

11    handcuffs to one pair and pat him down in preparation for the SMFD paramedics.  *See*

12    Winter Depo. at 50:21-52:22; Rossall Decl. ¶ 6.  The deputies finished this process and

13    re-positioned Kristopher into recovery position and noticed his shallow breathing and

14    slow pulse did not appear to change.  *See* KCV beginning at 45:45:00; Rossall Decl. ¶ 6;

15    Beatty Depo. at 78:6-15; Carillo Depo. at 72:16-22; Rossall Depo. at 65:6-13; Winter

16    Depo. at 50:21-52:22; NOL, Ex. K ("Sherlock Depo.") at 65:19-67:12.

17    The SMFD paramedics took about twice as long as normal to get to the scene

18    because they were being dispatched from outside of the district.  *See* Sherlock Depo. at

19    70:14-72:25; Rossall Decl. ¶ 7; PSS No. 30.  Once the SMFD paramedics arrived,

20    Kristopher was placed on and handcuffed to a gurney.  *See* KCV beginning at 46:50:00.

21    The paramedics attempted life-saving measures on Kristopher once he was in the

22    ambulance; those measures were ultimately unsuccessful.  *See* Carillo Depo. at 76:12-25;

23    PSS No. 32.

24    The medical examiner who autopsied Kristopher testified that Kristopher's cause

25    of death was "[s]udden cardiac arrest while restrained and contributing acute

26    methamphetamine intoxication."  NOL, Ex. M ("Stabley Depo.") at 46:1-6; *see also*

27    Fattahi Decl., Ex. W (Kristopher's death certificate); Ex. X (amendment to death

28    certificate listing "sudden cardiac arrest while restrained" as the immediate cause of death

and "acute methamphetamine intoxication" as a significant condition contributing to death).  Dr. Bennet Omalu, Plaintiffs' retained expert and a forensic pathologist, opines that Kristopher "died as a result of Restraint Asphyxiation.  Concussive Traumatic Brain Injury and Acute Methamphetamine Toxicity are contributory factors to his death."  Doc. No. 58-56 ("Omalu Decl."), Ex. A at 12.[14]  Dr. Robert O'Halloran, also a forensic pathologist retained by Plaintiffs, opines that Kristopher "died from asphyxia by chest compression and by oral and nasal obstruction during prone restraint by police officers."  Doc. No. 58-60 ("O'Halloran Decl."), Ex. A at 8.

Based on these events, Plaintiffs ultimately filed suit alleging, as relevant here, violation of Kristopher's Fourth Amendment rights based on the Deputy Defendants' use of excessive force and denial of medical care.[15]  In their individual capacities as Kristopher's child and parents, Plaintiffs allege violation of their Fourteenth Amendment substantive due process right to familial association with Kristopher.  Plaintiffs further allege that the County Defendants are liable pursuant to *Monell v. Department of Social Services*, 436 U.S. 658, 690-91 (1978), based on their failure to adequately train the Deputy Defendants.

## EVIDENTIARY OBJECTIONS

As an initial matter, the Deputy Defendants and Plaintiffs have raised objections to evidence relied upon in each other's motions for summary judgment.[16]  *See* Doc. Nos.

---

[14] This citation and the immediately subsequent citation refer to the pagination assigned by the documents' authors.

[15] Claims brought pursuant to 42 U.S.C. § 1983 survive the decedent if the claims accrued prior to the decedent's death, and if state law authorizes a survival action.  *See* 42 U.S.C. § 1988(a); *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).  California law authorizes a decedent's successor in interest to prosecute a survival action if the person purporting to act as successor in interest satisfies the requirements of California law, which A.B. does here.  *See* Cal. Civ. P. Code §§ 377.30, 377.32; *see* Doc. No. 15.

[16] The County Defendants have objected to various items of evidence submitted by Plaintiffs in support of Plaintiffs' response in opposition to the County Defendants' motion for summary judgment.  *See* Doc.

84-1 ("Deputy Defendants' Objections" or "DDO"), 85-2 ("Plaintiffs' Objections" or "PO"). Generally, evidence proffered either in support of or in opposition to a motion for summary judgment must be admissible for courts to consider the evidence in ruling upon the motion. *See Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."). "[A] party does not necessarily have to produce evidence in a form that would be admissible at trial" in a motion for summary judgment. *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001). Rather, "Rule 56[(c)] requires only that evidence 'would be admissible', not that it presently be admissible." *Burch v. Regents of Univ. of Cal.*, 433 F.Supp.2d 1110, 1120 (E.D. Cal. 2006). Thus, as Plaintiffs correctly note, at the summary judgment stage, the focus is on the admissibility of the evidence itself, not its form. PO at 1 (citing *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003)).

**1. Deputy Defendants' Objections**

The Deputy Defendants object to the following evidence submitted by Plaintiffs as inadmissible hearsay:

1. Exhibit EE (audio recording of non-party witness Hobby Lobby store manager Lawrence Cady);

2. Exhibits XX through BBB (policy documents/publications from non-party agencies/organizations);

3. Exhibit DDD (medical records re: Kristopher Birtcher);

4. Exhibit EEE (audio recording of Cady calling emergency dispatch); and

5. Exhibits LLL through WWW (video recordings by non-party witnesses, which include audio-recorded statements by non-party witnesses).

---

No. 83-1. Because Plaintiffs' claims against the County Defendants fail as a matter of law, as explained *infra*, the Court does not address the County Defendants' objections herein.

1    *See* DDO at 1-2.[17]  Exhibit EE is admissible under Federal Rule of Evidence 803(5) as a

2    recorded recollection concerning the incident.  As Plaintiffs note, Cady testified at his

3    deposition that his memory of the incident was unclear and referenced his interview tape

4    as reflecting a more accurate account of the incident.  *See* PO at 1 (quoting Cady's

5    deposition testimony).  The Court is also persuaded that Plaintiffs can proffer Exhibits

6    XX through BBB for non-hearsay purposes, such as to show notice or personal

7    knowledge.  *See id.* at 1-2.  Moreover, Exhibit DDD can be admitted in a different form,

8    such as through testimony of Kristopher's treating physician, radiologist, and physical

9    therapist.  The medical records shown in Exhibit DDD can also be admitted under

10   Federal Rule of Evidence 803 since the contents appear to be reasonably pertinent to

11   medical treatment of Kristopher and describe his medical history.  *See* Fed. R. Evid.

12   803(4).  Exhibit EEE can be admitted under Federal Rules of Evidence 803(1)-(3).

13   Moreover, without more specification as to the objectionable statements in Exhibits LLL

14   through WWW, the Court is not prepared to sustain the general objections before it.  For

15   the present purpose, the Court is satisfied that statements made in these video recordings

16   of the incident can be admitted under Federal Rules of Evidence 803(1) and (2).

17   Accordingly, the Court **OVERRULES** the Deputy Defendants' objections to the above-

18   referenced exhibits.

19         The Deputy Defendants argue that the following evidence is inadmissible under

20   Federal Rules of Evidence 901 and 902 because it is not properly authenticated and not

21   self-authenticating: Exhibits XX through BBB, DDD, LLL, SSS and TTT.  *See* DDO at

22   2-3.  "The burden to authenticate under Rule 901 is not high."  *United States v. Recio*,

23   884 F.3d 230, 236 (4th Cir. 2018).  "The district court must merely conclude that the jury

24   could reasonably find that the evidence is authentic, not that the jury necessarily would so

25   find."  *Id.*  The authentication of documentary evidence can be accomplished through a

26   witness with personal knowledge—someone who "wrote it, signed it, used it or saw

27   _____

28   [17] "DDO" and "PO" citations refer to the pagination assigned by the documents' authors.

others do so." *Orr*, 285 F.3d at 774 n.8.  Documents may also be authenticated by the "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Fed. R. Evid. 901(4).  The Court finds that the challenged documents are sufficiently authenticated.  Exhibits XX through BBB are policy documents and publications from the International Association of Chiefs of Police ("IACP") and the Anaheim Police Department ("APD").  These documents bear sufficient indicia of their connection to these organizations.  Similarly, Exhibit DDD is a compilation of Kristopher's medical records, which begins with a cover letter signed by the custodian of health records at California Correctional Health Care Services.  *See* Doc. No. 58-51 at DDD-1.  Finally, Plaintiffs assert that Exhibits LLL, SSS, and TTT are video recordings of the incident taken by two witnesses at the scene.  Based on the Court's review of the video recordings, the Court finds that the content supports the items' authenticity, since they simply show different angles of a portion of Kristopher's encounter with the deputies compared to the composite video recording submitted by the Deputy Defendants in support of their motion.  *Compare generally* KCV *with* Exs. LLL, SSS, and TTT.  Accordingly, the Court **OVERRULES** the Deputy Defendants' objections to the above-referenced exhibits.

In addition, the Deputy Defendants object to the following evidence as irrelevant:

1. Exhibit UU (pages from Taser publication);

2. Exhibit VV (pages from Taser training presentation);

3. Exhibits XX through BBB (policy documents/publications from non-party agencies/organizations);

4. Exhibit XXX (excited delirium training video); and

5. Exhibit YYY (maximum restraint training video).

*See* DDO at 3-4.  The Deputy Defendants assert that these exhibits are being proffered by Plaintiffs to demonstrate "how the Deputy Defendants were trained, what type of training the Sheriff's Department provides, and to highlight the differences between the Sheriff's Department's policies/training and other agencies[]."  DDO at 3.  The Deputy Defendants

argue that these items of evidence are irrelevant to the primary question of qualified immunity before the Court. *See id.* at 3-4 (citations omitted). In response, Plaintiffs rely on the language in *Vazquez v. Cty. of Kern*, that "[t]raining materials and regulations are [] relevant, although not dispositive, to determining whether reasonable officers would have been on notice that their conduct was unreasonable." 949 F.3d 1153, 1164–65 (9th Cir. 2020) (citations omitted). The Court agrees with Plaintiffs, as a plain reading of *Vazquez* supports their position. Accordingly, the Court **OVERRULES** Defendants' objections to these exhibits.

### 2. Plaintiffs' Objections

Plaintiffs first object to certain paragraphs in the Declaration of Jeffrey Martin, Defendants' police practices expert, as lacking foundation, rendering improper expert opinions, and impermissible due to the Deputy Defendants' alleged non-disclosure in violation of Federal Rule of Civil Procedure ("Rule") 26. *See* PO at 7 (citing Doc. No. 84-2 ("Martin Decl.") ¶¶ 6-13). The Court does not find an issue with the foundation, nor with the timeliness of Defendants' disclosure since the cited paragraphs concern the previously disclosed subjects of "Defendants' tactics" and "the uses of force applied . . . during the incident . . . ." Doc. No. 49-2 (also "Fattahi Decl."), Ex. B at 2. Rather, the issue lies with Martin's narrative opinions provided in the declaration. For example, Martin provides in his declaration that he analyzed certain video evidence and concluded that none of Deputy Robledo's sap strikes landed on Kristopher's head. *See, e.g.,* Martin Decl. ¶ 8. Martin also describes Kristopher's ability on the date in question to move his right arm. *See, e.g.*, *id.* ¶ 13. As such, consistent with the Court's Orders on the parties' *Daubert* motions, *see* Doc. Nos. 87, 88, the Court **SUSTAINS IN PART** Plaintiffs' objections to Martin's opinions to the extent they simply serve as factual conclusions. For example, Martin concludes that none of Deputy Robledo's sap strikes actually hit Kristopher's head; this type of factual conclusion is impermissible. However, Martin's opinions bearing on the reasonableness of the conduct in this case, based on his own observation or assumption that none of the sap strikes ever hit Kristopher's head, are

1   admissible; likewise, with respect to Martin's testimony concerning Kristopher's range of

2   motion.

3         Plaintiffs next object to a portion of Deputy Robledo's deposition testimony as

4   lacking foundation and "blatantly contradicted such that the Court must disregard it."

5   (citing Doc. No. 84-3 ("Supplemental Notice of Lodgment" or "SNOL"), Ex. T ("Supp.

6   Robledo Depo.") at 54:6-55:1, and *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  To give a

7   document foundation, the proponent need only make a showing of authenticity sufficient

8   to allow a reasonable juror to find that the matter in question is what its proponent claims.

9   *See United States v. Tank*, 200 F.3d 627, 630 (9th Cir. 2000) (citing Fed. R. Evid.

10  901(a)).  Deputy Robledo's testimony is based on his personal knowledge, and therefore

11  the Court finds a proper foundation has been laid.  Moreover, the Court rejects Plaintiffs'

12  argument that the testimony must be excluded as contradicted by the same exchange

13  during the deposition.  Accordingly, the Court **OVERRULES** Plaintiffs' objections to

14  Deputy Robledo's deposition testimony.  Plaintiffs object to portions of the deposition

15  testimony of Deputies Rossall and Carrillo on the same bases.  PO at 7-8 (citing SNOL,

16  Ex. BB ("Supp. Rossall Depo.") at 81:19-23; *id.*, Ex. CC ("Supp. Carillo Depo.") at

17  37:16-38:4, 74:15-75:2).  Plaintiffs' objections are likewise **OVERRULED**.

18        Plaintiffs' last objection is to the Declaration of Ann McCorkell on the ground that

19  McCorkell was never disclosed pursuant to Rule 26(a)(1)(A).  The Deputy Defendants

20  respond that McCorkell's full name appears on the dispatch entries produced by

21  Defendants early in discovery, and that Rule 26(a)(1)(A) does not require

22  supplementation of initial disclosures where the information was otherwise made known

23  during discovery.  *See* Doc. No. 84-4 at 31.[18]  Rule 26(e) imposes a duty on litigants

24  timely to supplement disclosures made under Rule 26(a) that become incomplete or

25  incorrect.  Supplementation becomes necessary when "(A) . . . the [disclosing] party

26  learns that in some material respect the disclosure or response is incomplete or incorrect,

---

[18] Citation refers to the pagination assigned by the document's author.

1    and if the additional or corrective information has not otherwise been made known to the

2    other parties during the discovery process or in writing; or (B) as ordered by the Court."

3    Fed. R. Civ. P. 26(e).

4         Plaintiffs do not appear to dispute that McCorkell's identity was made known to

5    them early in discovery based on the production of dispatch records.  Further, the Court's

6    review of the exhibit attached to the Declaration of Ann McCorkell shows that

7    McCorkell's full name appears on the dispatch records.  *See* McCorkell Decl., Ex. AA.

8    Thus, the Court finds that excluding the evidence is inappropriate.  Plaintiffs surely

9    reviewed the dispatch records in connection with prosecuting this action.  Accordingly,

10   the Court **OVERRULES** Plaintiffs' objection to the McCorkell Declaration.

### DISCUSSION

12        The Court first addresses the merits of Plaintiffs' constitutional claims against the

13   Deputy Defendants as the County Defendants' liability hinges on whether the Deputy

14   Defendants are entitled to qualified immunity.  *See City of Los Angeles v. Heller*, 475

15   U.S. 796, 799 (1986) ("Neither *Monell* . . . nor any other of our cases authorizes the

16   award of damages against a municipal corporation based on the actions of one of its

17   officers when . . . the officer inflicted no constitutional harm."); *see also Long v. City &*

18   *Cty. of Honolulu*, 511 F.3d 901, 907 (9th Cir. 2007) ("If no constitutional violation

19   occurred, the municipality cannot be held liable and whether 'the departmental

20   regulations might have authorized the use of constitutionally excessive force is quite

21   beside the point.'") (quoting *Heller*, 475 U.S. at 799).

22        The Deputy Defendants move for summary judgment as to all claims on the

23   grounds that undisputed evidence supports finding as a matter of law that they did not

24   violate Plaintiffs' or Kristopher's constitutional rights and they are otherwise entitled to

25   qualified immunity from suit because they did not violate "clearly established" law.[19]

_____

[19] The Deputy Defendants also move for summary judgment as to Plaintiffs' remaining state law claims
while Plaintiffs cross-move for summary judgment as to Plaintiffs' battery and negligence claims and

1   Plaintiffs cross-move for summary judgment on several grounds, arguing that the
2   Deputy Defendants used objectively unreasonable force when they restrained Kristopher
3   in a prone position and provided inadequate medical care in violation of Kristopher's
4   Fourth Amendment rights.  Plaintiffs also move the Court to find as a matter of law that a
5   deliberate indifference standard applies to their Fourteenth Amendment familial
6   association claim.

7   **1.  Relevant Law**

8   **a.  *Summary Judgment***

9   "A party may move for summary judgment, identifying each claim or defense—or
10  the part of each claim or defense—on which summary judgment is sought.  The court
11  shall grant summary judgment if the movant shows that there is no genuine dispute as to
12  any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.
13  P. 56(a).  The party seeking summary judgment bears the initial burden of establishing
14  the basis of its motion and of identifying the portions of the declarations, pleadings, and
15  discovery that demonstrate absence of a genuine issue of material fact.  *See Celotex Corp.*
16  *v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party has "the burden of showing the
17  absence of a genuine issue as to any material fact, and for these purposes the material it
18  lodged must be viewed in the light most favorable to the opposing party."  *Adickes v. S.*
19  *H. Kress & Co.*, 398 U.S. 144, 157 (1970).  A fact is material if it could affect the
20  "outcome of the suit" under applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
21  242, 248 (1986).  A dispute about a material fact is genuine if there is sufficient evidence
22  for a reasonable jury to return a verdict for the non-moving party.  *See id.*

23  If the moving party meets its burden, the nonmoving party must go beyond the
24  pleadings and, by its own evidence or by citing appropriate materials in the record, show
25  by sufficient evidence that there is a genuine dispute for trial.  *See Celotex*, 477 U.S. at

26  _____

27
28  the first element of Plaintiffs' Bane Act claim.  However, as discussed *infra*, the Court does not reach
    the merits of Plaintiffs' state law claims.

324.  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . .."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  A "scintilla of evidence" in support of the nonmoving party's position is insufficient; rather, "there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Anderson*, 477 U.S. 242 at 252.  Moreover, "a party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda."  *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982).

The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor, *id.* at 255, "so long as their version of the facts is not blatantly contradicted by the video evidence."  *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018) (citing *Scott v. Harris*, 550 U.S. 372, 378-79 (2007)).  However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott*, 550 U.S. at 380.

### b.  Integral Participation

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must prove that the defendant, while acting under color of state law, deprived the plaintiff of a right or privilege conferred by the Constitution of the United States.  *See Nelson v. Campbell*, 541 U.S. 637, 643 (2004) (citing 42 U.S.C. § 1983).  An official deprives a plaintiff "of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which [the plaintiff complains]."  *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).  As such, a defendant's "liability under section 1983 is predicated on his integral participation in the alleged violation.  Integral participation does not require that each officer's actions themselves rise to the level of a constitutional violation.  But it does require some fundamental involvement in the

conduct that allegedly caused the violation." *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007) (internal citations and quotations omitted).

### c. *Qualified Immunity*

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). As such, "[a]n official sued under § 1983 is entitled to qualified immunity unless it is shown that the official [1] violated a statutory or constitutional right [2] that was clearly established at the time of the challenged conduct." *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014) (internal quotations omitted). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. If either prong is dispositive, a court need not analyze the other prong. *See id.* at 236-37.

Qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. Iqbal*, 563 U.S. 662, 743 (2009) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)). To successfully rebut an affirmative defense of qualified immunity, "a plaintiff must show that the officer's conduct was so egregious that any reasonable person would have recognized a constitutional violation." *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991).

"[I]n resolving a motion for summary judgment based on qualified immunity, a court must carefully examine the specific factual allegations against each individual defendant (as viewed in a light most favorable to the plaintiff)." *Cunningham v. Gates*, 229 F.3d 1271, 1287 (9th Cir. 2000). Additionally, courts must take care to "consider the state of the law at the time of the alleged violation." *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007). Importantly, the Supreme Court has "'repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of

1    generality.'" *City and Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 135 S. Ct. 1765,

2    1775–1776 (2015) (quoting *Ashcroft*, 563 U.S. at 742).  "Where constitutional guidelines

3    seem inapplicable or too remote, it does not suffice for a court simply to state that an

4    officer may not use unreasonable and excessive force, deny qualified immunity, and then

5    remit the case for a trial on the question of reasonableness.  An officer 'cannot be said to

6    have violated a clearly established right unless the right's contours were sufficiently

7    definite that any reasonable official in the defendant's shoes would have understood that

8    he was violating it.'"  *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *Plumhoff*,

9    572 U.S. at 778).

10        **2.  Analysis**

11        Plaintiffs claim that the Deputy Defendants used excessive force against

12   Kristopher, denied Kristopher adequate medical care, and as a result of his death, are

13   liable for violating Plaintiffs' right to familial association with Kristopher.  The Deputy

14   Defendants argue that they are entitled to qualified immunity from suit as to all claims.

15   The Court addresses each alleged constitutional violation and the entitlement of each

16   Deputy Defendant to qualified immunity from suit as to each claim in turn.

17            ***a.  Fourth Amendment Excessive Force Claim***

18        Plaintiffs point to four instances in which the Deputy Defendants used allegedly

19   excessive force against Kristopher: (1) Deputy Garza's "takedown" of Kristopher in front

20   of the entrance to Hobby Lobby; (2) Deputies Garza's and Robledo's Taser deployments;

21   (3) Deputy Robledo's fist and sap strikes against Kristopher; and (4) the Deputy

22   Defendants' "forceful prone restraint" of Kristopher.  *See* Doc. No. 60 ("Plaintiffs'

23   Combined Memorandum" or "Ps Memo.") at 45-64.[20]

24            i.  Relevant Law

25        In Fourth Amendment excessive force cases, courts examine whether police

26   officers' actions are "objectively reasonable under the totality of the circumstances."

---

[20] Citations refer to the pagination assigned by the document's author.

*Santos v. Gates*, 287 F.3d 846, 855 (9th Cir. 2002).  The analysis must balance "the nature and quality of the intrusion" upon an individual's rights "against the countervailing government interests at stake," without regard for the officers' underlying intent or motivations.  *See Graham v. Connor*, 490 U.S. 386, 396-97 (1989); *see also Byrd v. Phoenix Police Dep't*, 885 F.3d 639, 642 (9th Cir. 2018).

Whether a use of force was reasonable will depend on the facts of the particular case, including, but not limited to, (1) whether the suspect posed an immediate threat to anyone; (2) whether the suspect resisted or attempted to evade arrest; and (3) the severity of the crime at issue.  *See Graham*, 490 U.S. at 396.  Only information known to the officer at the time the conduct occurred is relevant.  *See Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546-47 (2017); *Glenn v. Washington Cty.*, 673 F.3d 864, 873 n.8 (9th Cir. 2011) ("We cannot consider evidence of which the officers were unaware . . ..").  Courts must "judge the reasonableness of a particular use of force 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,' and allow 'for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'"  *S.B. v. Cnty. of San Diego*, 864 F.3d 1010, 1014 (9th Cir. 2017) (quoting *Graham*, 490 U.S. at 396-97).  In doing so, courts should be mindful that "there are no per se rules in the Fourth Amendment excessive force context; rather, courts 'must still slosh [their] way through the factbound morass of 'reasonableness.'  Whether or not [a defendant's] actions constituted application of 'deadly force,' all that matters is whether [the defendant's] actions were reasonable.'"  *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (alterations in original) (quoting *Scott*, 550 U.S. at 383).

ii.  <u>Analysis</u>

Applying the legal principles set forth above, the Court considers the constitutionality of each use of force and whether the Deputy Defendants who integrally participated are entitled to qualified immunity from suit with respect to the use of force at

issue.

### 1. Deputy Garza's "Takedown" of Kristopher[21]

The first instance of alleged excessive force took place when Deputy Garza attempted to physically restrain Kristopher in front of the entrance to Hobby Lobby by maneuvering him to the ground. As noted above, in determining whether Deputy Garza's "takedown" constituted excessive force, the Court must balance the "nature and quality of the intrusion" on Kristopher's "liberty with the countervailing governmental interests at stake." *Davis v. City of Las Vegas*, 478 F.3d 1048, 1054 (9th Cir. 2007) (internal quotations and citations omitted).

This balancing first requires the Court to "assess the quantum of force used." *Id.* (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1279-80 (9th Cir. 2001)). A reasonable jury could conclude that it takes a substantial amount of force to push a "well-developed and well-nourished" 34-year old, 165-pound male onto the ground. Omalu Decl., Ex. A-6. To determine whether the force used by Deputy Garza was excessive, it must be balanced against the "countervailing government interests in safely" detaining Kristopher. *Miller v. Clark Cty.*, 340 F.3d 959, 966 (9th Cir. 2003). This requires a consideration of "the totality of the circumstances," including the *Graham* factors, at the time Deputy Garza deployed the force at issue. *Id.* at 968.

Prior to pushing Kristopher down onto the ground, Deputy Garza had been on the scene observing Kristopher's demeanor and behavior for approximately five minutes. *See* KCV beginning at 24:45.00. Kristopher was not suspected of any serious criminal activity at that time, but he appeared "disheveled" and "fidgety" and would not stop moving; he was not wearing any shoes and had pinpoint pupils. Garza Depo. at 17:23-18:07. Deputy Garza did not immediately use force; rather, he attempted to engage Kristopher verbally. *See id.* at 20:07-21:04. Deputy Garza found Kristopher to be noncommunicative and based on Garza's experience and training as a PERT deputy, he

---

[21] It is undisputed that Deputy Garza was the sole "integral participant" in this particular use of force.

concluded that Kristopher might have been under the influence or mentally ill.  *See id.* at 21:05-21.  Deputy Garza further concluded that an assessment by Ms. Brasel was appropriate and Kristopher needed to be restrained via handcuffs in order for Ms. Brasel to safely assess his condition.  *See id.*; *see also id.* at 25:14-26:07.  Deputy Garza attempted to handcuff Kristopher, who did not cooperate, and only then did Deputy Garza push Kristopher onto the ground.  *See id.* 33:06-21.

Thus, when Deputy Garza used the force at issue, Kristopher appeared under the influence or otherwise affected, failed to respond coherently to routine questioning, and posed a potential threat to himself, as well as Deputy Garza and civilians in the immediate vicinity.[22]  At that point, Deputy Garza "had substantial grounds for believing that some degree of force was necessary" in order to detain Kristopher.  *Gregory v. Cty. of Maui*, 523 F.3d 1103, 1106 (9th Cir. 2008).  Garza chose to handle the situation by pushing Kristopher into a seated position on the ground.  *See* KCV beginning at 30:28:80.  Under the circumstances, no reasonable jury would conclude that this was an unconstitutionally excessive use of force.  *See, e.g.*, *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001) (holding that officers did not use excessive force in using physical force sufficient to lift an unarmed suspect from the ground after the suspect resisted being handcuffed by stiffening her arm and attempting to "pull free").

Plaintiffs maintain that Kristopher did not resist detention in front of Hobby Lobby and because there was no indication that he was armed or dangerous, Deputy Garza did not have grounds to "further intru[de] into his liberty" by pushing Kristopher to the ground.  Ps Memo. at 46 (citing *Terry v. Ohio*, 392 U.S. 1, 24 (1968)).  It is undisputed that when Deputy Garza first arrived on the scene Kristopher appeared neither armed nor dangerous and was not resisting detention – because Deputy Garza had not yet attempted

---

[22] Larry Cady testified regarding the concern that Kristopher might step into traffic and hurt himself, as Kristopher "had already done so."  Cady Depo. at 31:17-21.  And although not at issue here, Plaintiffs' retained police practices expert, Roger Clark, testified that at this point Deputy Garza had reasonable suspicion to detain Kristopher.  *See* SNOL, Ex. N ("Supp. Clark Depo.") at 141:22-24.

to physically detain him.  However, the situation was not static.  By the time Deputy Garza resorted to using physical force he had been unable to engage Kristopher in conversation; he had observed Kristopher's demeanor and erratic behavior; he did not know whether Kristopher had a weapon and believed that Kristopher's pockets might be full; and he had observed civilians in close proximity.  When Deputy Garza instructed Kristopher to put his hands behind his back and then attempted to handcuff him, Kristopher pulled away and began to turn towards Deputy Garza.  *See* Garza Depo. at 29:1-17; 31:25-33:11; 50:6-14; *see also Arpin*, 261 F.3d at 922 (noting that the suspect "stiffened her arm and attempted to pull it away, which was impermissible regardless of whether Officer Stone had probable cause to arrest her.").  It was only then that Deputy Garza physically forced Kristopher to the ground.

Plaintiffs further assert that Deputy Garza could have used less-intrusive alternatives and that he gave no warning to Kristopher before using force despite observing that Kristopher was emotionally disturbed due to mental illness or intoxication. *See* Ps Memo. at 46.  However, Plaintiffs do not dispute that Deputy Garza first attempted to verbally communicate with Kristopher, Kristopher was noncompliant, and once Deputy Garza attempted to hold Kristopher's hands and wrists together, Kristopher pulled them away and began to turn toward Garza.  And although Kristopher's criminal conduct was not severe, he exhibited bizarre behavior and resisted being handcuffed.  It was objectively reasonable for Deputy Garza at that point to believe that Kristopher "posed a threat to himself," to Deputy Garza and Ms. Brasel, and "possibly to anyone who passed by him," and to use physical force to maneuver Kristopher accordingly. *Tatum v. City & Cty. of San Francisco*, 441 F.3d 1090, 1096–97 (9th Cir. 2006). Moreover, "[w]hile the existence of less forceful options to achieve the governmental purpose is relevant, '[p]olice officers . . . are not required to use the least intrusive degree of force possible.'"  *Marquez v. City of Phoenix*, 693 F.3d 1167, 1174 (9th Cir. 2012) (quoting *Forrester v. City of San Diego*, 25 F.3d 804, 807–08 (9th Cir. 1994)).

Even assuming a reasonable jury could conclude that Deputy Garza used excessive

force, Plaintiffs have failed to identify a case that clearly establishes that Deputy Garza's use of force was unconstitutional. *Kisela*, 138 S. Ct. at 1153 (2018).  Plaintiffs argue that Deputy Garza's "takedown" of Kristopher resembles the gang tackle in *Blankenhorn v. City of Orange*, *supra*.  However, *Blankenhorn* is readily distinguishable on its facts,[23] as "the force used was significantly greater than the force used in this case" and "involved [a] differently situated plaintiff[]." *Emmons v. City of Escondido*, 921 F.3d 1172, 1174 (9th Cir. 2019).

*Blankenhorn* involved a man allegedly trespassing at a mall; when officers "stopped him, he was talking with an adult friend and was accompanied by two young boys." *Blankenhorn*, 485 F.3d at 478.  There were no facts to suggest the man was under the influence or otherwise impaired and he was "talking casually with a friend." *Id.*  In stark contrast, Deputy Garza observed Kristopher acting strangely, appearing disoriented, and suspected Kristopher was under the influence of an illicit substance, mentally ill, or both. *See* Garza Depo. at 20:5-21:11, 25:14-26:3.  Plaintiffs contend that Kristopher did not pose an immediate threat to Deputy Garza justifying the application of physical force, but in doing so disregard Kristopher's demeanor, resistance to being handcuffed, and the undisputed fact that the encounter took place in front of the entrance to Hobby Lobby where patrons – some with small children – were entering and exiting the store.

Additionally, the "takedown" in *Blankenhorn* consisted of three officers "almost immediately" "gang-tackl[ing]" the man after he refused to be handcuffed. *Blankenhorn*, 485 F.3d at 478.  In this case, Deputy Garza engaged Kristopher verbally, attempted to handcuff him, and only after he was unsuccessful at doing so did he resort to pushing Kristopher down and into a seated position on the walkway outside the store's entrance. *See* KCV at 30:20:95-30:39:74.  By way of contrast, in *Blankenhorn*, a reasonable jury

---

[23] The additional cases cited by Plaintiffs are even less analogous and do not merit further discussion. *See* Ps Memo. at 58 (citing *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1091-92 (9th Cir. 2013) (tasing a bystander); *Santos v. Gates*, 287 F.3d 846, 853-54 (9th Cir. 2002) (taking down an individual, resulting in a broken back)).

could have concluded from the testimony and video evidence that the officer never tried to handcuff the suspect and the suspect never actively resisted being handcuffed before the gang tackle.  *See* 485 F.3d at 478-79.

The Court is mindful that an encounter between an officer and a potentially "emotionally disturbed individual who is creating a disturbance or resisting arrest, as opposed to a dangerous criminal," typically warrants a lesser degree of force.  *Glenn*, 673 F.3d at 877 (citing *Deorle*, 272 F.3d at 1282).  However, no reasonable jury could conclude that Deputy Garza's use of downward force on Kristopher in an effort to place Kristopher in handcuffs so that Ms. Brasel could safely assess him constituted an excessive use of force.  *See, e.g.*, *Tatum*, 441 F.3d at 1097 (holding that where a suspect was "behaving erratically and resisting arrest, it was objectively reasonable for Smith to use a control hold to secure Fullard's arm long enough to place him in handcuffs.").  Furthermore, Deputy Garza's use of force did not violate clearly established law.  *See Saucier v. Katz*, 533 U.S. 194, 201-02 (2001).  Accordingly, Deputy Garza is entitled to qualified immunity from suit with respect to this use of force.

### 2.  *Taser Deployments*[24]

The next use of force at issue is the deployment by Deputies Garza and Robledo of their Tasers.  The Deputy Defendants argue that the Taser deployments were reasonable given Kristopher's active resistance and the Tasers' failures to immobilize Kristopher long enough for the deputies to handcuff him.  *See* Doc. No. 53-1 ("Deputy Defendants' Memorandum" or "DD Memo.") at 21-22.[25]  Plaintiffs contend that the four Taser deployments were excessive under the circumstances.  *See* Ps Memo. at 47-48.

It is well-settled in this circuit that Tasers, "when used in dart-mode constitute an intermediate, significant level of force that must be justified by the governmental interest

---

[24] Plaintiffs assert, Defendants do not argue otherwise, and the Court agrees that Deputies Garza and Robledo were "integral participants" as to each Taser deployment.  *See* Ps Memo. at 50.

[25] Citations refer to the pagination assigned by the document's author.

involved." *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010); *see also Thomas v. Dillard*, 818 F.3d 864, 890 (9th Cir. 2016).  As such, the Court must determine whether Deputies Garza's and Robledo's Taser deployments were "objectively reasonable given the totality of the circumstances." *Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019).

The record reflects that upon arriving at the scene Deputy Robledo had a reasonable basis to believe that confronting Kristopher would require the use of some degree of force.  Deputy Robledo had received information from the dispatcher indicating that Kristopher might be under the influence of drugs and the confrontation at issue had been going on for a while.  *See* Robledo Depo. at 15:3-25.  Deputy Robledo also had information supplied by Ms. Brasel indicating that Kristopher "was not following directives," and he knew that Brasel had requested a "code cover response."  *Id.* at 16:15-24.  As noted above, one of the most important factors to consider is whether the suspect posed an immediate threat to anyone's safety.  *See Mattos*, 661 F.3d at 441.  When Deputy Robledo arrived at the scene, he observed Kristopher resisting arrest and "wrestling" with Deputy Garza on the ground.  Robledo Depo. at 19:2-16; *see also* KCV beginning at 31:08:00.  At that point, it was reasonable for Deputy Robledo to believe that Kristopher posed an immediate threat to Deputy Garza's safety.  However, Deputy Robledo did not immediately deploy his Taser; rather, he gave a verbal warning that he intended to deploy his Taser.  *See* Robledo Depo. at 22:12-15; *see also* Garza Depo. at 34:25-35:02.  Deputy Robledo then observed Kristopher continuing to struggle against Deputy Garza and attempting to get up, while turning to face Robledo, and only then did Deputy Robledo deploy his Taser.  *See* Robledo Depo. at 24:13-18; KCV beginning at 31:20:00.

Deputy Robledo deployed his Taser at Kristopher from approximately seven feet away, Robledo Depo. at 24:03-23, however, Kristopher was not incapacitated.  Rather, Kristopher doubled over at the waist momentarily before moving towards Deputy Garza, and he then ran into the parking lot.  *See* KCV at 31:20:00-31:30:00; Garza Depo. at

37:2-24.  This led to the deputies deploying their Tasers a collective total of three more times, which again did not have the intended immobilizing effect.  *See* KCV at 31:26:00-31:33:00; Garza Depo. at 38:08-19, 40:15-41:08; Robledo Depo. at 31:09-16.  Kristopher's flight was only stopped once Deputy Robledo chased and tackled Kristopher to the ground.  *See* KCV at 31:30:00-31:45:00.

Plaintiffs primarily rely on *Bryan v. MacPherson* in support of their position that the Taser deployments were excessive uses of force.  630 F.3d 805; *see* Ps Memo. at 47-48.  *Bryan* involved a man pulled over by a police officer for a traffic violation.  While the man was behaving unusually and dressed in tennis shoes and boxer shorts, it was undisputed that he never made any verbal or physical threat to the officer or anyone else; he was clearly unarmed given his attire; and his only noncompliance was not remaining in his vehicle, a command that he asserted he did not hear from the officer.  *See Bryan*, 630 F.3d at 826-30.  The material dispute in *Bryan* was whether the man took a step toward the officer, and what followed indisputably was the officer, without warning, deploying his Taser at the man, who was immobilized, fell, and suffered injury as a result.  *See id.* at 822.

*Bryan* is factually distinguishable.  Kristopher wore pants with pockets, leaving the deputies uncertain as to whether Kristopher was in possession of any weapons.  *See, e.g.*, Garza Depo. at 20:05-21:11.  Prior to the initial Taser deployment, Deputy Robledo observed Kristopher struggling with Deputy Garza on the ground and actively resisting restraint.  *See id.* at 33:15-21; NOL, Ex. L ("Clark Depo.") at 179:22-180:8 (Plaintiffs' police practices expert, Roger Clark, admitted that Kristopher was "actively resisting a detention" at the time Kristopher was shot with the Taser).  Moreover, unlike in *Bryan*, the scene in front of Hobby Lobby had numerous civilians, including young children, entering and exiting in close proximity to Kristopher and the deputies.  *See* KCV beginning at 3:36:00.  Thus, by resisting, Kristopher posed a threat to not only himself and Deputy Garza but also civilians.  The undisputed facts show that Kristopher resisted detainment, ultimately leading to the initial Taser deployment, which did not immobilize

him sufficiently for the deputies to detain him.  Instead, Kristopher recovered quickly enough to move towards Deputy Garza and then run into the parking lot.

Plaintiffs argue that a reasonable jury could conclude that Kristopher was exercising his limited right to resist when he ran into the parking lot.  Ps Memo. at 48.  However, "[a]n individual's limited right to offer reasonable resistance is only triggered by an officer's bad faith or provocative conduct."  *Arpin*, 261 F.3d at 921.  Plaintiffs fail to proffer evidence of bad faith and no reasonable jury could find that Deputy Garza's use of physical force gave Kristopher a limited right to resist by struggling and attempting to flee the scene.  Further, Deputy Robledo's initial Taser deployment was reactive and intended to subdue, not provocative.  And the cases cited by Plaintiffs in support of their contention otherwise are distinguishable.  *Youngwood v. County of Los Angeles* involved a suspect who started moving or "circling" around an officer in response to the officer pepper spraying the suspect "from behind without warning while [he] was sitting on the sidewalk."  655 F.3d 1156, 1164 (9th Cir. 2011).  The second distinguishable case is again *Blankenhorn*, which involved a suspect who refused an officer's order to kneel down to be handcuffed before gang-tackling the suspect with other officers, triggering the suspect's limited right to resistance.  *Blankenhorn*, 485 F.3d at 479-80.  *Garlick v. County of Kern* is also distinguishable as it involved a suspect bit by a K-9 officer – the provocative conduct triggering the suspect's limited right to resistance, *i.e.*, the suspect's movement away from the officer and attempts to get the K-9 to stop biting him.  167 F. Supp. 3d at 1148.

Even if Deputies Garza's and Robledo's use of Tasers could be considered excessive force, its unconstitutionality is not "beyond debate."  *See Ashcroft*, 563 U.S. at 741.  The Court has exhaustively surveyed the controlling case law at the time of the events in question and concludes that it would not have been apparent to a deputy facing similar circumstances that using a Taser on an individual suspected to be under the influence, actively resisting detention, engaged in a physical confrontation with a deputy, and then attempting to flee, constituted excessive force.  As discussed above, *Bryan*

1    presents a significantly dissimilar factual scenario involving a man pulled over for a

2    traffic violation, clearly unarmed due to his attire, and complying with every request by

3    the officer (with one possible exception to remain in his car) before being shot with a

4    Taser without a prior warning.

5            Likewise, *Jones v. Las Vegas Metro. Police Dep't* would not have put Deputies

6    Garza and Robledo on notice that their conduct was unlawful.  Ps Memo. at 59 (citing

7    873 F.3d 1123, 1131-32 (9th Cir. 2017)).  First, *Jones* post-dates the events in question.

8    The Ninth Circuit did not file the *Jones* opinion until October 20, 2017.  The encounter

9    between Kristopher and the Deputy Defendants occurred on October 14, 2017.  A such,

10   *Jones* "'could not have given fair notice to [the deputies]' because a reasonable officer is

11   not required to foresee judicial decisions that do not yet exist in instances where the

12   requirements of the Fourth Amendment are far from obvious."  *Kisela*, 138 S. Ct. at 1154

13   (quoting *Brosseau v. Haugen*, 543 U.S. 194, 200 n.4 (2004)).

14           Second, like *Bryan*, the facts of *Jones* are not sufficiently similar to the facts here.

15   *Jones* involved an unarmed man pulled over by an officer for a traffic violation.  873 F.3d

16   at 1127.  The man initially complied with the officer's request to get out of the car, so the

17   officer could pat him down for weapons, then turned on the officer, who pulled his

18   firearm on the man.  *Id*.  The man then sprinted away, leading the officer to deploy his

19   Taser at the man and continue to activate the Taser even after the man was on the ground,

20   immobilized and not resisting, and handcuffed with backup officers arriving at the scene

21   to assist.  *See id*.  Here, there is no genuine dispute that Kristopher was actively resisting

22   detainment by first wrestling with Deputy Garza just prior to the first Taser deployment,

23   then lunging at Deputy Garza before fleeing to the parking lot after the initial Taser

24   deployment and during the next Taser deployments.  Moreover, the Taser deployments

25   did not have the intended effect of immobilizing Kristopher long enough for the deputies

26   to handcuff him.  Nor is there any evidence to suggest that the deputies continued to

27   activate the Tasers on Kristopher once he was brought to the ground.

28           Likewise, the facts in *Thomas v. Dillard* are not analogous.  In that case, prior to

being shot with a Taser, the suspect "stood facing the officer with his hands at his sides," "had been cooperative, aside from refusing to raise his hands, kneel and be frisked," "gave no indication he was going to flee, and his resistance was mostly passive." *Thomas*, 818 F.3d at 890.  Furthermore, the Ninth Circuit has held the use of Tasers reasonable under circumstances where the suspect "was also actively resisting arrest," and "the officers could reasonably have believed that they were themselves in danger." *Marquez*, 693 F.3d at 1175.

In sum, even if a reasonable jury could find that Deputies Garza's and Robledo's Taser deployments constituted excessive force, because Kristopher was resisting detention, struggling with Deputy Garza, and then attempted to flee, whether the deputies could constitutionally deploy Tasers against Kristopher was not "beyond debate" at the time of the events in question.  *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (quoting *Ashcroft*, 563 U.S. at 743)).  Accordingly, Deputies Garza and Robledo are entitled to qualified immunity from suit with respect to this use of force.

### 3.  Deputy Robledo's Fist and Sap Strikes[26]

The next instance of alleged excessive force at issue is Deputy Robledo's fist and sap strikes.  The Deputy Defendants argue that Deputy Robledo's fist and sap strikes were reasonable responses to Kristopher's resistance.  *See* DD Memo. at 23.  Plaintiffs respond that the strikes amounted to deadly force, which was excessive given Kristopher posed no immediate threat and only attempted to flee as a reasonable response to the force used.  *See* Ps Memo. at 51-52.

With respect to the quantum of force, a reasonable jury could find that Deputy Robledo's fist and sap strikes were significant and/or intermediate uses of force, respectively.  *Cf. Garlick*, 167 F. Supp. 3d at 1147 (finding baton blows and impact blows by punching are generally considered intermediate and significant uses of force,

---

[26] Plaintiffs assert, Defendants do not argue otherwise, and the Court agrees that Deputy Garza was an "integral participant" in Deputy Robledo's use of fist and sap strikes.  *See* Ps Memo. at 52.

respectively) (citing *Young*, 655 F.3d at 1161-62; *Blankenhorn*, 485 F.3d at 480).  A reasonable jury could also find that some of these strikes landed on Kristopher's head, rendering them potentially deadly uses of force.  Thus, the pertinent inquiry is whether a reasonable jury could find these strikes constituted excessive force under the totality of the circumstances.

As discussed above, Deputy Robledo arrived on the scene to witness Kristopher engaged in a physical altercation with Deputy Garza.  Robledo deployed his Taser at Kristopher, to minimal effect, and then chased and tackled Kristopher in the parking lot of the Hobby Lobby store.  *See* KCV at 31:30:00-31:45:00.  Kristopher was "trying to avoid contact, get away," "squirm[ing]," and resisting apprehension.  Clark Depo. at 203:17; 203:22; 213:19-20; *see also* Garza Depo. at 38:15-19.  That is when Deputy Robledo struck Kristopher "once in the face" with a closed fist.  Robledo Depo. at 31:15-22.  Kristopher "kept resisting and grabbing at [Deputy Robledo] and getting up," and Deputy Robledo struck Kristopher two more times in the facial area.  *Id*. at 32:12-13, 33:4-14; 35:3-7.  The strikes did not subdue Kristopher.  *See* KCV at 31:35:59-31:47:00.  Kristopher continued to resist apprehension over Deputies Garza's and Robledo's and several intervening civilians' efforts.  *See id.* beginning at 31:58:00.  Deputy Robledo struck Kristopher in the area of his hands, head, and shoulders first with about four hammer-fist strikes, then with about six strikes with a sap.  *See* Robledo Depo. at 47:15-48:6, 53:11-54:10, 56:10-19, 59:2-21; Brasel Depo. at 33:4-9, 65:20-66:5; Cady Depo. at 48:17-49:8, 76:15-24, 78:6-12, 78:23-79:10, 79:20-80:1.

Plaintiffs argue that under *Graham* the series of fist and sap strikes employed by Deputy Robledo constitutes excessive force.  *See* Ps Memo. at 51-53.  Plaintiffs posit that "the possibility of drug use or mental illness does not justify any force."  *Id*. at 52.  However, this contention is not supported by the law in this circuit, where courts have declined to "adopt a per se rule establishing two different classifications of suspects: mentally disabled persons and serious criminals.  Instead, . . . where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a

factor that must be considered in determining, under *Graham*, the reasonableness of the force employed." *Deorle*, 272 F.3d at 1283. Plaintiffs also minimize the severity of Kristopher's actions and the threat he posed to those around him as the encounter continued. Prior to administering the strikes, Deputy Robledo had observed Kristopher resist and struggle physically with Deputy Garza, get shot with several Taser darts with no apparent significant effect on his mobility, move towards Deputy Garza before fleeing into the parking lot, and stop only after being tackled to the ground.

Nevertheless, Plaintiffs maintain that Kristopher "posed no immediate threat at the time of these strikes." Ps Memo. at 52. Plaintiffs point to Deputy Robledo's interview, during which he did not mention that Kristopher kicked or flailed after being tackled. *See* PSS Nos. 172-74. While the Court is keenly aware that "[s]ummary judgment is not appropriate in § 1983 deadly force cases" when "the officer's credibility . . . is genuinely in doubt," *Newmaker v. City of Fortuna*, 842 F.3d 1108, 1116 (9th Cir. 2016), this is not such a case. Although Deputy Robledo did not state in so many words during his interview that Kristopher "kicked" him, Deputy Robledo reported that Kristopher "immediately turned around . . . and was flailing and throwing his hands up . . .." Fattahi Decl., Ex. QQ ("Robledo Int.") at 21:21-24. The surveillance video of the incident confirms that this is a reasonable characterization of Kristopher's actions and Plaintiffs' retained police practices expert agreed that Kristopher squirmed and tried to get away. *See* KCV at 31:32:00-31:40:00; Clark Depo. at 203:22. Deputy Robledo further reported that after punching Kristopher one time in the face, Kristopher "was slapping at me . . . [and] managed to get up . . . [and] started running . . . ." *Id*. at 21:25-22:11. At one point, Kristopher grabbed at Deputy Robledo's baton on the ground until Deputy Robledo was able to knock it away. *See* KCV at 32:25:00-32:55:00; Brasel Depo. at 31:5-22. Video evidence demonstrates conclusively that Kristopher in fact broke away from Deputy Robledo and started running into a busy parking lot. *See* KCV at 31:46:77-31:50:01. Additionally, Plaintiffs do not dispute that during this struggle, civilians were still nearby in front of the entrance to Hobby Lobby and in the parking lot, with at least one civilian

1    in close proximity and trying to assist Deputies Robledo and Garza with physically
2    subduing Kristopher.

3        Plaintiffs further assert that Kristopher's resistance was a reasonable attempt to
4    protect his body from excessive force.  *See* Ps Memo. at 52.  However, the Court rejects
5    this argument for the same reasons noted above, namely that the Taser deployments did
6    not constitute such provocative force here that would give rise to a limited right to resist
7    by attempting to flee the scene.  This applies equally to Deputy Robledo's tackle and
8    initial strikes, which were reactive attempts to subdue Kristopher – a struggle which
9    prompted several civilian passersby to intervene and help restrain Kristopher.  *See* KCV
10   at 31:44:00-32:50:00; Garza Depo. at 43:6-23; Robledo Depo. at 42:16-43:10.

11       "The calculus of reasonableness must embody allowance for the fact that police
12   officers are often forced to make split-second judgments—in circumstances that are
13   tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a
14   particular situation."  *Graham*, 490 U.S. at 396-97.  The struggle with Kristopher on the
15   ground of Hobby Lobby's parking lot was clearly tense, uncertain, and rapidly evolving
16   as Kristopher continued to resist and attempted to flee.  Based on the context in which the
17   strikes occurred, no reasonable jury could conclude that Deputy Robledo used force other
18   than in proportion to Kristopher's continued resistance and incidental to the deputies'
19   efforts to detain and secure Kristopher.

20       Even assuming that Deputy Robledo's fist and sap strikes were excessive uses of
21   force, such force did not violate clearly established law.  Plaintiffs argue that
22   *Blankenhorn* and *Young v. County of Los Angeles* "clearly established that repeated
23   punches to the head and impact strikes to the body *require aggressive or combative acts,*
24   *not just passive resistance* by someone who is reasonably resisting excessive force."  Ps
25   Memo. at 59 (citation omitted) (emphasis added).  The Court agrees.  However, neither
26   *Blankenhorn* nor *Young* "squarely govern" the facts of this case.  *Kisela*, 138 S. Ct. at
27   1153.  As discussed above, the undisputed facts in this case demonstrate that Deputy
28   Robledo's strikes took place as Kristopher *actively* resisted; fled from the deputies;

1   flailed; broke Deputy Robledo's tackle; attempted to flee again before being dragged to
2   the ground; and continued flailing and resisting detainment.  Neither *Blankenhorn* nor
3   *Young* placed Deputies Garza and Robledo on notice that Robledo's strikes were
4   excessive under these specific circumstances.  Accordingly, Deputies Garza and Robledo
5   are entitled to qualified immunity from suit with respect to this use of force.

*4. Deputy Defendants' "Forceful Prone Restraint" of*
*Kristopher*[27]

8        The last instance of alleged excessive force is the Deputy Defendants' "forceful
9   prone restraint" of Kristopher.  The Deputy Defendants argue that their actions, including
10  placing Kristopher in maximum restraints, constituted a reasonable application of force
11  given that Kristopher was resisting detention and "posed a danger to them, himself, and
12  to the civilians in the area."  DD Memo. at 23-25 (citing Rossall Decl. ¶ 4).  Plaintiffs
13  respond that "not only are Defendants not entitled to summary judgment, but the
14  undisputed lack of any serious immediate threat entitles Plaintiffs to summary judgment
15  for Defendants' continued use of dangerous restraint techniques, particularly after
16  [Kristopher] pleaded to them that he could not breathe."  Ps Memo. at 53.

17       Assuming a reasonable factfinder could conclude that the Deputy Defendants'
18  restraint of Kristopher constituted a substantial use of force, the question is whether the
19  force was reasonable based on the totality of the circumstances.

20       "Restraining a person in a prone position is not, in and of itself, excessive force
21  when the person restrained is resisting arrest."  *Estate of Phillips v. City of Milwaukee*,
22  123 F.3d 586, 593 (7th Cir. 1997) (citing *Mayard v. Hopwood*, 105 F.3d 1226, 1227–28
23  (8th Cir. 1997)); *accord Tatum*, 441 F.3d at 1098.  Here, Kristopher continued to resist
24  restraint during his struggle with the deputies, eventually leading to the deputies securing

---

[27] Plaintiffs assert, Defendants do not argue otherwise, and the Court agrees that each of the Deputy Defendants was an "integral participant" in the "forceful prone restraint" of Kristopher.  *See* Ps Memo. at 53-54.

Kristopher in two pairs of handcuffs. *See* KCV at 34:00:00-34:55:00; Stalzer Depo. at 31:8-32:20, 42:7-21, 43:4-8, 46:1-11, 71:8-72:11. Kristopher spat onto the ground while the deputies attempted to secure Kristopher in handcuffs, leading the deputies to place a spit sock over Kristopher's head. *See* Beatty Depo. at 44:17-45:3, 46:7-11, 47:7-14; Carillo Depo. at 36:8-13, 37:16-19, 88:5-12; Garza Depo. at 43:6-23; Kodadek Depo. at 32:13-25; Rossall Depo. at 23:5-7, 82:11-83:4, 83:11-14; Stalzer Depo. at 46:12-17, 46:22-47:7; Robledo Depo. at 32:12-13, 33:7-14, 53:1-7, 90:21-91:5, 122:3-16; Winter Depo. at 27:20-28:14; 38:20-39:10, 61:5-9; *see also* KCV at 36:26:00-37:13:00. Deputy Beatty applied cord cuffs to Kristopher's ankles so that the deputies could place Kristopher in maximum restraints. *See* Beatty Depo. at 29:7-21, 37:5-38:5. During the process of securing Kristopher in maximum restraints, Kristopher kicked Deputy Beatty's chest. *See* Beatty Depo. at 46:7-11, 47:7-14; Rossall Depo. at 20:16-18, 21:4-10, 22:1-4; Winter Depo. at 61:5-9; Rossall Decl. ¶ 5. Kristopher continued to struggle and the deputies deciding to replace the restraint with a more secure one. *See* Rossall Depo. at 20:16-18, 21:4-10, 22:1-22, 23:1-13, 33:2-7; Winter Depo. at 33:2-21, 35:5-15; Rossall Decl. ¶ 5. After the second set of restraints had been applied, the deputies noticed that Kristopher had stopped moving, so they placed him into a recovery position on his side and monitored his pulse and breathing. *See* KCV at 40:47:00-43:00:00; Carillo Depo. at 50:22-51:13, 52:21-53:15; Winter Depo. at 42:1-9, 43:7-45:2, 46:5-25.

Plaintiffs argue that the force used by the deputies was excessive in light of the fact that "there was no serious or violent crime at issue." Ps Memo. at 54. This argument is not well-taken, as it minimizes the seriousness of Kristopher's increasing resistance to apprehension. The same is true for Plaintiffs' assertion that Kristopher "posed no immediate threat" or had not "any aggressive behavior toward anyone," *id.*, which the video and undisputed testimonial evidence overwhelmingly refute.

Plaintiffs further take issue with the Deputy Defendants' restraint process because the deputies were trained that (1) struggling with someone in a state of excited delirium and (2) restraining someone in the manner performed here, both posed an increased risk

of death.  *See id.* at 55.  However, Plaintiffs proffer no evidence that the Deputy Defendants knew for a fact that Kristopher was in a state of excited delirium at the time, only that they suspected he was under the influence of drugs, mentally ill, or both.  Only information known to the officer at the time the conduct occurred is relevant.  *See Mendez*, 137 S. Ct. at 1546-47; *Glenn*, 673 F.3d at 873 n.8.  And the record reflects that the Deputy Defendants escalated their use of force in direct correlation to Kristopher's continued resistance.  As discussed above, the encounter with Kristopher began with questioning in front of Hobby Lobby's entrance, followed by an unsuccessful attempt to place Kristopher in handcuffs, a struggle to keep Kristopher from rising to his feet, ineffective Taser deployments, a chase, a tackle, closed fist and sap strikes, Kristopher breaking the tackle, another struggle to restrain Kristopher, a struggle to secure Kristopher in two pairs of handcuffs, and finally, a struggle to place Kristopher in more secure maximum restraints, the first of which the deputies felt the need to replace due to Kristopher's continued resistance.

The non-controlling cases on which Plaintiffs rely are distinguishable.  Although *Garlick* involved a similar prolonged application of weight on a handcuffed man, the government's need for the intrusion was low.  The severity of the crime at issue was resisting an officer, but apparently in a non-violent, non-combative manner.  *See Garlick*, 167 F. Supp. 3d at 1156.  Here, Kristopher was suspected of being under the influence of drugs and resisting detention in an antagonistic manner for virtually the entire encounter with the deputies, including during the process of securing Kristopher in both sets of maximum restraints.  And while Kristopher stated during the struggle with the application of the second restraint that he could not breathe (like the suspect in *Garlick* did), the video evidence shows conclusively that the deputies were not placing their full body weight on Kristopher's back or neck at that point, but only exerting downward pressure with their hands as he struggled and tried to remove the spit sock.  *See, e.g.,* Fattahi Decl., Ex. HHH beginning at 19:57; *see also id.*, Ex. III beginning at 4:20.  On the other hand, in *Garlick*, "the officers allegedly applied approximately ten minutes of

1    pressure to [the suspect's] back."  167 F. Supp. 3d at 1155.

2        Similarly, in *Greer v. City of Hayward*, the defendant officers "testified that [the

3    suspect] was not combative, merely uncooperative[, and n]one of them explicitly testified

4    that they feared for their own safety.  229 F. Supp. 3d 1091, 1104 (N.D. Cal. 2017).  As

5    discussed above, Kristopher resisted for virtually the entire encounter.  Moreover, the

6    Deputy Defendants remained unsure if Kristopher had any weapons on his person until

7    after he was restrained in the second set of maximum restraints.  *See, e.g.*, Rossall Decl. ¶

8    6.  And in *Greer*, there was a genuine issue of material fact as to the suspect's resistance.

9    229 F. Supp. 3d at 1105.  But here, the video evidence, including the recordings

10   submitted by Plaintiffs themselves, conclusively demonstrates Kristopher's active

11   resistance to restraint and detention.

12       Even assuming the Deputy Defendants used excessive force to restrain Kristopher,

13   the Court concludes that the deputies did not have "fair notice" that their actions were

14   unconstitutional.  *Brosseau*, 543 U.S. at 198.  Relying on *Drummond ex rel. Drummond*

15   *v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003), Plaintiffs argue that at the time of the

16   events in question "any reasonable officer would have had clear notice that multiple

17   officers' sustained compression of the torso of an emotionally disturbed person who was

18   handcuffed and hogtied and did not pose a serious safety threat, while he cried for help

19   and said he could not breathe, constituted excessive force."  Ps Memo. at 60.  However,

20   as explained above, in Fourth Amendment excessive force cases, "police officers are

21   entitled to qualified immunity *unless existing precedent 'squarely governs' the specific*

22   *facts at issue*."  *Kisela*, 138 S. Ct. at 1153 (citation omitted) (emphasis added); *see also*

23   *West v. City of Caldwell*, 931 F.3d 978, 983 (9th Cir. 2019).  *Drummond* does not

24   "squarely govern" the facts of this case.

25       In *Drummond*, two officers brought to the ground an unarmed man whom they

26   knew suffered from mental illness.  343 F.3d at 1054.  Although the man "offered no

27   resistance," the officers continuously applied their weight to his neck and upper torso.  *Id.*

28   The man repeatedly told the officers he could not breathe; he soon fell into respiratory

distress, and eventually lost consciousness. *Id.* at 1054–55. The court found that the officers applied severe force that resulted in compression asphyxia, *id.* at 1056, despite the minimal need for force because Drummond was not resisting and "*no* underlying crime was at issue." *Id.* at 1057 (emphasis in original, internal quotation marks omitted). The Ninth Circuit held that "[t]he officers—indeed, any reasonable person—should have known that squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable." *Id*. at 1059.

The facts of *Drummond* are critically different from the undisputed material facts here. First, the Deputy Defendants did not know for certain whether Kristopher suffered from a mental illness, but merely suspected that he was under the influence of drugs, mentally ill, or both. Most significantly, Kristopher was initially combative and actively resisted detention in a public place with numerous civilians nearby, and therefore, the government's need to intrude upon Kristopher's Fourth Amendment rights was substantially greater than that in *Drummond*. Even as the Deputy Defendants used physical force to restrain Kristopher, he continued to resist, repeatedly lifting his upper body and head off the ground. *See* KCV beginning at 34:05:00. Kristopher's behavior throughout the encounter is a key distinguishing factor. The facts in *Drummond* indicate a materially different scenario:

> Independent eyewitnesses saw Officer Ned knock Drummond to the ground[,] where the officers cuffed his arms behind his back as Mr. Drummond lay on his stomach. Although Drummond offered no resistance, McElhaney put his knees into Mr. Drummond's back and placed the weight of his body on him. [Ned] also put his knees and placed the weight of his body on him, except that he had one knee on Mr. Drummond's neck.

*Drummond*, 343 F.3d at 1054 (internal quotation marks omitted). In holding that the officers were not entitled to qualified immunity, the *Drummond* court repeatedly emphasized the detainee's compliance. *See id.* at 1061 ("The officers allegedly crushed

Drummond against the ground by pressing their weight on his neck and torso, and continuing to do so despite his repeated cries for air, and despite the fact that his hands were cuffed behind his back and *he was offering no resistance*.  Any reasonable officer should have known that such conduct constituted the use of excessive force.") (emphasis added); *id*. at 1062 ("We need no federal case directly on point to establish that kneeling on the back and neck of a *compliant detainee,* and pressing the weight of two officers' bodies on him even after he complained that he was choking and in need of air violates clearly established law, and that reasonable officers would have been aware that such was the case.").

Another important distinguishing factor between this case and *Drummond* is the nature of the force used by the Deputy Defendants.  In *Drummond*, "two officers lean[ed] their weight on Drummond's *neck* and torso for a substantial period of time," creating an obvious risk of "compression asphyxia."  *Id*. at 1059-60 & n.7 (emphasis added).  The bodily pressure applied by the Deputy Defendants to Kristopher was materially different from that applied in *Drummond*.  Here, the Deputy Defendants never kneeled or otherwise put their full body weight on Kristopher's neck.  Rather, they applied varying degrees of physical force on other parts of Kristopher's body to maintain control over Kristopher, including: placing a knee and a forearm/elbow on Kristopher's upper back, *see e.g.*, KCV at 34:08:21; placing a hand on the back of Kristopher's head, *see e.g.*, *id*. at 34:16:08 and 37:21:19; placing a hand on Kristopher's shoulder, *see e.g.*, *id*. at 34:35:04; pressing with closed fists on Kristopher's upper back, *see e.g.*, *id*. at 35:06:02 and 38:48:15; placing a hand on Kristopher's hand, *see e.g.*, *id*. at 38:01:18; and finally, placing a hand on the back of Kristopher's head and neck for approximately 19 seconds, *see e.g.*, *id*. at 39:58:24-40:17:20.  This case is also distinguishable from *Drummond* based on the duration of the force used to restrain Kristopher.  In *Drummond*, the officers allegedly applied continuous pressure to the detainee's neck and back for over thirty minutes.  *See* CDCA Case No. 00cv243-AHS, Doc. No. 301 at 6.  In this case, the Deputy Defendants restrained Kristopher on the ground in a prone position for a total of

1    approximately seven minutes.  *See* KCV at 34:04:00-40:59:23.

2         In sum, *Drummond* does not squarely govern the specific facts of this case and

3    Plaintiffs have not identified, nor as the Court discovered, another controlling precedent

4    which does.  Accordingly, the Deputy Defendants are entitled to qualified immunity from

5    suit with respect to the force used to restrain Kristopher in a prone position.

6                      iii.  Conclusion

7         For the reasons set forth above, the Court concludes that the Deputy Defendants

8    are entitled to qualified immunity and therefore summary judgment in their favor as to

9    Plaintiffs' Fourth Amendment excessive force claim.

10             **b.  Fourth Amendment Medical Care Claim**

11        Next, the Deputy Defendants argue that they are entitled to qualified immunity

12   with respect to Plaintiffs' Fourth Amendment claim regarding the alleged denial of

13   medical care to Kristopher.  *See* DD Memo. at 27-29.  The Deputy Defendants assert that

14   medical care was properly and timely summoned in this case.  *See id.*  Plaintiffs respond

15   that "[i]t is objectively unreasonable to ignore an arrestee's rapidly deteriorating

16   condition" and therefore they are entitled to summary judgment in their favor on this

17   issue.  Ps Memo. at 73 (citing *Tatum*, 441 F.3d at 1099).

18                      i.  Relevant Law

19        Claims under the Fourth Amendment predicated upon a failure to administer

20   medical care to detainees are analyzed under the Fourth Amendment's objective

21   reasonableness standard.  *See Tatum*, *supra*, 441 F.3d at 1099.  The Ninth Circuit's

22   decision in *Maddox v. City of Los Angeles*, 792 F.2d 1408 (9th Cir. 1986), "sets the

23   standard for objectively reasonable post-arrest care."  *Id.* (citing *Maddox*, 792 F.2d at

24   1415).  As such, officers must "seek the necessary medical attention for a detainee when

25   he or she has been injured while being apprehended by either promptly summoning the

26   necessary medical help or by taking the injured detainee to a hospital."  *Maddox*, 792

27   F.2d at 1415.

28        Under this standard, "a police officer who promptly summons the necessary

medical assistance has acted reasonably for purposes of the Fourth Amendment, even if the officer did not administer CPR." *Tatum*, 441 F.3d at 1099 (quoting *Maddox*, 792 F.2d at 1415 ("We have found no authority suggesting that the due process clause establishes an affirmative duty on the part of police officers to render CPR in any and all circumstances.")).  "Just as the Fourth Amendment does not require a police officer to use the least intrusive method of arrest, . . . neither does it require an officer to provide what hindsight reveals to be the most effective medical care for an arrested suspect." *Id*. at 1098 (citing *Forrester*, *supra*, 25 F.3d at 807).

### ii.  Analysis

The undisputed facts demonstrate that dispatch requested SMFD paramedics at approximately 4:00:21 p.m., less than five minutes after Deputy Garza first deployed his Taser.  *See* McCorkell Decl. ¶¶ 4, 6.  By 4:01:18 p.m., the fire department had confirmed they were responding to the request.  *See id.* ¶¶ 11-13.  While the Deputy Defendants waited for SMFD paramedics to arrive at the scene, they administered two Naloxone doses and monitored Kristopher's pulse and breathing once they noticed that Kristopher had gone limp.  *See* Beatty Depo. at 7-:6-10; Carillo Depo. at 52:21-54:9, 55:13-57:21, 63:3-64:13, 70:1-72:22; Garza Depo. at 55:18-56:14; Winter Depo. at 48:10-49:25, 50:1-20; Fattahi Decl., Ex. HHH beginning at 22:30; Rossall Decl. ¶ 6.  Considering the evidence proffered by the Deputy Defendants, the record shows that the Deputy Defendants fulfilled their obligation of acting reasonably under the Fourth Amendment by "promptly summon[ing] the necessary medical assistance . . . ." *Tatum*, 441 F.3d at 1099; *see also Maddox*, 792 F.2d at 1415.

Plaintiffs have failed to raise a genuine issue of material fact regarding the reasonableness of the Deputy Defendants' conduct with respect to Kristopher's medical needs.  Plaintiffs argue that the Deputy Defendants hogtied Kristopher and increased the risk of harm to him by applying a spit sock and rolling Kristopher onto his stomach "even after he stopped breathing and became unresponsive."  Ps Memo. at 66.  However, the Court has already found that the Deputy Defendants' decision to place Kristopher in

1   maximum restraints was reasonable.  Their decision to apply a spit sock on Kristopher

2   was likewise reasonable, given that Kristopher spat.  *See* KCV at 36:26:00.  As for the

3   decision to roll Kristopher onto his stomach, Plaintiffs cite no evidence that the Deputy

4   Defendants recognized Kristopher had already stopped breathing prior to that decision.

5   Rather, the evidence in the record demonstrates that the Deputy Defendants were

6   monitoring Kristopher's breathing and pulse and noticed they were shallow and slow,

7   respectively, before making the decision to roll Kristopher onto his stomach.  *See* Beatty

8   Depo. at 7-:6-10; Carillo Depo. at 52:21-54:9, 55:13-57:21, 63:3-64:13, 70:1-72:22;

9   Garza Depo. at 55:18-56:14; Winter Depo. at 48:10-49:25, 50:9-15; Fattahi Decl., Ex.

10  HHH beginning at 22:30.  Further, the Deputy Defendants decided to briefly re-position

11  Kristopher to his stomach to reduce the handcuffs to one pair and pat him down in

12  preparation for releasing Kristopher to the SMFD paramedics.  *See* Rossall Decl. ¶ 6.

13      Deputy Rossall testified that the deputies were concerned that Kristopher would

14  awaken violently from the Naloxone dosage, a common occurrence; Kristopher was

15  awkwardly cuffed in two pairs of handcuffs, and therefore would have had greater range

16  of motion in SMFD paramedics' custody unless the handcuffs were reduced to one pair;

17  and the deputies up to this point still were not certain whether Kristopher had any

18  weapons on his person.  *Id*.  The deputies finished this process and re-positioned

19  Kristopher into recovery position and noticed his shallow breathing and slow pulse did

20  not change.  *See* Rossall Decl. ¶ 6; KCV beginning at 45:45:00; Beatty Depo. at 78:6-15;

21  Carillo Depo. at 72:16-22; Rossall Depo. at 65:6-13; Winter Depo. at 50:21-52:22;

22  Sherlock Depo. at 65:19-67:12.  Lastly, Defendants proffer uncontroverted evidence that

23  it would have been improper to initiate CPR with Kristopher merely having a weak pulse

24  or shallow breathing.  *See* DD Memo. at 29 (citing Sherlock Depo. at 65:19-67:12).

25      Plaintiffs further argue that the Deputy Defendants violated their training policies

26  while monitoring Kristopher by failing to perform rescue breathing.  However, the

27  deputies were not constitutionally obligated to administer rescue breathing pursuant to

28  the Ninth Circuit's holdings in *Tatum* and *Maddox*.  *See Tatum*, 441 F.3d at 1099 ("[A]

police officer who promptly summons the necessary medical assistance has acted reasonably for purposes of the Fourth Amendment, *even if the officer did not administer CPR*.") (emphasis added); *see also Maddox*, 792 F.2d at 1415 ("We have found no authority suggesting that the due process clause establishes an affirmative duty on the part of police officers to render CPR in any and all circumstances.").  In any event, "whether [Kristopher] was breathing when the paramedics arrived does not alter [the Court's] conclusion that [the Deputy Defendants] behaved reasonably for purposes of the Fourth Amendment."  *Tatum*, 441 F.3d at 1099 (citing *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 595 (7th Cir. 1997) (explaining that officer "who discovered [detainee] was not breathing is a fact of no consequence," in light of uncontroverted evidence that the officers continually monitored him)).  "[T]he critical inquiry is not whether the officers did all that they could have done, but whether they did all that the Fourth Amendment requires.  Here, the officers promptly requested medical assistance, and the Constitution required them to do no more."  *Id*.  Plaintiffs fail to meet their burden of producing affirmative evidence showing a genuine issue of material fact as to whether the Deputy Defendants failed to promptly summon or provide the requisite medical care for Kristopher.

Even if a reasonable jury could conclude that the Deputy Defendants provided inadequate medical care to Kristopher, the deputies are entitled to qualified immunity because no clearly established law provided them with notice that their conduct was unlawful.  As discussed above, *Tatum* and *Maddox* clearly reject the notion that an officer's failure to provide rescue breathing or CPR constitutes unreasonable conduct when the officer has promptly summoned the necessary medical assistance.

Plaintiffs rely on non-binding and inapposite authority to argue that the Deputy Defendants were on notice "that people in custody had a constitutional right to be free from deliberate indifference to their known medical needs."  Ps Memo. at 68.  The first case on which Plaintiffs rely is *Lolli v. Cty. of Orange*.  351 F.3d 410 (9th Cir. 2003).  *Lolli*, however, analyzed the medical needs claim under the Fourteenth Amendment's

"deliberate indifference" standard, not the Fourth Amendment's objective reasonableness standard. *See id*. at 418-19. Nevertheless, Plaintiffs' reliance on *Lolli* is unavailing for several reasons, the first of which is that Plaintiffs has not proffered any evidence of deliberate indifference towards Kristopher's medical needs, given their failure to meet the lesser standard of unreasonableness. Second, *Lolli* did not involve placing a detainee in maximum restraints or handcuffs. Rather, the case concerned a diabetic detainee in a holding cell who appeared ill and told the guards that he needed food for his condition. *Id*. at 420-21. The "clearly established law" prong of qualified immunity is satisfied only if "at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ("[E]xisting precedent must have placed the statutory or constitutional question beyond debate."). Thus, the Court cannot conclude that *Lolli* clearly defined a constitutional right for Kristopher to receive different treatment than the kind he received while secured in maximum restraints, since the facts in *Lolli* are distinguishable.

Plaintiffs' reliance on *Ostling v. City of Bainbridge Island*, 872 F. Supp. 2d 1117 (W.D. Wash. 2012), and *K.J.P. v. Cty. of San Diego*, No. 15-CV-02692, 2019 WL 1586739, at *15 (S.D. Cal. Apr. 12, 2019), is similarly misplaced. The former is an out-of-circuit case that cannot constitute clearly established law here, and the same is true for the latter, which is non-binding authority. In order for the law to be clearly established, "the prior precedent must be 'controlling'— from the Ninth Circuit or Supreme Court— or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." *Sharp v. Cty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017). Nor do Plaintiffs argue that these cases are embraced by a consensus of courts, and thus, the cases could not have provided notice to the Deputy Defendants that their conduct was unlawful.

### iii.  Conclusion

For the reasons set forth above, the Court concludes that the Deputy Defendants are entitled to qualified immunity and therefore summary judgment in their favor as to

1  Plaintiffs' Fourth Amendment medical care claim.

2            ***c. Fourteenth Amendment Familial Interference Claim***

3         The Deputy Defendants also move for summary judgment as to Plaintiffs'

4  Fourteenth Amendment familial association claim.  They argue that the claim is

5  duplicative of the Fourth Amendment survivorship claim, and in any event, their conduct

6  on the date in question did not rise to the level of a constitutional violation.  DD Memo.

7  at 29-31, n. 19.  Plaintiffs contend that the Deputy Defendants are not entitled to

8  summary judgment on this claim and request the Court "rule as a matter of law that the

9  proper standard for evaluating Plaintiffs' Fourteenth Amendment claim is deliberate

10  indifference, not purpose to harm."  Ps Memo. at 72.

11               i.  <u>Relevant Law</u>

12         The Fourteenth Amendment prohibits states from depriving "any person of life,

13  liberty, or property, without due process of law."  U.S. Const. amend. XIV § 1.  "Parents

14  and children may assert Fourteenth Amendment substantive due process claims if they

15  are deprived of their liberty interest in the companionship and society of their child or

16  parent through official conduct."  *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062,

17  1075 (9th Cir. 2013); *see also Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1079 (9th Cir.

18  2011) ("The substantive due process right to family integrity or to familial association is

19  well established.").  In the Ninth Circuit, the standard of culpability for a due process

20  right to familial association claim is whether the conduct at issue "shocks the

21  conscience."  *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008); *see also Gonzalez*

22  *v. City of Anaheim*, 747 F.3d 789, 797 (9th Cir. 2014).

23         To show a defendant's conduct shocks the conscience, a plaintiff must demonstrate

24  that the defendant either "acted with deliberate indifference" or with a "purpose to harm

25  . . . that was unrelated to legitimate law enforcement objectives," the latter requiring a

26  "more demanding showing."  *Porter*, 546 F.3d at 1137.  The deliberate indifference

27  standard applies "only when actual deliberation is practical."  *Cnty. of Sacramento v.*

28  *Lewis*, 523 U.S. 833, 851 (1998).  "On the other hand, where a law enforcement officer

makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). "Examples of such circumstances include chasing a fleeing suspect or responding to gunfire in crowded public spaces." *Tatum v. Moody*, 768 F.3d 806, at 821 (9th Cir. 2014).

ii. <u>Analysis</u>

As an initial matter, the Ninth Circuit has previously stated that "[r]ecovery for a violation of the right to familial association is generally contingent on the existence of an underlying constitutional violation." *Schwarz v. Lassen Cty. ex rel. Lassen Cty. Jail*, 628 F. App'x 527, 528 (9th Cir. 2016) (citing *Gausvik v. Perez*, 392 F.3d 1006, 1008 (9th Cir. 2004)); *see also J.P. ex rel. Balderas v. City of Porterville*, 801 F.Supp.2d 965, 988 (E.D. Cal. 2011) ("Where a claim for interference with familial relationships is integrally predicated upon, or entwined with, other conduct that is alleged to be unconstitutional, a finding that the other conduct was constitutional generally will preclude recovery for interference with familial relationship."). Because the Court has determined that the Deputy Defendants did not violate Kristopher's Fourth Amendment rights, Plaintiffs' Fourteenth Amendment claim fails as a matter of law.

Even assuming the existence of an underlying Fourth Amendment violation, this is not a case where "the circumstances [we]re such that actual deliberation" by the deputies was "practical." *Wilkinson*, 610 F.3d at 554 (quoting *Porter*, 546 F.3d at 1137). In other words, no reasonable jury could conclude that "the circumstances allowed the [deputies] time to fully consider the potential consequences of their conduct." *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 373 (9th Cir. 1998). The video evidence makes clear that this is not a case where law enforcement officers committed an "obviously and easily detectable mistake . . . that they had time to detect and correct," such that a deliberate indifference standard should apply. *Porter*, 546 F.3d at 1139. Deputy Garza had only a matter of seconds to react when Kristopher resisted being

1   handcuffed.  *See* KCV at 30:18:75-30:21:65.  When Deputy Robledo arrived on the

2   scene, he observed Deputy Garza engaged in a physical altercation with Kristopher and

3   had minimal time in which to react to an escalating and potentially dangerous situation.

4   *See id*. beginning at 31:14:00.  When Deputies Kodadek and Stalzer arrived, they

5   observed Kristopher struggling and resisting against the restraint of both Deputies Garza

6   and Robledo, as well as several civilians.  *See id*. beginning at 33:55:00.  Deputies

7   Beatty, Carrillo, Rossall, and Winter similarly arrived to see their fellow deputies

8   struggling to restrain Kristopher in the middle of a busy parking lot with civilians nearby.

9   These circumstances did not permit deliberation and there is no evidence in the record to

10   suggest that the Deputy Defendants acted "with only an illegitimate purpose in mind."

11   *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013) (citing *Porter*, 546 F.3d

12   at 1140).

13                   iii.  <u>Conclusion</u>

14          For the reasons set forth above, the Court concludes that the Deputy Defendants

15   are entitled to summary judgment in their favor as to Plaintiffs' Fourteenth Amendment

16   familial association claim.

17          ***d.  Municipal Liability***

18          Plaintiffs allege that the County Defendants are liable under Section 1983 and

19   *Monell v. New York City Dept. of Social Servs.*, *supra*, on the grounds that "they (A)

20   failed to train deputies how to deal with the recurring scenario of restraining a disoriented

21   person without asphyxiating them, and (B) distributed spit socks to all deputies without

22   training them on their own policy or warning that they could restrict breathing when

23   saturated with fluids."  Doc. No. 72 ("Ps Opp.") at 1.[28]  The County Defendants move for

24   summary judgment in their favor on Plaintiffs' federal municipal liability claim on a

25   variety of grounds.  As relevant here, the County Defendants argue that Plaintiffs fail to

26   establish the necessary predicate violation of their constitutional rights by a county

27   _____

28   [28] This citation and the following citation refer to the pagination assigned by the documents' authors.

1  employee.  *See* Doc. No. 54-1 ("CDs Memo.") at 12.

2         i.  <u>Relevant Law</u>

3        Municipalities may "be held liable only when an injury was inflicted by a city's

4  'law-makers or by those whose edicts or acts may fairly be said to represent official

5  policy.'"  *Delia v. City of Rialto*, 621 F.3d 1069, 1081 (9th Cir. 2010).  "In limited

6  circumstances, a local government's decision not to train certain employees about their

7  legal duty to avoid violating citizens' rights may rise to the level of an official

8  government policy for purposes of § 1983."  *Connick v. Thompson*, 563 U.S. 51, 61

9  (2011).  The policy or custom requirement "distinguish[es] acts of the municipality from

10  acts of the employees."  *Delia*, 621 F.3d at 1081.  "Thus, in order to establish an official

11  policy or custom sufficient for *Monell* liability, a plaintiff must show a constitutional

12  right violation resulting from (1) an employee acting pursuant to an expressly adopted

13  official policy; (2) an employee acting pursuant to a longstanding practice or custom; or

14  (3) an employee acting as a final policy maker."  *Id.* (citations omitted).

15        ii.  <u>Analysis</u>

16        It is well-established that a public entity cannot be held liable where there is no

17  underlying constitutional violation by its employees.  *See Long*, *supra*, 511 F.3d at 907

18  (citing *Heller*, *supra*, 475 U.S. at 799) (holding that where there was no constitutional

19  violation of plaintiff Long's rights by the defendant officers, there was "no basis for

20  finding the officers inadequately trained" to establish liability under *Monell*).  Here, the

21  County Defendants "were sued only because they were thought legally responsible for

22  [the Deputy Defendants'] actions; if the latter inflicted no constitutional injury on

23  [Kristopher or the Plaintiffs], it is inconceivable that [the former] could be liable to

24  [Plaintiffs]."  *Heller*, 475 U.S. at 799.

25        Because the Court finds as a matter of law that the Deputy Defendants' conduct in

26  this case did not deprive Kristopher or Plaintiffs of a constitutional right, the County

27  Defendants may not be held liable for the events leading up to Kristopher's death.  *See*

28  *Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994) ("[T]here was no violation of the

decedent's constitutional rights, and thus no basis for finding the officers inadequately trained. Scott's claims against the municipal defendants must therefore be dismissed."). As such, the County Defendants are entitled to summary judgment.

### iii. Conclusion

For the reasons set forth above, summary judgment in favor of the County Defendants at to Plaintiffs' federal claim for municipal liability is appropriate.

### e. *State Law Claims*

Because Defendants are entitled to summary judgment in their favor as to Plaintiffs' federal claims, those claims are subject to dismissal. As such, the Court in its discretion declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims. *See* 28 U.S.C. § 1367(c)(3); *see also Carnegie– Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988) ("[I]n the usual case in which federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."); *San Pedro Hotel Co. Inc., v. City of L.A.*, 159 F.3d 470, 478-79 (9th Cir. 1998) (holding district court need not explain dismissal of state claims where it is based on the dismissal of all claims over which the district court has original jurisdiction).

### CONCLUSION

Based on the foregoing, the Court **GRANTS** the Deputy Defendants' and County Defendants' motions for summary judgment and **DENIES** Plaintiffs' cross-motion for summary judgment. The Court **DISMISSES** Plaintiffs' federal claims **with prejudice**. The Court **DECLINES** to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims and **DISMISSES** those claims **without prejudice**. The Court **DIRECTS** the Clerk of Court to enter judgment accordingly and close the case.

**IT IS SO ORDERED**.

DATE: October 1, 2020

HON. MICHAEL M. ANELLO
United States District Judge